# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 287 | **DATE** | 9/9/2004 |
| **CASE TITLE** | In re Motorola Securities Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The court regrets its error and apologizes to counsel. Enter attached Amended Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **13** number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 10 2004 date docketed | |
| | Notified counsel by telephone. | | | **89** |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/25/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT 2004 SEP -9 PH 3:26 Date/time received in central Clerk's Office | ETV mailing deputy initials | |



| | | |
|---|---|---|
| IN RE MOTOROLA SECURITIES LITIGATION | ) ) ) ) | No. 03 C 287 Judge Rebecca R. Pallmeyer |

## AMENDED MEMORANDUM OPINION AND ORDER

The Investment Division of the New Jersey Department of Treasury, Lead Plaintiff in this consolidated action ("Lead Plaintiff"), has filed this federal securities class action lawsuit on behalf of all "persons and entities that purchased" Motorola, Inc. ("Motorola") common stock and debt securities between February 3, 2000 and May 14, 2001 (the "Class Period"). Defendant Motorola has substantial national and international operations in the telecommunications, electronics, computer, and satellite communications industries. Defendants Christopher Galvin, Robert Growney, and Carl Koenemann (the "Individual Defendants") are former officers of Motorola. Lead Plaintiff alleges that Defendants engaged in a fraudulent scheme to inflate the price of Motorola securities by recognizing over $1 billion in revenue on 100% vendor-financed sales of equipment, services, and infrastructure to Telsim Mobil Telekomunikayson Hizmetleri A.S. ("Telsim"), a Turkish mobile telecommunications company, in violation of generally accepted accounting principles ("GAAP"). Plaintiff claims that these actions violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA" or the "Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Defendants move to dismiss the complaint for failure to comply with the pleading requirements of FED. R. CIV. P. 9(b) and 11 and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq. For the reasons set forth here, Defendants' motion to dismiss is granted in part and denied in part.



## FACTUAL BACKGROUND

**I.    Defendants**

According to Lead Plaintiff's Complaint, approximately 2.3 billion shares of Motorola common stock, traded on the New York Stock Exchange, were outstanding as of September 28, 2002. (Cmplt. ¶ 26.)[1] Defendant Christopher Galvin ("Galvin") became Motorola's Chief Executive Officer on January 1, 1997, and was named Chairman of the company's Board of Directors in June 1999. (*Id.* ¶ 32.) On September 19, 2003, Motorola announced that Galvin had resigned, primarily because he had lost the confidence of Motorola's Board. (*Id.*) Defendant Carl Koenemann ("Koenemann"), who served as Motorola's Executive Vice President-Finance and Chief Financial Officer from 1991 until his retirement on April 17, 2002, was responsible for the company's financial reporting during the Class Period. (*Id.* ¶ 34.) Defendant Robert Growney ("Growney") was Motorola's Chief Operating Officer from January 1, 1997 until his retirement on March 31, 2002. (*Id.* ¶ 35.)

By virtue of their positions as officers of Motorola, Individual Defendants controlled the contents of the Company's annual and quarterly reports filed with the SEC, proxy statements, and press releases. (*Id.* ¶ 37.) During the Class Period, Individual Defendants allegedly "caused the material misstatement of the Company's financial condition." (*Id.*) Individual Defendants were aware of the contents of the Company's press releases and SEC filings alleged to be misleading and could have, but failed to, prevent their issuance. (*Id.*)

---

[1]    The factual assertions in Lead Plaintiff's Complaint are drawn from "an extensive investigation of counsel," including a review of Defendants' public filings to the Securities and Exchange Commission, press releases issued by Motorola, media reports, news articles, academic studies and reports, securities and debt analysts' reports, internet postings concerning Motorola, transcripts and recordings of conference calls between Motorola representatives and "the investment community," price and volume data concerning Motorola securities, and documents filed with the United States District Court for the Southern District of New York in *Motorola Credit Corp. v. Uzan*, 02 Civ. 666(JSR) (discussed below). (Cmplt. ¶ 3.)

Motorola managed the Telsim relationship "through its most senior corporate officers." These officers included: Keith Bane ("Bane"), Executive Vice President and President for Global Strategy and Corporate Development; Merle Gilmore ("Gilmore"), Executive Vice President and President for Communications Enterprise; Ed Hughes ("Hughes"), Motorola's Senior Vice President and Director of Finance for Motorola's Global Customer Solutions; and Walter Keating ("Keating"), Vice President and a Director of Motorola Credit Corporation ("MCC"), a wholly-owned credit subsidiary of Motorola. Both Bane and Gilmore reported directly to Galvin and Growney during the Class Period. Hughes, who reported directly to Bane during the Class Period, "was intimately involved on a daily basis with the Telsim financing." Keating "was the primary person at MCC responsible for the Telsim relationship." (*Id.* ¶ 39.) The Complaint further alleges that Individual Defendants were "actually aware of and received reports about the financing provided to Telsim and the potential problems associated with Telsim's inability to pay Motorola back." (*Id.* ¶ 241.)

In 1994, Motorola's share of the United States market for cellular telephones was 60%. (*Id.* ¶ 51.) As competition in the cellular telephone increased, however, at an unspecified time Motorola "made a serious miscalculation" by investing in a new line of phones that used analog technology,[2] while its competitors offered phones employing the more popular digital technology. (*Id.*) By 1998, Motorola's market share in cellular phones (presumably also in the United States) had dropped to 34%; by the end of the Class Period, that market share was only 13%. (*Id.*) Between 1994 and

---

[2]     Although the Complaint does not define the term "analog technology," the court understands that analog technology involves transmission of voice data via radio waves to a receiving antenna, usually mounted on a tower, pole, or other high structure. With digital technology, on the other hand, the caller's voice is broken up into binary digits that correspond with various sounds at different points in time. By avoiding the amplification process, digital telecommunications avoid problems with background noise, resulting in a much clearer signal. Digital technology also reduces the strain on the cellular infrastructure by compressing voice signals, thereby eliminating natural pauses and increasing calling capacity. *See* Stephanie E. Niehaus, Note, *Bridging the (Significant) Gap: To What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service?*, 77 NOTRE DAME L. REV. 641, 648-649 (2002).

1996, Motorola's market share in wireless infrastructure equipment also declined by an unspecified amount due to faulty products and service. (*Id.* ¶ 52.)

In 1995, Motorola Board members declined to appoint Galvin as CEO[3] because "he lacked a technical background and was too young (43)." (*Id.* ¶ 53.) For reasons not specified, on January 1, 1997, the Board did make Galvin CEO. (*Id.* ¶ 54.) Galvin knew his status was tenuous and that some Board members did not believe he was the best possible candidate for CEO. (*Id.* ¶ 55.) In an effort to disprove his detractors, on an unspecified date Galvin "set high goals for Motorola." (*Id.*) Galvin "knew that his performance would be judged by whether or not he could achieve those goals." (*Id.*) A May 4, 1999 *Business Week* article stated that Motorola officials indicated that Galvin had "set a hurdle of 15% to 20% revenue growth," which he expected to achieve within the next one to two years. (*Id.* ¶ 55.)

For 1998, Motorola reported a 1% decline in revenue from the previous year. (*Id.* ¶ 57.) During 1998, "Motorola's management was the subject of repeated criticism for its lack of leadership." (*Id.* ¶ 58.) Between 1996 and 1998, Motorola "developed a reputation for missing analysts' earnings expectations." (*Id.* ¶ 59.) Specifically, on the September 12, 1997 episode of the CNBC program "The Money Club," correspondent Scott Cohn reported that Motorola's quarterly results had consistently missed Wall Street's expectations since 1989 by an average of 10 percent. (*Id.*)

Lead Plaintiff alleges that Defendants were motivated to take steps that would boost Motorola's share price, even by artificial or improper means. First, Defendants were aware that failing to meet Wall Street's expectations would have a "devastating effect" on Motorola's stock price and on their own careers. Second, Motorola stock had declined significantly when the

---

[3] The Complaint does not state whether Galvin was seeking appointment as CEO, or what position he held, at that time.

company had missed earnings expectations. Third, Defendants knew that Motorola would lose reported revenue if it ceased extending credit and doing business with Telsim, as explained below.

The Complaint also alleges that Individual Defendants were motivated to engage in fraud by the prospect of receiving large bonuses. Prior to and during the Class Period, Motorola maintained a "very generous incentive-based compensation program" for Individual Defendants based on Motorola's achieving certain operating and stock performance objectives. (*Id.* ¶ 248.) In early 2000, Motorola provided Individual Defendants with the following compensation in addition to their base salaries. Motorola granted Galvin a $1.9 million cash bonus, 900,000 stock options, and $13,153,000 in restricted stock awards. (*Id.* ¶ 249.) For Growney, the Company provided a $1.2 million cash bonus, 825,000 stock options, and $11,837,000 in restricted stock awards. (*Id.* ¶ 250.) Motorola gave Koenemann a $500,000 cash bonus and 330,000 stock options. (*Id.* ¶ 251.) Motorola's March 22, 2000 Proxy Statement (for 1999) indicated that these stock options and restricted stock awards were granted "in recognition of their successful efforts to significantly improve the Company's performance during 1999 and to provide them with strong incentive to increase the value of the Company during their employment." (*Id.* ¶ 254.) Based on Motorola's 2000 operating and stock performance, in early 2001, Motorola provided Individual Defendants with cash bonuses in the following amounts: $1.25 million to Galvin, $875,000 for Growney, and $450,000 to Koenemann. (*Id.* ¶ 256.)

## II. Motorola Relationship with Telsim Prior to Class Period

In 1993, Turkish businessman Kemal Uzan, his sons Hakan and Cem, and various members of his immediate family (collectively, the "Uzans") formed Telsim. (Cmplt. ¶¶ 5, 62.) The Uzans structured Telsim so that another of their companies, Rumeli Telefon Sistemleri A.S. ("Rumeli Telefon"), held the majority of Telsim's stock. (*Id.* ¶ 62.) Also in 1993, Telsim obtained

5

a license from the Turkish government to provide cellular telephone service in Turkey. (*Id.* ¶ 63.) In 1994, the Uzans launched Telsim's operations. (*Id.*)

On November 29, 1994, Motorola Limited, Motorola's British subsidiary, entered into an agreement to provide cellular infrastructure equipment to Telsim, which paid for the equipment in part with a series of promissory notes in the amount of $52.5 million. (*Id.* ¶ 65.) On April 24, 1998, Defendant Motorola, Inc. and Telsim entered into two agreements (collectively, the "Agreements"). The first was an Equipment Financing and Security Agreement (the "Equipment Financing Agreement"), in which Motorola expanded the amount of credit available to Telsim to $360 million for the purchase of Motorola equipment (the outstanding $52.5 million promissory notes were rolled into this agreement). The second was a License Financing Agreement, in which Motorola agreed to loan Telsim $200 million to purchase cellular licenses from the Turkish government. (*Id.* ¶ 66.) These Agreements were intended to enable Telsim "to build-out a Turkish cellular network utilizing state of the art Global System for Mobile Telephony 900 technology." (*Id.* ¶ 67.)[4] The Agreements required the parties to arbitrate any disputes in Switzerland. (*Id.* ¶ 71.)

Also on April 24, 1998, MCC entered into a Share Pledge Agreement with Telsim in which Telsim granted Motorola a security interest in 51% of Telsim's total outstanding capital stock. (*Id.* ¶¶ 31, 76.) Telsim's stock was neither publicly-traded nor marketable, however, and thus the value of Telsim stock depended upon Telsim's cash flow and profits. (*Id.* ¶ 76.) Further, the Share Pledge Agreement required Motorola to wait one year after obtaining judgment from a Swiss arbitrator before liquidating such shares. (*Id.* ¶ 77.)

On May 14, 1998, Motorola's stock was trading at approximately $19 per share. On that date, Motorola issued a press release announcing that it had reached a $500 million sales agreement to supply Telsim with Global System for Mobile communications ("GSM") equipment

---

[4] The Complaint does not define the term "Global System for Mobile Telephony 900 technology."

to enhance Telsim's network in Turkey. The press release also stated that, on April 27, 1998, Telsim paid a $500 million license fee to the Turkish government for the right to operate a GSM network for 25 years. The press release did not mention that Motorola had loaned Telsim $560 million pursuant to the Agreements. (*Id.* ¶ 78.)

On August 19, 1998, Motorola agreed to loan $77,331,369.00 to L.L.P. KaR-Tel ("KaR-Tel"), a telecommunications company in Kazakhstan affiliated with the Uzans, to enable the company to develop a cellular system in Kazakhstan. (*Id.* ¶ 80.) Telsim guaranteed KaR-Tel's obligations under the loan agreement. (*Id.* ¶ 81.) Lead Plaintiff claims the repayment date for that loan was extended several times, ultimately to April 30, 2001. (*Id.* ¶ 82.)

On an unspecified date, Motorola provided "billions of dollars in equity, debt and vendor financing" to Iridium LLC, a provider of satellite mobile telecommunications service.[5] On August 13, 1999, Iridium declared bankruptcy. Lead Plaintiff alleges that "Motorola's dealings with Iridium cost Motorola approximately $4 billion." As a result of the Iridium collapse, in and around August 1999 Defendants were subjected to "much criticism from the media and investment community." (*Id.* ¶ 87.)

On August 19, 1999, Motorola loaned Telsim an additional $123 million under the Equipment Financing Agreement to enable Telsim to buy additional equipment and services from Motorola, thereby increasing the total loan amount under the two Agreements to $683 million. (*Id.* ¶¶ 86-87.) Defendants[6] "knew, by virtue of their relationship with the Uzans, that if Motorola

---

[5]    The Complaint does not state whether Iridium, LLC operated internationally. The court notes that Motorola formed Iridium, Inc., as a wholly owned subsidiary in 1991, and that in 1996, after others invested, Iridium, Inc. was merged into a newly created Delaware limited liability company, Iridium LLC. In December 1997, Iridium LLC's assets were transferred to Iridium Operating LLC, a Delaware limited liability company wholly owned by Iridium LLC. *Chase Manhattan Bank v. Motorola, Inc.*, 136 F. Supp. 2d 265, 266 (S.D.N.Y. 2001).

[6]    The Complaint does not specify which Defendants allegedly knew this. The court presumes throughout this opinion that the term "Defendants" in the Complaint refers collectively to all Defendants.

ceased financing Telsim the $560 million in previous loans would go into default," and were "anxious to avoid public disclosure" of any such default due to their nearly contemporaneous difficulties with Iridium. (*Id.* ¶ 87.)

In August and November 1999, Turkey suffered two devastating earthquakes that killed more than 17,000 people and decimated the Marmara area, which accounted for one-third of the Turkish economy. (*Id.* ¶ 83.) On an unspecified date, an unnamed individual or entity estimated that repairs would cost between $5 billion and $7 billion. (*Id.*) These earthquakes "compounded an already deepening economic crisis in Turkey." (*Id.*) On an unspecified date following the earthquakes, an unnamed governmental body levied an additional 25% tax on cell phone usage. (*Id.* ¶ 84.) On an unspecified date, an unnamed individual or entity predicted that the Turkish population would make 30% fewer cell phone calls as a result of that tax increase. (*Id.*) This tax had "a negative effect on Telsim's ability to generate cash flow." (*Id.*) Following the August 1999 earthquake, Mark Atkins, a Motorola executive (the Complaint does not identify his position) who "worked closely on the Telsim relationship," and other unidentified Motorola executives, "acknowledged Telsim's inability to pay." (*Id.* ¶ 85.)[7] At unspecified dates, Telsim lodged "ongoing complaints and reported problems with equipment provided by Motorola." (*Id.*) According to Lead Plaintiff, such complaints created "a situation where Telsim would refuse to pay on the grounds the receivables related to defective equipment." (*Id.*) The court infers that such complaints were a sham, lodged to create an excuse for nonpayment.

In meetings held September 1, 3, and 7-10, 1999, Hakan Uzan represented to Motorola officers, including Vice Presidents Ed Hughes and Walter Keating, that Telsim would cooperate in seeking from Deutsche Bank financing that would be guaranteed by the United Kingdom's Export Guarantee Credit Department ("ECGD"), which promotes exports to developing countries by

---

[7]    The Complaint does not state to whom or in what context these executives acknowledged this.

providing insurance, loan guarantees, and other assistance. (*Id.* ¶ 89.) In reliance on these representations, on September 19, 1999, Motorola provided an additional $200 million loan to Telsim pursuant to the Equipment Financing Agreement, including $35 million in working capital and $165 million for unspecified equipment, bringing the total loan amount under the Agreements to $883 million. (*Id.* ¶¶ 90-91.) According to Lead Plaintiff, Motorola extended this additional loan in order (1) "to secure the sale of an additional $165 million in Motorola equipment to Telsim," and (2) to prevent Telsim from defaulting on its prior outstanding debt. (*Id.* ¶ 92.)

In September 1999, unnamed Motorola employees introduced Hakan Uzan to Deutsche Bank representatives. (*Id.* ¶ 94.) For several months afterward, however, when Deutsche Bank representatives visited Telsim's offices attempting to review its financial records, Telsim employees denied the representatives access. (*Id.*) In one such incident in the fall of 1999, a Telsim employee accused a Deutsche Bank analyst of taking a Telsim financial document without permission. (*Id.*) That evening, Hakan Uzan presented Keating and Hughes with sworn statements from Telsim employees documenting the alleged incident; Mr. Uzan refused to permit Deutsche Bank officials any further access to Telsim's offices. (*Id.*) Keating and Hughes themselves did not find the allegations to be credible. (*Id.* ¶ 96.) The complaint alleges that Mr. Uzan manufactured this incident as an excuse to keep Deutsche Bank from reviewing Telsim's financial records and to avert the heightened oversight of its financial dealings that financing from ECGD would have entailed. (*Id.* ¶ 95.) Deutsche Bank and ECGD refused to provide financing to Telsim. (*Id.* ¶ 96.) Lead Plaintiff alleges that on numerous occasions during an unspecified two-year period during the course of Motorola's relationship with Telsim, the Uzans similarly failed to comply with requests by Keating and Hughes for financial statements and other records from Telsim. (*Id.* ¶ 98.)

Beginning in October 1999, an unnamed individual from Telsim represented to an unnamed Motorola employee that two European telecommunications companies had expressed interest in

acquiring or making minority investments in Telsim, and that these investments would enable Telsim to repay its loans from Motorola in full. (*Id.* ¶ 101.) In December 1999, an unidentified Telsim employee represented to an unnamed individual at Motorola that an additional $450 million loan from Motorola would better position Telsim to sell a minority interest in itself. (*Id.*) Without conducting any due diligence, Motorola entered into a Memorandum of Understanding with Telsim on December 22 and 23, 1999 in which it agreed to provide Telsim with an additional $125 million in financing for "working capital" and $325 million for the purchase of infrastructure equipment and handsets. (*Id.* ¶¶ 102-04.) Telsim and Rumeli Telefon (which, as noted, was controlled by the Uzans and which owned the majority of Telsim's stock) agreed to increase MCC's security interest in Telsim's total outstanding capital stock from 51% to 66%. (*Id.* ¶ 105.) As with the September 19, 1999 loan increase, Lead Plaintiff claims that Motorola extended this additional loan in order (1) "to secure an additional $325 million in reported revenues during the fourth quarter of 1999," and (2) to prevent Telsim from defaulting on its prior outstanding debt. (*Id.* ¶ 108.)

For fiscal year 1999,[8] Motorola recognized a total of $613 million in revenue on sales of goods and services to Telsim. (*Id.* ¶ 109.) The court presumes this $613 million in revenue is precisely equal to the amounts Motorola loaned to Telsim: $123 million for the August 19, 1999 equipment financing extension; $165 million for the September 19, 1999 loan; and $325 million for the December 22-23, 1999 credit increase. Motorola and Telsim did not amend the Equipment Financing Agreement to reflect that Telsim's total indebtedness to Motorola had increased to $1.333 billion, however, until February 1, 2000. (*Id.* ¶¶ 106-07.) Following this December 1999 loan increase, "in recognition of the grave risks continued financing to Telsim presented," an unidentified Motorola official or officials "strongly encouraged Telsim to seek additional and alternate sources of both equity and debt financing." (*Id.* ¶ 110.)

---

[8]     The court presumes Motorola observes a January through December fiscal year.

In December 1999, Telsim retained Merrill Lynch to pursue an equity investment or sale of its business. (*Id.* ¶ 112.) As part of this effort, dubbed "Project Skyy," Merrill Lynch prepared a prospectus that was reviewed by six European telecommunications companies: Deutsche Telekom, Mannesmann Eurokom (both of which are German companies), Vodafone (British), Telia A.B. (Swedish), Orange (British), and Telecom Italia (Italian). (*Id.*) Based on their review of the prospectus and "recognizing the inherent problems with the Uzans, the Turkish economy and Telsim's cash flow, none of the six companies pursued further financing or investment transactions involving Telsim." (*Id.*)

At an unspecified time, Telsim undertook "Project Storm," in which it worked with Chase Securities to evaluate the possibility of a public offering of Telsim debt in Turkey. (*Id.* ¶ 115.) As with Project Skyy, Telsim received no financing as a result of Project Storm. (*Id.*) Lead Plaintiff urges that, had Defendants inquired about the status of Project Storm, "they would have learned that these financing efforts were illusory." (*Id.* ¶ 116.)

III.    **Motorola Relationship with Telsim and Public Statements During Class Period**

        A.      **February 3, 2000 Press Release**

On February 3, 2000, Motorola issued a press release stating that Motorola and Telsim "have today announced the signing of a contract worth $1.5 billion to provide infrastructure, handsets and associated services in order to expand the countrywide [GSM] network." (*Id.* ¶ 118.) Motorola's shares closed on that date at $50.92 per share, up from $48.21 the day before. (*Id.* ¶ 119.) According to Lead Plaintiff, "Individual Defendants were responsible for the content and publication of the February 3, 2000 press release in that they reviewed and approved it." (*Id.* ¶ 120.) This press release was "archived and maintained on Motorola's web site." (*Id.*) A March 4, 2000 article in *The Times* of London pointed to this announcement as evidence of "the turnaround in Motorola's cellular infrastructure business." (*Id.* ¶ 121.)

Lead Plaintiff claims the February 3, 2000 press release was false and misleading on several grounds. First, no agreement was entered into on or about February 3, 2000 providing for Telsim to purchase $1.5 billion in equipment, service, and infrastructure from Motorola. Second, the press release failed to disclose the $1.333 billion prior financing provided to Telsim "for which collection was gravely in doubt." Third, no mention was made that Telsim was at that point "in breach of the [Agreements] by refusing to provide Motorola with Telsim's financial statements or other records." Fourth, the press release did not disclose that "Telsim had inadequate cash flow and no access to capital markets to be able to purchase additional equipment, services, or infrastructure from Motorola, and that any such purchases would have to be made through additional, risky vendor financing provided by Motorola." Fifth, the press release did not mention that "the entire amount of the contract"[9] was contingent upon Motorola's providing 100% financing for the equipment purchased and additional financing for Telsim in the form of "working capital." Finally, the press release did not reveal that the sole collateral for Telsim's obligations was shares in Telsim itself, which were "both illiquid and of uncertain value," that any dispute between the parties would have to be resolved through arbitration in Switzerland, and that any arbitral award would have to be enforced in Turkey. (*Id.* ¶ 122.)

## B.  March 22, 2000 Proxy Statement and 1999 Form 10-K

On March 22, 2000, Motorola filed with the SEC its 1999 Form 10-K,[10] which was signed by Individual Defendants and incorporated by reference the Company's audited financial statements and notes and the "Management Discussion and Analysis" ("MD & A") section of the Company's Proxy Statement. (*Id.* ¶ 124.) In its Proxy Statement, filed with the SEC on the same

---

[9]  It is not clear to which of the Motorola-Telsim contracts Lead Plaintiff is referring here.

[10]  The purpose of a Form 10-K is to provide investors with a comprehensive overview of a company's business and financial condition. *See* http://www.sec.gov/answers/form10k.htm.

date, Motorola reported $30.93 billion in net sales, $817 million in net income, and earnings per share of $1.31. (*Id.* ¶ 125.) The MD & A section of the Proxy Statement acknowledged Motorola's involvement in vendor financing generally, but did not mention Telsim specifically:

> Purchasers of the Company's infrastructure equipment continue to require suppliers to provide long-term financing in connection with equipment purchases. Financing may include all or a portion of the purchase price and working capital. . . . During 1999 the Company significantly increased the amount of customer financing provided by its consolidated financing subsidiary. . . . The Company expects that the need to provide this type of financing . . . will continue and may increase in the future.

(*Id.* ¶ 126.) The Proxy Statement noted that MCC, Motorola's wholly-owned finance subsidiary, was "engaged principally in financing long-term receivables arising out of equipment sales made by the Company to customers throughout the United States and internationally." The Proxy Statement also reported that $1.7 billion of Motorola's $11.58 billion in "other assets" were "long-term finance receivables." (*Id.* ¶ 127.) Defendants "put additional pressure" on themselves by predicting in the Form 10-K and Proxy Statement that "[s]ales are expected to grow at a rate higher than the 1999 growth rates due primarily to strong demand for wireless telephones." (*Id.* ¶¶ 129-130.)

Lead Plaintiff claims the statements in the March 22, 2000 Form 10-K and Proxy Statement were false and misleading for two of the reasons identified regarding the February 3, 2000 press release: Telsim had breached the Agreements; and Telsim had inadequate cash flow and lack of access to capital markets. Lead Plaintiff further urges the Form 10-K and Proxy Statement were false and misleading on several additional grounds, as well. First, for reasons that are unclear, Motorola delayed finalizing its December 1999 commitment to provide Telsim with an additional $450 million in vendor financing until February 1, 2000 to avoid having to disclose that financing in the Form 10-K and Proxy Statement. Although Lead Plaintiff does not so state, the court presumes Lead Plaintiff points to this delay as evidence that the March 22 filings were false because, as noted, Motorola recognized $325 million for the December 22-23, 1999 credit increase

for fiscal year 1999. Second, the $450 million increased vendor financing commitment to Telsim meant that Motorola failed to disclose that $1.333 billion of its $2.153 billion in total vendor financing, or 62%, as of December 31, 1999 was concentrated in a single customer, *i.e.*, Telsim. Third, Defendants' reported "other assets" were "artificially inflated" by the inclusion of the $833 million in assets provided to Telsim through vendor financing, as those assets were assertedly "impaired." Fourth, Defendants "failed to disclose the concentration of and risks associated with the vendor financing to Telsim." Fifth, Defendants' financial statements did not conform to GAAP (discussed below). Sixth, Defendants did not disclose that Telsim had not repaid any of the financing Motorola had provided and "it was highly improbable that Telsim would be able to pay Motorola back for the amounts already borrowed." Finally, Motorola's reported overall net sales, and sales for two of its business segments, for fiscal year 1999 were "artificially inflated" as that figure included the $613 million in revenue on 100% vendor-financed sales of goods and services to Telsim for which collection "was not reasonably assured" and, in any event, payment for these goods and services was not required for one year after shipment. (*Id.* ¶ 128.)

### C.    Nokia Vendor Financing

In March 2000, Finnish telecommunications manufacturer Nokia Oyj ("Nokia") provided Telsim with $800 million worth of vendor-financed switching equipment. (*Id.* ¶ 131.) As collateral, Nokia received a stock pledge for 7.5% of the outstanding shares of Telsim. (*Id.* ¶ 132.) At this point, then, 73.5% of Telsim's equity was pledged as collateral to Motorola and Nokia. (*Id.*) During the summer of 2000, unnamed Nokia officials contemplated "buying out Telsim's debt to Motorola and becoming Telsim's sole partner." (*Id.* ¶ 134.) Nokia never consummated this transaction, however, because it recognized "the enormous economic risks" inherent in Telsim's $1.33 billion debt to Motorola. (*Id.*)

D.     **March 24, 2000 Press Statement**

On March 24, 2000, Motorola denied a report in the Turkish newspaper *Hurriyet* on an unspecified date that Telsim was having difficulty paying Motorola. (*Id.* ¶ 135.)[11] According to Lead Plaintiff, "Defendants' reported denial was materially false and misleading in that Telsim was in fact unable to repay Motorola and continually had to increase its indebtedness to Motorola, and subsequently incur debt to Nokia, to support its operations." (*Id.* ¶ 136.) On March 24, 2000, Motorola's common stock closed at $54.52 per share. (*Id.* ¶ 137.)

E.     **April 10, 2000 Press Releases and First Quarter 2000 Form 10-Q**

On April 10, 2000, Motorola issued a press release[12] announcing $8.77 billion in net sales for the first quarter of 2000 (reflecting a 19% increase over the first quarter of 1999), net income of $448 million, and earnings per share of $0.59. (*Id.* ¶ 138.) Although Motorola stated in its consolidated balance sheet that it held $3.624 billion in "other assets," it did not disclose the amount of those assets attributable to vendor financing. (*Id.*) The press release stated that "[u]nder an agreement with Telsim, estimated to have a sales potential of at least $1.5 billion over three years, Motorola will provide infrastructure, handsets and associated services to expand the countrywide GSM network in Turkey." (*Id.* ¶ 139.) The complaint alleges that Galvin and Growney were quoted "throughout the . . . press release," although it does not identify the specific statements attributed to Galvin and Growney. (*Id.* ¶ 140.) Koenemann was responsible for the financial data reported in the press release. (*Id.*)

At an unspecified time, unidentified analysts projected, based on Motorola's February 3, 2000 press release, that Motorola would report earnings of $.70 per share for the second quarter

---

[11]     The Complaint does not specify in what forum Motorola denied the report.

[12]     Lead Plaintiff alleges that Defendants "caused Motorola" to issue this press release. As Defendants consist of three individuals and the corporation itself, the court understands Plaintiff to mean that the three individual Defendants caused Motorola to issue the press release.

of 2000. (*Id.* ¶ 141.) After the markets closed on April 10, 2000, "Motorola made public statements guiding analysts' [earnings per share] expectations for the second quarter of 2000 down three cents a share, from 70 cents to 67 cents a share." (*Id.* ¶ 144.) This three cent differential was "largely the result of [D]efendants' undisclosed knowledge concerning Telsim." (*Id.*) The Complaint does not explain how Motorola made statements that "guided" analysts' expectations downward, nor does it say whether they did so by disclosing aspects of the relationship between Motorola and Telsim. On April 11 and 12, 2000, the price of Motorola's common stock plunged from $50.33 per share to $38.625 per share at the close of April 12, 2000, due to Defendants' revised guidance as to Motorola's second quarter profitability. (*Id.* ¶ 145.)

Motorola's Form 10-Q[13] for the first quarter of 2000, which it filed with the SEC on May 16, 2000, reiterated and affirmed the financial results published in the April 10, 2000 press release. (*Id.* ¶ 147.) The Form 10-Q also stated that:

> The preparation of financial statements in conformity with generally accepted accounting principles requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(*Id.*) The Form 10-Q added that Motorola had "signed an agreement with Telsim, which is estimated to have a sales potential of at least $1.5 billion over three years. Under this agreement, the Company expects to provide infrastructure equipment, wireless phones and associated services to expand the countrywide GSM network in Turkey." (*Id.* ¶ 148.) Motorola again made

---

[13] The purpose of a Form 10-Q, which includes unaudited financial statements, is to provide investors with a continuing view of a company's financial condition during the year. *See* http://www.sec.gov/answers/form10q.htm.

no mention of its vendor financing to Telsim. (*Id.*) Motorola's common stock closed on May 16, 2000 at $32.73 per share. (*Id.* ¶ 149.)[14]

Lead Plaintiff claims that Motorola's first quarter 2000 Form 10-Q was false and misleading for many of the same reasons identified in relation to the Company's March 22, 2000 Form 10-K and Proxy Statement: Telsim had breached the Agreements; Telsim had inadequate cash flow and lack of access to capital markets; the Telsim contract[15] was 100% vendor-financed and Motorola provided additional financing in the form of "working capital"; assets provided to Telsim through vendor financing were "impaired"; Defendants failed to disclose the Telsim concentration and risks; Defendants' financial statements did not conform to GAAP; loan repayment was "highly improbable"; and collection of Telsim loan was not "reasonably assured." Lead Plaintiff further asserts these filings were false and misleading on several additional grounds. First, there was no signed agreement providing for Telsim to purchase $1.5 billion in equipment, service, and infrastructure from Motorola. Second, the filing failed to disclose the $1.333 billion prior financing provided to Telsim "for which collection was gravely in doubt." Finally, the form did not reveal that the sole collateral for Telsim's obligations was shares in Telsim itself, which were "both illiquid and of uncertain value," that any dispute between the parties had to be resolved through arbitration in Switzerland, and that any arbitral award would have to be enforced in Turkey. (*Id.* ¶ 150.)

**F.      July 12, 2000 Press Release and Second Quarter 2000 Form 10-Q**

After the financial markets closed on July 12, 2000, Motorola issued a press release[16] reporting $9.255 billion in net sales for the second quarter of 2000 (reflecting a 15% increase over

---

[14]      The Complaint states that Motorola's common stock closed at $32.73 per share on May 16, 2001, but the court presumes this is merely a scrivener's error.

[15]      Here, again, it is not clear to what contract Lead Plaintiff is referring.

[16]      See footnote 13.

the second quarter of 1999[17] and a 5.5% increase over the first quarter of 2000), net income of $204 million, and earnings per share of $0.09. (*Id.* ¶¶ 151-52.) Motorola reported in its consolidated balance sheet that it held $4.293 billion in "other assets," (*id.* ¶ 151); although the Complaint is not explicit, the court presumes that Motorola did not disclose the amount of those assets attributable to vendor financing.[18] According to Lead Plaintiff, investors perceived the second quarter as "an excellent quarter for Motorola, beating the (reduced) consensus estimates and showing improvement in revenue and income." (*Id.* ¶ 152.) Motorola's common stock closed on July 13, 2000 at $39.1875 per share. (*Id.* ¶ 154.)

Motorola's Form 10-Q for the second quarter of 2000, which Motorola filed with the SEC on July 31, 2000, repeated and affirmed the financial results published in the July 12, 2000 press release, and included the same language regarding conformity with GAAP as appeared in its May 16, 2000 Form 10-Q. (*Id.* ¶ 155.) The Form 10-Q also noted that as of July 1, 2000, Motorola had provided a total of $457 million in vendor financing to Nextel Communications, Inc. (*Id.* ¶ 156.) Defendants did not mention its vendor financing to Telsim or any customer other than Nextel. (*Id.* ¶ 157.) Motorola's common stock closed on July 31, 2000 at $33.25 per share. (*Id.* ¶ 158.)

Lead Plaintiff claims that Motorola's July 10, 2000 press release and second quarter 2000 Form 10-Q were false and misleading on several of the same grounds previously identified: Telsim had breached the Agreements; Telsim had inadequate cash flow and lack of access to capital markets; assets provided to Telsim through vendor financing were impaired; Defendants failed to disclose the Telsim concentration and risks; Defendants' financial statements did not conform to

---

[17] Lead Plaintiff claims that Motorola's reported sales figure for the second quarter of 2000 ($9.255 billion) reflects a 23% increase over the second quarter of 1999. (Cmplt. ¶ 151.) Lead Plaintiff also indicates that Motorola reported sales of $8.03 billion for the second quarter of 1999. (*Id.* ¶ 152.) The court calculates, then, Motorola's reported sales increased 15%, rather than 23% as Lead Plaintiff contends.

[18] For reasons it does not explain, Lead Plaintiff does not specifically allege that Koenemann was responsible for the financial data reported in the July 12, 2000 press release.

GAAP; loan repayment was "highly improbable"; and the Telsim contract[19] was 100% vendor-financed and Motorola provided additional financing in the form of "working capital." In addition, Lead Plaintiff alleges that the July 10, 2000 press release and second quarter 2000 Form 10-Q were false and misleading because Defendants' failure to disclose the $1.333 billion financing to Telsim "created the materially false and misleading impression that Nextel represented Motorola's largest concentration of vendor financing." (*Id.* ¶ 159.)

### G. August 1, 2000 Press Release

On August 1, 2000, Motorola issued a press release describing the Motorola-Telsim relationship in positive terms, stating that Telsim was "once again taking technology forward in Turkey at internet speed" and that "Motorola has estimated that revenues from [Telsim] could be at least $1.5 billion." (*Id.* ¶ 160.) Following this announcement on August 1, Motorola's common stock closed at $35 per share, a 5% increase over the previous day's closing value of $33.25 per share. (*Id.* ¶ 161.)

Lead Plaintiff claims that Motorola's August 1, 2000 press release was false and misleading for some of the same reasons previously discussed: Telsim had inadequate cash flow and lack of access to capital markets; loan repayment was "highly improbable"; and there was no $1.5 billion agreement with Telsim. Lead Plaintiff alleges that the August 1, 2000 press release was false and misleading for several additional reasons, as well: First, Motorola's efforts to have third parties assume Telsim's indebtedness had failed. Second, all of Telsim's efforts to find a buyer for the company, to conduct a public offering of its shares, or to receive a significant equity investment had failed. Third, Telsim had denied Motorola representatives access to its books and records, so Motorola could not assess the value of its purported collateral, i.e., Telsim's stock. Fourth, Defendants did not disclose that the sole remedy for a default was "to secure payment through

---

[19]     Again, it is not clear to what contract Lead Plaintiff is referring.

arbitration in Switzerland and by attaching shares of a closely-held Turkish corporation, [which] did not provide for reasonable expectations of collectibility." Fifth, Lead Plaintiff alleges that "Telsim was claiming to experience severe technical problems with the Motorola equipment." (Id. ¶ 162.)

### H. September 29, 2000 Vendor Financing Agreement

On or about August 2000, an unidentified Telsim representative told an unnamed individual at Motorola that Telsim had failed to find an interested buyer and that it required an additional $700 million in financing. (Id. ¶ 163.) On or about September 15, 2000, Motorola had "a senior executive meeting" to discuss lending additional funds to Telsim. (Id. ¶ 164.) Based on Telsim's representations that it would "pursue all potential third-party sources of such funds, including, without limitation, placement of equity and high-yield debt," on September 29, 2000, Motorola agreed to amend the Equipment Financing Agreement to provide Telsim with an additional $450 million for the purchase of infrastructure equipment and handsets and $250 million in financing for "working capital." (Id. ¶¶ 165-66.) Motorola "immediately used" this $450 million "to report an aggregate amount of $450 million in revenue from purported sales to Telsim in the third quarter of 2000"; the Complaint does not explain how or where Motorola reported this revenue. (Id. ¶ 166.) Lead Plaintiff claims that Motorola extended this additional loan in order (1) to prevent Telsim from defaulting on its prior outstanding loans, which would lead to "full disclosure of all material facts," and (2) to provide an additional $450 million in reported revenues during the third quarter of 2000, thereby enabling Motorola to meet Wall Street's expectations. (Id. ¶ 167.)

### I. October 10, 2000 Press Release and Third Quarter 2000 Form 10-Q

After the financial markets closed on October 10, 2000, Motorola issued a press release[20] reporting $9.493 billion in net sales for the third quarter of 2000 (reflecting a 15% increase over the

---

[20]     See footnote 13.

third quarter of 1999[21] and a 3% increase over the second quarter of 2000), net income of $531 million, and earnings per share of $0.23. (*Id.* ¶ 170.) Motorola reported in its consolidated balance sheet that it held $5.058 billion in "other assets" (*id.*); the Complaint does not state whether Motorola disclosed the proportion of those assets attributable to vendor financing. As with the April 10, 2000 press release, Lead Plaintiff claims that Galvin and Growney were quoted "throughout the [October] 10, 2000 press release,"[22] although, as before, the Complaint does not identify the specific statements attributed to Galvin and Growney. (*Id.* ¶ 172.) Koenemann was responsible for the financial data reported in the press release. (*Id.*) According to Lead Plaintiff, Motorola's reported revenues were approximately $500 million below expectations, which caused Motorola's shares "to decline $4.937 per share from $26.375 to $21.438." (*Id.* ¶ 173.)[23] Lead Plaintiff claims, however, that this decline would have been significantly worse if not for the $450 million in revenue from Telsim that Motorola "fraudulently reported" on its third quarter balance sheet. (*Id.* ¶ 174.)

Motorola's Form 10-Q for the third quarter of 2000, which Motorola filed with the SEC on November 7, 2000, reiterated and affirmed the financial results published in the October 10, 2000 press release, and included the same language regarding conformity with GAAP that appeared in its May 16, 2000 and July 30, 2000 Form 10-Q. (*Id.* ¶ 175.)

Lead Plaintiff claims that Motorola's October 10, 2000 press release and third quarter 2000 Form 10-Q were false and misleading in all of the ways previously identified: Telsim had breached

---

[21]     Lead Plaintiff claims that Motorola's reported sales figure for the third quarter of 2000 ($9.493 billion) reflects a 23% increase over the second quarter of 1999. (Cmplt. ¶ 170.) The court presumes the reference to the second quarter of 1999 is a scrivener's error. Further, as Lead Plaintiff indicates that Motorola reported sales of $8.223 billion for the second quarter of 1999, (*id.* ¶ 171), the court calculates that Motorola's reported sales increased 15%, rather than 23% as Lead Plaintiff alleges.

[22]     Lead Plaintiff alleges that "Galvin and Growney were quoted throughout the April 10, 2000 press release," but the court presumes this is a scrivener's error.

[23]     The Complaint does not state when this decline in the value of Motorola shares occurred.

the Agreements; assets provided to Telsim through vendor financing were impaired; Defendants failed to disclose the amount of, and the concentration and risks associated, the Telsim loan; Defendants' financial statements did not conform to GAAP; it was "highly improbable," or in any event not "reasonably assured," that Telsim would be able to repay the loan; and the Telsim contract[24] was 100% vendor-financed and Motorola provided additional financing in the form of "working capital." (*Id.* ¶ 176.)

## J.     October 31, 2000 Press Release

Before the financial markets opened on October 31, 2000, Motorola issued a press release[25] titled "Motorola in Third Generation Mobile Network Deal With Turkey's Telsim" which touted the success of the Motorola-Telsim relationship and claimed that the two companies had entered into a contract that could provide an additional $2 billion in telecommunications equipment. (*Id.* ¶ 177.) The press release further represented that Telsim was "one of the most successful [GSM] operators worldwide," that Telsim had more than 5 million customers, and that Telsim was projected to have 7.5 million customers by the end of 2000. (*Id.*) According to Lead Plaintiff, Motorola's common stock rose $2.44 to $24.98 "in response to" this press release. (*Id.* ¶ 179.)[26]

Lead Plaintiff claims that Motorola had "no reasonable basis" to make the representations in the October 31, 2000 press release. (*Id.* ¶ 177.) The Complaint alleges that this press release was false and misleading on several of the grounds previously identified: Telsim had breached the Agreements; Defendants failed to disclose the amount of the Telsim loan; loan repayment was "highly improbable"; the Telsim contract[27] was 100% vendor-financed; and Motorola provided

---

[24]     As with several press releases and financial statements discussed above, it is not clear to what contract Lead Plaintiff is referring.

[25]     See footnote 13.

[26]     The Complaint does not state when this increase occurred.

[27]     Again, it is not clear to what contract Lead Plaintiff is referring.

additional financing in the form of "working capital." In addition, Lead Plaintiff asserts that the press release misrepresented that Telsim was "one of the most successful [GSM] operators worldwide" and that Telsim had more than 5 million customers; in fact, Lead Plaintiff notes, Motorola had been denied access to Telsim's records to verify these statements and Defendants knew that Telsim had been unable to obtain third-party financing. (*Id.* ¶ 180.)

### K.      November 24, 2000 Press Statement

In the November 24, 2000 edition of the *Wall Street Journal*, Koenemann stated that in vendor financing, Motorola should "act like a bank" in determining to whom it should extend credit, adding, "[a]s long as you're making sound judgments, you can grow with your customers." (*Id.* ¶ 181.) Lead Plaintiff claims this press release was false and misleading on the ground that "he failed to disclose Motorola's $2 billion concentration of vendor financing to one uncreditworthy Turkish customer," and that "every bank that had been approached by Telsim or Motorola had flatly rejected extending credit to Telsim." (*Id.* ¶ 182.)

### L.      Notice of Uzans' Improper Use of Motorola Funds

Lead Plaintiff identifies several instances that should have put Defendants on notice of Telsim's financial uncertainty: First, in a March 9, 2000 email to Hughes and Keating addressing the concerns of Motorola's senior officers regarding repayment of the Telsim loans, Hakan Uzan referred to such officers as "the guys with shaky hands." (*Id.* ¶ 123.) Several months later, in a December 14, 2000 meeting with Motorola Vice Presidents Hughes and Keating, Hakan Uzan acknowledged that he had improperly used the money that Motorola had provided Telsim in September 1999 "to cover payments required during a run on one of the Uzan-controlled banks." (*Id.* ¶ 183.) Also in December 2000 (the Complaint does not state the precise date), Hakan Uzan claimed Telsim urgently needed to borrow $35 million in cash from Motorola. On an unspecified date, Hughes read an article in *The Washington Post* which reported that Hakan Uzan had

acquired a $38 million apartment in New York. When Hughes questioned Hakan Uzan about the article during a December 2000 meeting in Istanbul (again, the Complaint does not specify the date), Mr. Uzan smiled sheepishly and said, "[w]e were hoping you guys didn't find that out." Motorola denied Hakan Uzan's request for additional funds. (*Id.* ¶ 184.) Hakan Uzan told Hughes and Keating during a January 9, 2001 meeting that he was seeking a twelve-month extension on a contract with the Turkish Football League and that, if he could not renegotiate Telsim's contract with the League, he would not pay the League the amounts he owed. (*Id.* ¶ 185.)[28]

### M.     January 10, 2001 Press Release

After the financial markets closed on January 10, 2001, Motorola issued a press release[29] reporting $10.1 billion in net sales for the fourth quarter of 2000 (reflecting an 11% increase over the fourth quarter of 1999 and a 6% increase over the third quarter of 2000), net income of $135 million, and earnings per share of $0.06. (*Id.* ¶ 186.) For fiscal year 2000, Motorola reported $37.6 billion in net sales for the fourth quarter of 2000 (reflecting a 14% increase over fiscal year 1999), net income of $1.3 billion, and earnings per share of $0.58. Motorola reported in its consolidated balance sheet that it held $5.375 billion in "other assets" (*id.*); again, the Complaint does not state whether Motorola disclosed what portion of those assets was attributable to vendor financing. Lead Plaintiff alleges that Motorola's common stock "rose $0.94 on January 11, 2001 to close at $22.125 per share." (*Id.* ¶ 188.)

Lead Plaintiff claims that Motorola's January 10, 2001 press release was false and misleading in several of the ways previously identified: Telsim had breached the Agreements; assets provided to Telsim through vendor financing were impaired; Defendants failed to disclose the amount of, and the concentration and risks associated with, the Telsim loan; Telsim's ability to

---

[26]     The Complaint does not explain the nature of this contract, or why Uzan owed the League money under it.

[29]     See footnote 13.

repay the loan was not reasonably assured; the Telsim contract[30] was 100% vendor-financed; and Motorola provided additional financing in the form of "working capital." Lead Plaintiff further claims the January 10, 2001 press release was false and misleading on several additional grounds. First, there were "technical and operational limitations" apparent in Telsim's implementation of the systems it purchased from Motorola. Second, there were "[n]umerous warning signs" that the Uzans had defrauded other unspecified business partners. Third, Motorola had "[c]oncerns that the Uzans were failing to ensure that the Telsim financing would be repaid." Finally, the Uzans had made several complaints about the performance of the Motorola equipment. (*Id.* ¶ 189.) Lead Plaintiff also claims that "Defendants' failure to disclose the information about the Telsim financing, the likelihood of default on the Telsim financing and the deterioration of the Company's relationship with Telsim and the Uzans, as these things occurred or became apparent . . . . constituted a knowing and willful fraud upon the Class." (*Id.* ¶ 190.)

## N. The Uzans' False Claims

On January 22, 2001, Hakan Uzan sent an e-mail message to Hughes and Keating, falsely claiming that 16 separate major faults in Motorola equipment had seriously affected call traffic or the performance of Telsim's cellular system. (*Id.* ¶ 194.) (Lead Plaintiff does not explain how or when Keating and Hughes discovered that the complaints were false.) At a February 8, 2001 meeting in London, Hakan Uzan told Motorola Executive Vice President Keith Bane that Telsim's audited financial statements would be made available to Motorola by February 23, 2001. (*Id.* ¶¶ 39(a), 195.) The Uzans never provided the financial statements to Motorola, however. (*Id.* ¶ 195.)

---

[30]     As with several press releases and financial statements discussed above, it is not clear to what contract Lead Plaintiff is referring.

## O.    Disclosure of Motorola's Increased Debt Load

Motorola's short-term borrowing increased from $2.5 billion in December 1999 to $6.4 billion at the end of 2000, "resulting in a liquidity crisis that endangered the Company's credit ratings." (*Id.* ¶ 196.) The Complaint alleges that this increased debt load resulted from "the negative cash flow effect of the vendor financing to Telsim." (*Id.*) On an unspecified date, an unnamed Motorola official stated that Motorola might report a first-quarter operating loss. (*Id.* ¶ 197.) In response to this statement, on February 23, 2001, Moody's Investor Service and Standard & Poor's Corp. placed Motorola's debt ratings on review for possible downgrading. (*Id.*) The price of Motorola's 6.5% debentures due 2028 fell from $85.25 at the close of February 23, 2001 to $74.94 at the close of February 27, 2001 (a 12% decline in value). (*Id.* ¶ 198.) Motorola's common stock declined from a closing value of $17.29 on February 22, 2001 to close at $16.25 per share on February 23, 2001 (a 6% decline in value). (*Id.*) On February 12, 2001, 11 days before Motorola's debt ratings were placed on review for possible downgrading, Galvin sold 165,000 of his own shares of Motorola common stock at $23.50 per share, thereby grossing $3.85 million. (*Id.* ¶ 257.)

## P.    Motorola's March 2001 Attempts to Recover Loan

The Equipment and License Finance Agreements, as well as the agreement regarding Motorola's loans to KaR-Tel, required Telsim to make two payments to Motorola during the spring of 2001: (1) $12,698,115.20, due on March 30, 2001; and (2) $737,906,243.67, due on April 30, 2001. (*Id.* ¶ 200.) In a March 19, 2001 letter to Hakan Uzan, with copies sent to Koenemann, Bane, and Hughes, Keating acknowledged Telsim's "impending default." (*Id.* ¶ 199.) Keating also proposed rescheduling Telsim's debt: Telsim would make a $200,000,000 payment on April 20, 2001, and would pay the remaining balance by July 31, 2001. (*Id.* ¶ 200.) In March 2001, Motorola retained Goldman Sachs to make an independent valuation of Telsim. (*Id.* ¶ 202.) As they had

done with other bankers, unnamed Telsim representatives denied Goldman Sachs access to Telsim's financial information. (*Id.*)

### Q.    March 30, 2001 Proxy Statement

In its Proxy Statement filed with the SEC on March 30, 2001, signed by Galvin and Koenemann, Motorola disclosed that out of a total of $2.8 billion in gross long-term finance receivables as of December 31, 2000, "approximately $1.7 billion . . . related to one customer in Turkey." (*Id.* ¶ 203.) Lead Plaintiff claims this Proxy Statement was false and misleading on the grounds that it (1) omitted any risk of default by Telsim and (2) understated the amount of financing provided to Telsim by $300 million. (*Id.* ¶ 204.)

### R.    April 6, 2001 Analysis

On April 6, 2001, a *Bloomberg News* columnist published an analysis of Motorola's loan to Telsim and the related disclosures in the March 31, 2001 Proxy Statement. (*Id.* ¶ 205.) The analysis underscored the significance of the loan to Telsim, noting that the company was owed "a staggering $1.7 billion by a single customer in an emerging market country." (*Id.*) That day, Motorola shares declined by 23% from the previous day's close of $14.95 per share to $11.50 per share. (*Id.*)

### S.    First Quarter 2001 Form 10-Q

Motorola's Form 10-Q for the quarter ended March 31, 2001, which Motorola filed with the SEC on May 14, 2001, reported that Telsim's vendor-financing debt to Motorola totaled $2 billion ($300 million more than Motorola had disclosed in its March 31, 2001 Proxy Statement) of its total $2.9 billion in gross long-term finance receivables. In addition, the Form 10-Q stated that "[o]n April 30, 2001, $728 million of the Telsim Loan became due, but was not paid," and noted that if Telsim did not pay within 30 business days, it would be in default. (*Id.* ¶ 207.)

27

## IV.    Motorola's Disclosures and Relationship with Telsim Subsequent to Class Period

On May 15, 2001, Motorola stock closed at $14.96 per share, a 5% decrease from the previous day's closing value of $15.74. (*Id.* ¶ 208.) On October 9, 2001, Motorola announced its results for the third quarter of 2001,[31] and disclosed that it had recorded a $1.3 billion charge against earnings in that quarter for the purpose of taking a reserve against the outstanding balance Telsim owed. (*Id.* ¶ 209.) At an unspecified time after October 9, 2001, Motorola sent financial investigators to Turkey to assess the collectibility of the Telsim loan. (*Id.* ¶ 211.) From this investigation, unnamed Motorola officials learned that the Uzans had diverted at least $1 billion of Motorola's financing for purposes other than the development of Telsim's telecommunications business. (*Id.* ¶ 212.) Lead Plaintiff urges that "[t]hese same facts would have been evident to Motorola during the Class Period if not for its reckless indifference to the truth." (*Id.*)

On January 2, 2002, MCC and Nokia filed suit in the United States District Court for the Southern District of New York against five members of the Uzan family, one of their associates, and three Uzan-controlled companies, charging defendants with federal acts of racketeering, state claims of fraud, and other serious misconduct. *See Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 491 (S.D.N.Y. 2003) (Rakoff, J.). Early in the case, the court entered an injunction to maintain the status quo, including the preservation of the portion of Telsim's outstanding shares that functioned as collateral. *Id.* Defendants, however, refused to obey the court's orders, including breaking their sworn promise not to further eviscerate the collateral. *Id.*[32] The defendants also repeatedly reneged on promises to provide ordered discovery, and instructed their counsel not to reveal to the court or the Court of Appeals steps they were secretly taking in Turkey to obtain *ex parte* orders undercutting the prior orders of the New York court. *Id.* Defendants "expressly

---

[31]    The Complaint does not state where or to whom Motorola announced these results.

[32]    The court did not indicate when or where defendants made this "sworn promise."

refus[ed] to attend or participate in the trial" that commenced on February 19, 2003. *Id.* at 492. Although the court observed that plaintiffs were arguably entitled to a default judgment, he nevertheless proceeded with a trial, hearing only plaintiffs' testimony, but also taking into account the proof developed at an earlier six-day evidentiary hearing and a two-day contempt hearing that the defendants had contested. *Id.* at 493. Concluding that the Uzans and the other defendants had "perpetrated a huge fraud" on MCC and Nokia, the court awarded MCC more than $2 billion in compensatory damages and an equal amount in punitive damages on July 31, 2003. *Id.* at 490.[33]

In the May 29, 2003 edition of the *Wall Street Journal*, Telsim published a full-page open letter to Motorola's shareholders, stating in relevant part:

> Although Motorola issued multiple press releases describing the potential billions of dollars in revenues that would be generated as a result of its partnership with Telsim, shareholders were not told that their own money was being used to finance the equipment sales – so-called "vendor financing." In September 2000, Motorola persuaded Telsim to accept a particularly large shipment of equipment, much of which was deficient.[34] While this contract enabled Telsim to meet its needs through 2003, Motorola booked the sales immediately, thereby inflating its sales figures for that quarter.

(*Id.* ¶ 168.)[35]

---

[33]     Nokia did not seek compensatory or punitive damages. Instead, Nokia, along with MCC, sought to impose a constructive trust on Telsim stock. *Uzan*, 274 F. Supp. 2d at 501. The court entered a constructive trust in plaintiffs' favor over Telsim shares held by any of the entities controlled by the Uzans that collectively constitute 73.5% of the ownership, control, and share value of Telsim. *Id.* at 579-80. (As noted, as of March 2000, Telsim had pledged 73.5% of its equity as collateral to Motorola and Nokia. (Cmplt. ¶ 132.))

[34]     The Complaint does not explain in what way this shipment was deficient.

[35]     In addition, Lead Plaintiff points to a comment in a book by Arthur Levitt, chairman of the SEC from July 1993 to February 2001:

> A company spokesman says that because telecom companies use vendor financing as a competitive tool, it was not in Motorola's interest to reveal how much it had lent to finance its customer equipment purchases. Perhaps Motorola should ask itself: why is it in shareholders' interest to invest in a company that fails to disclose an enormous risk taken with their money?

## V.    Comparison with Other Telecommunications Manufacturers

According to Lead Plaintiff, as of December 31, 2000, Motorola had a market capitalization of $44.4 billion, of which $3.8 billion (or 8.6%) consisted of vendor financing for outstanding loans. By comparison, in 2000, Nortel's vendor financing constituted only 1.4% of total market capitalization, while vendor financing comprised only 0.2% of Cisco's total market capitalization. (*Id.* ¶ 215.) Lead Plaintiff claims, further, that the vendor financing Motorola provided to Telsim ($2.033 billion) constituted 28% of the total vendor financing provided by all telecommunications manufacturers to their customers (including Nokia, Lucent, Nortel, Cisco, and Motorola's remaining customers). The court notes, further, that, according to Lead Plaintiff's data, the next highest amount of vendor financing was provided by Nokia to Telsim ($700 million). (*Id.* ¶ 216.) Lead Plaintiff concludes that Motorola's vendor financing to Telsim "was entirely out of character with the vendor financing provided by any of its peers to a single customer." (*Id.* ¶ 217.)

## VI.    Alleged Accounting Violations

Lead Plaintiff notes that under GAAP, revenues and gains are not to be recognized until realized or realizable. ACCOUNTING FOR CONTINGENCIES, Statement of Financial Accounting Standards No. 5, ¶ 83(a) (Fin. Accounting Standards Bd. 1975), *available at* http://www.fasb.org/ pdf/fas5.pdf. Revenues are realized when goods, services, or other assets are exchanged for cash or claims to cash. *Id.* Revenues are realizable "when related assets received or held are readily convertible to known amounts of cash or claims to cash." *Id.* As collection of the Telsim receivables "was not reasonably assured," Lead Plaintiff urges that Motorola violated GAAP by recognizing the Telsim receivables as revenue. (Cmplt. ¶ 223.) Lead Plaintiff further alleges that Motorola recognized revenue and income on accrued interest on the Telsim debt that was paid

---

ARTHUR LEVITT, TAKE ON THE STREET: WHAT WALL STREET AND CORPORATE AMERICAN DON'T WANT YOU TO KNOW 167 (2002).

"only through the artifice of increased Telsim indebtedness." (*Id.* ¶ 193.) As collection of that interest was not reasonably assured, Lead Plaintiff maintains that Motorola's recognition of that interest violated GAAP. (*Id.*)

Lead Plaintiff also claims that Motorola's recognition of revenue from Telsim violated Securities and Exchange Commission Staff Accounting Bulletin 101, which states that revenue is generally realized or realizable and earned only when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,
- Delivery has occurred or services have been rendered,
- The seller's price to the buyer is fixed or determinable, and
- Collectibility is reasonably assured.

(*Id.* ¶ 224.)

Lead Plaintiff urges that collection of payments from Telsim was not reasonably assured, as Motorola's extension of credit "was premised on speculation that if Telsim were successful at some future point Motorola would be paid for the goods and services sold to Telsim." (*Id.* ¶ 226.)

Lead Plaintiff further alleges that Defendants either knew that Telsim would not or had no reasonable basis to believe that Telsim would repay the loans, and therefore that collection of the loan amounts was not "reasonably assured," on several grounds. First, Telsim was not required to repay the finance receivables "for over one year, forcing Motorola to project payments into future periods, which placed the burden on Motorola to bear the risk of future uncertainties." Second, "Telsim was a start-up venture in a developing country with a troubled economy." Third, Defendants knew that Telsim lacked sufficient cash flows to repay the loan, as Telsim required substantial working capital as well as equipment financing from Motorola. Fourth, Lead Plaintiff essentially contends that Telsim's only source of cash flows was financing from Motorola: "Since any hope Motorola had to be paid was based on Telsim's future cash-flows, which cash flows were dependent on Motorola's continuing supply and support of Telsim's GSM network, the collectibility of the revenue was contingent on Motorola's future financing, sales and cooperation with Telsim."

Fifth, Telsim was in breach of the Agreements, as it had refused to provide Motorola with financial statements or other records as required by those Agreements. Sixth, as Telsim denied Motorola access to its books and records, Motorola could not "make a reasonable determination whether collectibility was reasonably assured." Seventh, Hakan Uzan told unnamed Motorola officials that he had "converted loaned funds for unauthorized purposes." Eighth, Hakan Uzan told unnamed Motorola officials that "he intended to default on obligations to third parties." Ninth, Defendants knew that Defendants knew that Telsim was unable to obtain financing from third parties.[36] Finally, Defendants knew that collecting on the collateral would be "highly problematic" as Motorola would have to undergo arbitration in Switzerland and to enforce any arbitral award in Turkish courts. (*Id.* ¶¶ 227-28.)

Lead Plaintiff notes that a "loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement." ACCOUNTING BY CREDITORS FOR IMPAIRMENT OF A LOAN, Statement of Financial Accounting Standards No. 114, ¶ 8 (Fin. Accounting Standards Bd. 1993), *available at* http://www.fasb.org/pdf/fas114.pdf. Further, according to the American Institute of Certified Public Accountants, factors indicating that a creditor should evaluate the collectibility of a loan include, *inter alia*:

- [L]oan files lacking current financial data related to borrowers and guarantors;
- [B]orrowers experiencing problems such as operating losses, marginal working capital, inadequate cash flow, or business interruptions;
- [L]oans secured by collateral that is not readily marketable or that is susceptible to deterioration in realizable value; [and]
- [L]oans to borrowers in industries or countries experiencing economic instability.

*Id.* ¶ 7 & n.1.

---

[36]     Although the Complaint merely states that "Telsim was unable to secure third party financing," (Cmplt. ¶ 227(i)), the court presumes that Lead Plaintiff believes that Defendants were aware of this fact at the time they recognized revenue from the Telsim sales.

According to Lead Plaintiff, the Telsim loan ran afoul of each of these four factors and was therefore impaired. First, Telsim breached the Agreements beginning in January 2000 by refusing to provide Motorola with its financial statements or other records as required by those Agreements. Second, Telsim was a start-up venture that had "experienced operating losses, had marginal working capital and lacked adequate cash flows." Third, shares of Telsim stock, which served as collateral for the loan, "were not marketable, were not saleable and would be extremely difficult to obtain possession of even in the event of a default." Finally, following the 1999 earthquakes, "Turkey experienced tremendous economic difficulty, including hyperinflation of the Turkish Lira, a recession, and increased usage taxes on cellular telephone service." (Cmplt. ¶¶ 234-35.)

Lead Plaintiff further urges that Motorola was required to disclose the fact that its long-term finance receivables were concentrated in Telsim. (Id. ¶ 238.) The AICPA Accounting Standards Executive Committee's Statement of Position 94-6, which is considered part of GAAP, see S.E.C. v. Spiegel, Inc., No. 03 C 1685, 2003 WL 22176223, at *69 (N.D. Ill. Sept. 15, 2003), requires disclosure of certain concentrations when all of the following exist and are known to management prior to the issuance of the financial statements:

- The concentration exists at the date of the financial statements.
- The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.
- It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

SOP 94-6 notes that "it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term."

According to Lead Plaintiff, Motorola was required to disclose its concentration of long-term finance receivables in Telsim for several reasons. First, Motorola management knew of the 62% concentration of Motorola long-term finance receivables in Telsim before Motorola issued its March 22, 2000 Proxy Statement. Second, because of the sizeable amount of the loan ($1.333 billion), a default by Telsim would have had a "severe impact," and did in fact have such an impact,

as Motorola expended "great effort" to recover the loan after Telsim defaulted, "including initiating litigation in at least three international venues."[37] Third, Motorola under-reported $450 million in financing in its March 22, 2000 Proxy Statement (for 1999) by waiting to formalize its December 1999 commitment to Telsim until February 1, 2000. Fourth, Telsim was located outside Motorola's home country and, therefore, it was reasonably possible that its operations would be disrupted in the near term. (*Id.* ¶ 238.)

## DISCUSSION

Lead Plaintiff claims that Defendants violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme, and course of conduct" in which they knowingly and/or recklessly took actions, made deceptive statements, and omitted to state material facts in order to induce Lead Plaintiff and other Class members to purchase Motorola securities at artificially inflated prices during the Class Period. (*Id.* ¶ 261.) Plaintiff also alleges that Individual Defendants violated § 20(a) of the SEA in that they acted as controlling persons of Motorola and had the power to control the company's decisions, including "the conduct of Motorola's business, the information contained in its filings with the SEC and public statements about its business" that were misleading. (*Id.* ¶ 272.)

Defendants have moved to dismiss Lead Plaintiff's § 10(b) and § 20(a) claims. The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will ordinarily be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A plaintiff alleging fraud must do so "with particularity," FED. R. CIV. P. 9(b), however, meaning that the plaintiff must set forth "the who, what, when, where and how: the first paragraph of any newspaper

---

[37]    The Complaint does not identify these "international venues" other than the United States District Court for the Southern District of New York.

story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). Lead Plaintiff must also meet the strict pleading requirements of the PSLRA, which requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In addition, Lead Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## I.    Section 10(b) Claim

SEC Rule 10b-5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements misleading in connection with the purchase or sale of any security. To state a claim under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, a plaintiff must allege that each defendant "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996). According to Defendants, the Complaint fails to satisfy the first, second, and third requirements: they argue that the Complaint does not identify any misstatements or omissions attributable either to Motorola or to Individual Defendants, that the statements complained of are immaterial in light of the "total mix of information," and that the Complaint fails to satisfy the PSLRA's heightened pleading requirements for scienter as to either Motorola or the Individual Defendants. The court considers each argument as to both Motorola and Individual Defendants below.

### A.    False and Misleading Statements and Omissions

#### 1.    Motorola

Lead Plaintiff claims that several public statements by Motorola or its representatives during the Class Period were false or misleading, including: press releases issued February 3, April 10, July 12, August 1, October 10, and October 31, 2000, and January 10, 2001 (*id.* ¶¶ 118-22, 138-40,

35

151-62, 170-72, 176-80, 186-90); the March 22, 2000 Form 10-K and Proxy Statement, (*id.* ¶¶ 124-28, 219-38); Forms 10-Q for the first, second, and third quarters of 2000, (*id.* ¶¶ 147-50, 155-57, 159, 175-76); Koenemann's statement in the November 24, 2000 *Wall Street Journal* that in vendor financing, Motorola should "act like a bank" (discussed below), (*id.* ¶¶ 181-82); and improper financial reporting in violation of GAAP, (*id.* ¶¶ 219-38.) Lead Plaintiff claims that in these statements, Defendants repeatedly issued only "selective disclosures," in that they stated that Motorola had reached multi-billion dollar sales pacts with Telsim, but failed to disclose that those sales were 100% financed by Motorola. (Lead Pl. Resp., at 13.)[38] Our Court of Appeals has explained that Rule 10b-5 "only proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (citation omitted).

Ignoring Lead Plaintiff's repeated allegations that certain of Motorola's disclosures were misleading, Defendants suggest that the only "misstatement or omission" identified in the Complaint was "the claim that Telsim's loans should have been written off earlier than they were." (Def. Mem., at 22.)[39] As this court reads the Complaint, Lead Plaintiff has not in fact alleged that Motorola's failure to write the Telsim loan off earlier constitutes a "misstatement." Instead, as discussed below, Lead Plaintiff has identified several statements that arguably violated GAAP and in any event might be found by a reasonable trier of fact to constitute misleading "half-truths." The court concludes that these allegations are sufficient to state a claim under the securities laws even

---

[38]     Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint is cited as "Lead Pl. Resp., at __."

[39]     Defendants' Memorandum of Law in Support of Motion to Dismiss the Consolidated Class Action Complaint is cited as "Def. Mem., at __."

in light of the "total mix of information" on which Defendants rely in arguing that the disclosures challenged here were not material.

Before addressing materiality, however, the court pauses to address the argument that Lead Plaintiff has not alleged any misstatement or omission by Individual Defendants.

### 2.    Individual Defendants

Defendants claim that Lead Plaintiff has failed to allege any misstatement or omission by Individual Defendants. (Def. Mem., at 26.) Instead, Defendants urge, Lead Plaintiff has engaged in impermissible "group pleading" by attributing all of the alleged misrepresentations to all Defendants. (*Id.*) The "group pleading doctrine," where courts recognize it, "allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 946 (N.D. Ill. 2003) (quoting *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *5 n.5 (N.D. Ill. Aug. 9, 2001)). The Seventh Circuit has not yet addressed whether plaintiffs may rely on group pleading in light of the PSLRA, although well prior to the PSLRA it observed that "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). Courts in this district disagree as to whether group pleading survives the PSLRA. *See In re Spiegel, Inc. Sec. Litig.*, No. 02 C 8946, 2004 WL 1535844, at *21-23 (N.D. Ill. July 8, 2004) (collecting cases). This court concluded in *Spiegel* that group pleading may be appropriate in certain circumstances, as long as the complaint sets forth facts demonstrating that each defendant may be responsible for the fraudulent statements. *Id.* at *23.

Defendants urge that Lead Plaintiff only specifically attributes one statement (in the July 12, 2000 press release) to Galvin, but does not allege that the statement was false or misleading. (*Id.*

at 28 (citing Cmplt. ¶ 153).) Defendants further point out that, although Lead Plaintiff states that Galvin and Growney were quoted throughout the April 10, 2000 press release, it neglects to identify any false statements attributable to them. (*Id.* (citing Cmplt. ¶ 140).) Although Defendants do not so state, the court notes that Lead Plaintiff's allegation that Galvin and Growney were quoted throughout the October 10, 2000 press release, as well as the allegations that Koenemann was responsible for the financial data in both press releases, arguably also fail to point to any false statements made by Individual Defendants as well.

Lead Plaintiff contends that all allegedly false or misleading statements made in Motorola's press releases can be attributed to Individual Defendants. (Lead Pl. Resp., at 17.) Lead Plaintiff cites just one case in support, an unpublished decision in *Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *6 (N.D. Ill. July 20, 2001).[40] There, Judge Holderman of this court found that plaintiffs had adequately alleged that the company president was responsible for a press release, in part because an employee who was directly quoted in the press release and allegedly had knowledge of the alleged fraud reported directly to the president. *Lindelow* is distinguishable, however, in that Lead Plaintiff has not identified any company officials who were directly quoted in the press releases. Lead Plaintiff does not specify the statements Galvin and Growney allegedly made in the press releases, or identify any statements by Koenemann in those documents. Unlike the pleadings in *Lindelow*, Lead Plaintiff's Complaint arguably fails to specify each statement in the press releases alleged to have been misleading as to Individual Defendants.[41]

---

[40]     Lead Plaintiff also notes that allegations that key officials knew of facts critical to a business's core operations or to an important transaction that would affect the company's performance imply that such officials knew a statement was false. *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (citing *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)). This argument, which deals with an individual defendant's scienter, is discussed below.

[41]     As noted, Lead Plaintiff does point to a statement by Koenemann in a November 24, 2000 *Wall Street Journal* article that Motorola should "act like a bank" when determining to whom it should extend credit. (Cmplt. ¶ 181.) Defendants essentially argue this statement did not

Lead Plaintiff does allege that Individual Defendants made false and misleading statements in Motorola's SEC filings. (Lead Pl. Resp., at 16.) Specifically, Lead Plaintiff alleges that Galvin, Growney, and Koenemann signed Motorola's 1999 Form 10-K, which Lead Plaintiff alleges was flawed for several reasons. (Cmplt. ¶¶ 124, 128.) Although it has not adopted the group pleading doctrine, the Fifth Circuit Court of Appeals has explained that corporate documents with no stated author or statements in a document not attributed to an individual may be charged to any corporate officials who signed the document for pleading purposes under the PSLRA. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). Several district courts have found that corporate officers who sign fraudulent SEC filings with the requisite level of scienter can be liable as violators of section 10(b) for making false statements. *In re Syncor Int'l Corp. Sec. Litig.*, – F. Supp. 2d –, Nos. CV 02-8560 LGB, CV 02-8972, CV 02-9248, CV 02-8575, CV 02-8841, CV 02-9583, CV 02-8687, CV 02-9076, CV 02-9621, CV 02-9640, CV 03-52, 2004 WL 1700940, at *17 (C.D. Cal. July 6, 2004); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) (collecting cases). In this case, Lead Plaintiff has arguably satisfied the PSLRA's pleading requirements by alleging that all three Individual Defendants signed Motorola's 1999 Form 10-K, that Galvin and Koenemann signed Motorola's 2000 Proxy Statement, and that Koenemann stated that Motorola should "act like a bank" in determining to whom it should extend credit, all of which assertedly contained false or misleading statements. The court need not decide this issue, however, for, as discussed below, the court finds that Lead Plaintiff has not adequately pleaded scienter for Individual Defendants.

---

alter the "total mix of information" available to investors regarding Motorola's vendor financing arrangements. (Def. Mem., at 29.) As this assertion relates to materiality, it is discussed below.

## B.    Materiality

Defendants contend that the investing public knew from the "total mix of information" before the beginning of the Class Period that Motorola had provided loans to Telsim. (Def. Mem., at 23-24.) The court interprets this contention as an argument that the statements Lead Plaintiff alleges were misleading were not material. Under the securities laws, a statement is material if "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).) "[T]his determination is a highly fact-dependent analysis." *Id.; see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) ("In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss") (citation omitted).

Defendants point out that during a May 14, 1998 news teleconference to announce the sales agreement with Telsim, a reporter asked an unnamed Motorola official whether Motorola was financing the project. The official responded that "[t]his is a commercial relationship that has a broad range of features and capabilities, so there is an element of financing involved, yes." (Craig Menefee, *Motorola[] Inks Largest GSM Deal Ever in Turkey*, NEWSBYTES NEWS NETWORK, May 14, 1998, Ex. 2 to Def. Mem.)[42] In Defendants' view, the fact that this press release did not specifically

---

[42]    Defendants claim this court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment. (Def. Mem., at 6 n.6.) In support, they cite an opinion from a district court in another circuit, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003). Lead Plaintiff claims that the court may only consider documents that are referred to in the complaint and are central to the claim, citing *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002) ("[D]ocuments that are neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion to dismiss"). (Lead Pl. Resp., at 13 n.12.) The Seventh Circuit Court of Appeals has stated that courts may take judicial notice of matters in the public record on a motion to dismiss. *Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (citations omitted). This court could find no cases in which our Court of Appeals has addressed

state that the Telsim sale was supported by vendor financing "is of no import" as this teleconference informed the investing public that Motorola had provided loans to Telsim. (Def. Mem., at 23-24.)

Defendants also claim that "Motorola repeatedly notified investors" throughout the alleged class period that it had provided increased vendor financing and that such financing would continue to increase. (Def. Mem., at 24.) In support, Defendants cite Motorola's statements in its Form 10-K for fiscal year 1998 and its March 22, 2000 Proxy Statement that the Company had "significantly increased the amount of customer financing," as well as a remark in its March 22, 2000 Proxy Statement that MCC was "engaged principally in financing long-term receivables arising out of equipment sales made by the Company to customers throughout the United States and internationally." (Ex. 5 to Def. Mem., at 15; Ex. 8 to Def. Mem., at F-20, F-35.) In addition, Defendants point to statements in Motorola's Forms 10-Q for the first, second, and third quarters of 2000 that "[s]ome purchasers of Company's infrastructure equipment continue to require suppliers to provide long-term financing in connection with equipment purchases. Financing may include all or a portion of the purchase price and working capital." (Exs. 9-11 to Def. Mem.)[43]

Defendants deem immaterial Lead Plaintiff's allegation that Koenemann's statement that in vendor financing, Motorola should "act like a bank." As the court understands the argument, Lead Plaintiff claims this press release makes the implicit suggestion that Motorola's lending decisions were akin to those of responsible bankers. Any such suggestion was false and misleading, according to Lead Plaintiff, because Koenemann "failed to disclose Motorola's $2 billion concentration of vendor financing to one uncreditworthy Turkish customer," and because "every

---

whether newspaper articles are matters of public record, but the court need not decide the issue for, as discussed below, the court finds that this article and Defendants' statements regarding vendor financing in its SEC filings do not warrant dismissal of the Complaint.

[43]     The first quarter 2000 Form 10-Q does not include the initial word "Some." (Def. Ex. 9, at 14.)

bank that had been approached by Telsim or Motorola had flatly rejected extending credit to Telsim." (*Id.* ¶ 182.) Defendants respond, first, by asserting that the article addresses vendor financing generally and discusses several companies. Second, according to Defendants, "no reasonable investor would find such a statement material because it does not even state what Motorola does in practice, but what Motorola should do in practice." Third, Defendants note that approximately two weeks prior to publication of Koenemann's statement, Motorola stated in its Form 10-Q for the third quarter of 2000 that "[a]s of September 30, 2000, the Company's aggregate commitment to provide financing to third party vendors was $3.8 billion, of which $2.8 billion had been utilized." (Ex. 11 to Def. Mem., at 38.) Defendants therefore urge that Koenemann's statement regarding vendor financing did not alter the "total mix of information" available to investors regarding Motorola's vendor financing arrangements. (Def. Mem., at 29.)

Lead Plaintiff urges that Motorola's May 1998 statement disclosing that an "element of financing" was involved in the Telsim relationship is "at best, [an] ambiguous, general references to the Telsim debt," and in any event did not impact the total mix of information available as of February 3, 2000 (the beginning of the Class Period), when Motorola announced a $1.5 billion contract with Telsim. (Lead Pl. Resp., at 13-14.) Indeed, the expression "an element of financing" was itself misleading, as the deal was 100% financed by Motorola. (*Id.*) In any event, Lead Plaintiff contends, this single teleconference did not disclose all of the material facts concerning the Motorola-Telsim deal, namely the high concentration of financing in a single start-up venture that had been denied access to capital markets or other sources of financing in an emerging market. (Lead Pl. Resp., at 15.)

The court concludes that Lead Plaintiff has adequately pleaded that Defendants' alleged misleading or false statements are material notwithstanding the additional information Defendants cite. In *Cabletron*, 311 F.3d at 35, plaintiff alleged that defendant company's revenue had been fraudulently inflated by tens of millions of dollars per quarter. The court explained that earnings

figures are vital aspects of the "total mix of information" that investors would consult when evaluating the company's stock. *Id.* In addition, the court noted that the nature of the alleged inaccuracy in earnings derived from systematic fraud, including fictitious sales. *Id.* The court found that plaintiff had adequately pleaded that the fraudulent revenue recognition had rendered the company's SEC filings misleading. *Id.* Similarly, Lead Plaintiff contends that the revenue reported on Motorola's earnings statements was fraudulently inflated by hundreds of millions of dollars per quarter, several times greater than plaintiff in *Cabletron* alleged, by the inclusion of "sales" that in fact amounted to loans.

In *Searls*, 64 F.3d at 1066, plaintiffs alleged that during the class period, Defendant company CEO repeatedly characterized the company as "recession-resistant," despite his knowledge that the company was not in fact resisting the recession. Additionally, plaintiffs urged that the CEO consistently represented that the company would maintain a high level of disposition gains although he knew that statement was false. *Id.* The court found that the phrase "recession-resistant" was too vague to constitute a material statement of fact, and indeed was true at the time it was uttered. *Id.* Similarly, the court determined that the CEO's predictions of "high" disposition gains were not sufficiently definite to constitute material misstatements of fact, and in any event that disposition gains were difficult to predict. *Id.* at 1066-67. Here, Lead Plaintiff has alleged more than merely vague characterizations or indefinite and uncertain predictions of growth. Instead, Lead Plaintiff contends, Motorola recognized loans to Telsim as revenue in violation of GAAP and made public statements touting supposed sales contracts with Telsim while failing to disclose that those sales were entirely vendor-financed.

Lead Plaintiff also cites *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) to support its assertion that the May 1998 teleconference and statements regarding vendor financing in its SEC filings do not suffice to neutralize Motorola's false or misleading disclosures. The facts of *Ganino* bear a striking similarity to the circumstances of this case. In *Ganino*, Citizens Utilities

("Citizens") gave loans and loan guarantees to Hungarian Telephone & Cable Corporation ("HTCC"), a U.S. company that provided telephone services in Hungary. *Id.* at 158. In consideration for the loans and guarantees, Citizens primarily received HTCC stock and options. *Id.* Although Citizens earned and received approximately $10.1 million in stock, options, and other fees from HTCC in 1995, Citizens's 1995 Form 10-K stated that Citizens "ha[d] been compensated for . . . guarantees and financial support [to HTCC]." *Id.* Investors were therefore allegedly misled into believing that the $10.1 million booked in 1996 was new income, unrelated to the 1995 HTCC loan and guarantee transactions. *Id.*

Defendants in *Ganino* defended under the "truth on the market" doctrine, under which a misrepresentation is immaterial if the information is already known to the market. *Id.* at 167 (citations omitted). Specifically, they asserted that Citizens' unspecified disclosures before the class period had already made all relevant information about the HTCC deal available to the market. *Id.* To prevail on a "truth on the market" theory, the Second Circuit observed, a defendant must show that any corrective information was conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements. *Id.* (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). The truth-on-the-market defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* Reversing the district court's order dismissing the complaint, the Court of Appeals concluded that "it cannot be said that no reasonable investor could have been misled by Citizens' statement in its 1995 Form 10-Q that it 'ha[d] been compensated' for its loans and guarantees to HTCC, into believing that Citizens' 1996 First and Second Quarter Form 10-Qs included no HTCC Fees." *Id.* at 168.

The *Ganino* Defendants also argued that a disclosure by HTCC in an undisclosed format one month before the Class Period that it had paid the fees to Citizens in 1995 negated any misleading appearances created by Citizens' 1996 financial reports. The court found this argument

untenable for two reasons. First, Defendants had conceded that the fees had been recognized as 1996 income, which plaintiffs alleged violated GAAP. Second, "even assuming that HTCC's disclosures were factually accurate, we cannot decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility' as to dispel the false impression created by Citizens' alleged misrepresentations." *Id.* The court therefore rejected defendants' truth-on-the-market defense.

Here, the court cannot find on the facts before it that the "element of financing" comment or the general statements regarding vendor financing in Motorola's SEC filings were conveyed with sufficient "intensity and credibility" to dispel any false impressions, omissions, or "half-truths" created by Defendants' alleged misrepresentations. The court therefore turns to consider whether Lead Plaintiff has adequately pleaded scienter as to each Defendant.

## C.    Scienter

To establish scienter, Lead Plaintiff must plead facts establishing that Defendants acted with intent to deceive or manipulate. Reckless disregard of the truth is sufficient to establish intent for this purpose. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (citations omitted). On the other hand, "an unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be 'fraud by hindsight.'" *Asher v. Baxter Int'l, Inc.*, – F.3d –, No. 03-3189, 2004 WL 1687885, at *3 (7th Cir. July 29, 2004) (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2nd Cir. 1978) (Friendly, J.)). Although our Court of Appeals has not addressed the requirement for pleading scienter in light of the PSLRA, the majority of courts in this district have held that the PSLRA adopts the standard enunciated by the Second Circuit in *Press v. Chemical Investment Servs Corp.*, 166 F.3d 529, 538 (2d Cir. 1999), requiring a plaintiff to allege either (1) facts showing that defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Spiegel*, 2004 WL 1535844, at *24

(collecting cases). Whether defendant acted with intent is ordinarily an issue "appropriate for resolution by the trier of fact." *Press*, 166 F.3d at 538. The Second Circuit has instructed litigants and lower courts not to rely on "magic words such as 'motive and opportunity.'" *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Nevertheless, the court has explained that a strong inference of scienter may arise where the complaint sufficiently alleges that defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.*

Lead Plaintiff claims that its various allegations give rise to a strong inference that all Defendants knew or recklessly disregarded the facts that (1) their statements regarding the Telsim relationship were materially false or misleading when made, (2) Motorola increased the amount loaned to Telsim in order to recognize additional revenue and to avoid having to place the outstanding loans in default, and (3) Motorola misrepresented the "known and material risk of uncollectibility of the outstanding loans" to investors. (Lead Pl. Resp., at 22.) Defendants do not directly address the first contention, and the second goes to motive, which the court addresses below as to Individual Defendants. Nevertheless, Lead Plaintiff's argument that Defendants knew the identified statements were misleading is premised on the third assertion: that the Telsim loan had a high risk of uncollectibility, and therefore that the terms of the Telsim financing should have been disclosed in Motorola's various public statements. Thus, the court must first determine whether Lead Plaintiff has alleged facts constituting strong circumstantial evidence that Defendants knew or were reckless in not knowing that Motorola's various public statements should have disclosed or reflected the financing terms of Motorola's sales to Telsim.

Lead Plaintiff urges that its claims that Defendants knew or were reckless in not knowing that Motorola's statements were misleading is bolstered by its allegations concerning Defendants' motive. (*Id.*, at 27.) As discussed below the court concludes that Lead Plaintiff has alleged strong

circumstantial evidence that Motorola knew or was reckless in not knowing that its various public statements were false or misleading, and therefore need not consider the Company's motives for defrauding the Class. On the other hand, the court finds insufficient evidence of knowledge or recklessness on the part of Individual Defendants, so the court considers Lead Plaintiff's motive allegations with regard to Individual Defendants.

### 1. Motorola

Recklessness requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. III. 1997). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308. One of the "classic fact patterns" that gives rise to a strong inference of scienter is where "defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665-66 (8th Cir. 2001) (citing *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260-61 (10th Cir. 2001); *Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 76 (2d Cir. 2001); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *Novak*, 216 F.3d at 311).

As noted, Plaintiff essentially claims that Motorola knew or was reckless in not knowing that it had violated GAAP by recognizing revenue from vendor-financed sales to Telsim and interest on the loans to Telsim, even though collection of the Telsim receivables was not reasonably assured,

the loan was impaired, and it was reasonably possible that operations in Turkey would be disrupted in the near term. (Cmplt. ¶¶ 192-93, 223-38.) Defendants urge that such allegations cannot establish scienter. (Def. Mem., at 18.) They note, correctly, that a violation of GAAP, standing alone, is not sufficient to raise an inference of scienter. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (citing *Chu v. Sabratek Corp.* ("*Chu II*"), 100 F. Supp. 2d 827, 838 (N.D. Ill. 2000)). Instead, a plaintiff must also plead facts supporting an inference of the defendant's reckless disregard or gross indifference to alleged misrepresentations in the financial statements, such as those pointing to the magnitude of the accounting error, the defendant's prior notice of the error, or the defendant's responsibility for calculating and disseminating financial information. *Id.*

Defendants also urge that allegations of GAAP violations are only relevant to establishing scienter when accompanied by "red flags," citing in support *Riggs Partners, LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. Ill. Oct. 25, 2002), and *In re System Software Associates, Inc.*, No. 97 C 177, 2000 WL 283099, at *14 (N.D. Ill. Mar. 8, 2000). (Def. Mem., at 18.) According to Defendants, Lead Plaintiff has not alleged any such red flags. (*Id.*)[44] Lead Plaintiff insists it has identified the "red flags," including Telsim's refusal to provide financial statements or to assist in efforts to attract other lenders or equity investors. (Lead Pl. Resp., at 23 n.22.) Defendants point to the New York district court's conclusion that MCC thought it was protected by "substantial collateral." *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 491 (S.D.N.Y. 2003). In *Uzan*, the court determined that MCC was justified in relying on Hakan and Cem Uzan's false statements of material fact regarding Telsim's business practices and finances, the value and security of the collateral, Telsim's use of prior loan proceeds, the status of other

---

[44]     Defendants claim that Motorola's independent auditor, KPMG, L.L.P. (which is not named in this suit) signed off on Motorola's financial statements, implying that this fact rebuts any inference of fraudulent intent. (Def. Mem., at 18-19.) Lead Plaintiff responds that there are no facts in its Complaint to indicate that KPMG was not also deceived. (Lead Pl. Resp., at 24.) In the court's view, neither the scope of KPMG's scrutiny nor the information available to it are issues relevant to the adequacy of Lead Plaintiff's allegations against these Defendants.

sources of financing, the existence and value of offers to purchase an interest in Telsim, and the

status of negotiations with third parties. *Id.* at 577. In addition, the court concluded that "MCC did

not know and could not through reasonable diligence have discovered the falsity of defendants'

representations (which, indeed, [the Uzans] went to great lengths to conceal), and that MCC would

not have extended the loans if it had known the truth." *Id.* The court determined that the Uzans

had "hugely and fraudulently heightened the risk borne by MCC in making its loans, by such means

as vastly impairing the value of [MCC's] security and diverting enormous sums from Telsim's

coffers to other Uzan entities and to their own pockets." *Id.* at 580.

In this court's view, the New York court's findings that MCC could not have known of the

Uzans' fraudulent conduct do not preclude a finding in this case that Motorola knowingly or

recklessly concealed risks associated with the Telsim loan from the investing public. As noted, the

Uzans failed to attend or participate in the trial in the New York action, and waived their right to

further litigate any factual disputes or waivable legal issues they could reasonably have raised at

trial or earlier. *Id.* at 492-93. Thus, defendants in that action did not argue that MCC did or should

have known of their actions. Indeed, the *MCC v. Uzan* court recognized that investigations by

Turkish regulators might have provided some notice to MCC and Nokia officials concerning the

Uzans' fraudulent behavior prior to Telsim's default; but, as the court observed,

> Turkey was a tempting market for cellular communications expansion, and the
> Uzans lulled the plaintiffs into complacency by making timely payment on small
> initial transactions by which plaintiffs "tested the waters." Once, moreover, plaintiffs
> had committed very large sums in reliance on defendants' false representations
> regarding the transactions here in issue, they were psychologically predisposed to
> credit defendants' further lies rather than admit that they had been swindled and
> faced huge losses.

49

*Id.* at 558.[20] It is conceivable, in any event, that Lead Plaintiff can demonstrate that even if they could not have known about the Uzans' misconduct, Motorola officials knew or were recklessly unaware of the risks associated with the Telsim loan.

Lead Plaintiff identifies numerous circumstances that raise an inference that Motorola officials should have been aware of the risks associated with the Telsim loan. As noted, the Complaint alleges that on or about August 2000, an unidentified Telsim representative told an unnamed individual at Motorola that Telsim had failed to find an interested buyer; nevertheless, on September 29, 2000, Motorola agreed to extend an additional $600 million loan to Telsim. (Cmplt. ¶¶ 163-66.) "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Rehm*, 954 F. Supp. at 1255 (citing *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y. 1989)). In addition, according to Lead Plaintiff, on numerous occasions during an unspecified two-year period, the Uzans failed to comply with requests by Motorola Vice Presidents Hughes and Keating for financial statements and other records from Telsim. (Cmplt. ¶ 98.) Lead Plaintiff further claims that in a March 9, 2000 email to Hughes and Keating, Hakan Uzan referred to Motorola's senior officers as "the guys with shaky hands," suggesting that Uzan himself was aware that Motorola officials had lost confidence in Telsim's financial soundness. (*Id.* ¶ 123.)

In a December 14, 2000 meeting with Hughes and Keating, Hakan Uzan allegedly acknowledged that he had improperly used funds from Motorola's September 1999 loan "to cover payments required during a run on one of the Uzan-controlled banks." (*Id.* ¶ 183.) On an unspecified date, Hughes confronted Hakan Uzan about a $38 million apartment he had acquired in New York, to which Mr. Uzan replied, "[w]e were hoping you guys didn't find that out." (*Id.*

---

[20]    The court notes that although Judge Rakoff noted the Uzans' "making timely payment on small initial transactions," Lead Plaintiff's Complaint does not indicate that Telsim repaid any portion of the amounts Motorola loaned to Telsim between November 29, 1994 and September 29, 2000, nor do Defendants claim that Telsim has repaid any portion of that debt.

¶ 184.) Mr. Uzan told Hughes and Keating during a January 9, 2001 meeting that he might not pay the Turkish Football League amounts he owed. (*Id.* ¶ 185.) Lead Plaintiff claims that, despite knowing these facts, Motorola did not inform investors in its January 10, 2001 press release of the risks of the outstanding Telsim loan. (Lead Pl. Resp., at 24.)

Lead Plaintiff also claims the court can infer Motorola's knowledge from the sheer size of the Telsim loan. Although the mere fact that a company's financial reporting was inaccurate does not establish scienter, the magnitude of reporting errors may lend weight to allegations that Motorola was reckless in failing to detect the errors where they were in a position to do so. *Rehm,* 954 F. Supp. at 1256 (citations omitted). "The more serious the error, the less believable are defendants['] protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *Id.*

In any event, Lead Plaintiff urges, Motorola was aware that investors would find the vendor-financed nature of the Telsim relationship material in light of the approximately $4 billion Motorola lost when Iridium, to which Motorola had provided "billions of dollars in equity, debt and vendor financing," declared bankruptcy on August 13, 1999. (Cmplt. ¶ 87.) Lead Plaintiff contends that the statement that "there is an element of financing" in the Telsim transaction misleadingly minimized the scope of Motorola's financial commitment and constitutes additional evidence of an intent to defraud. (Lead Pl. Resp., at 25.) Further evidence of fraudulent intent, Lead Plaintiff asserts, is found in the discrepancy between the December 1999 Memorandum of Understanding to provide Telsim with an additional $450 million loan and the February 1, 2000 amendment to the Equipment Financing Agreement to reflect the increase in Telsim's total indebtedness, suggesting that Motorola wished to delay reporting the loan amount until 2000 while reporting the revenue gain in 1999. (Cmplt. ¶¶ 104-07.)

Lead Plaintiff notes that in its second quarter 2000 Form 10-Q, Motorola disclosed that as of July 1, 2000, it had provided a total of $457 million in vendor financing to Nextel

51

Communications, but did not mention Motorola's vendor financing to Telsim or any other customer. (*Id.* ¶ 156-57.) According to Lead Plaintiff, this discrepancy implies that Motorola intended to deceive investors regarding the large concentration of vendor financing in Telsim which, at that time, totaled $1.3 billion. (Lead Pl. Resp., at 26.)

Lead Plaintiff's claims regarding Motorola's scienter can be summarized as follows: Motorola officials knew or were reckless in not knowing that Motorola had concentrated a significant amount of its vendor financing in a single customer in an emerging market that had recently experienced substantial economic disruption and multiple natural disasters in exchange for stock of uncertain value. These officials also knew or were recklessly unaware that Motorola continued to extend vendor financing even after Telsim denied Motorola's requests to review its books and other potential investors had declined to extend loans to the company.

As explained above, Defendants argue that the thrust of Lead Plaintiff's accounting allegations is that Motorola should have taken a charge to increase Motorola's allowance for the loan to Telsim earlier than it did,[21] because they knew the Telsim loan was "bad" when it was made. (Def. Mem., at 19.) Our Circuit Court of Appeals has explained that allegations that a company should have written a bad loan off sooner because it was likely to be uncollectible, without more, does not constitute fraud. *DiLeo*, 901 F.2d at 627. On the other hand, the Second Circuit has observed that the write-off of a $73.8 million loan, together with allegations of poor sales, rendered less credible the proposition that during the class period, the company believed it likely that it could recover the amount of the loan through future sales. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

---

[21] On its Form 10-Q for the third quarter of 2001, filed with the SEC on November 9, 2001, Motorola recorded a $1.5 billion pre-tax charge in connection with the Telsim loans. (Ex. 15 to Def. Mem., at 18.)

As noted earlier, as the court reads the Complaint, Lead Plaintiff has not in fact alleged that Motorola's failure to write the Telsim loan off earlier constitutes a "misstatement." Instead, Lead Plaintiff here has alleged that the Company, through one or more of its representatives, knew facts or had access to information, through various named and unnamed officials, suggesting that the Company's public statements were not accurately forthcoming, and that Company officials failed to check information they had a duty to monitor. *See Novak*, 216 F.3d at 308. Lead Plaintiff's allegations regarding the huge size of the Telsim loan, misbehavior by the Uzans, other potential lenders' assessment of the Telsim risk, and Telsim's pattern of default on loan payments and refusal to provide access to its financial records, combined with the well-known economic conditions and devastating earthquakes that occurred in Turkey prior to and during the Class Period, raise a strong inference that Motorola was aware of the risks inherent in its extensions of credit to Telsim. Motorola's numerous public statements touting the benefits of the Telsim transaction, without disclosing the associated risks, and its practice of providing general information regarding vendor financing and specific information regarding financing to Nextel, without specifically mentioning Telsim, bolster the inference that Motorola, through its various officials, sought to mislead the investing public.

As noted, Telsim's letter published in the May 29, 2003 edition of the *Wall Street Journal*, stated that "[a]lthough Motorola issued multiple press releases describing the potential billions of dollars in revenues that would be generated as a result of its partnership with Telsim, shareholders were not told that their own money was being used to finance the equipment sales." Referring to the September 29, 2000 agreement to loan Telsim an additional $450 million to purchase infrastructure equipment, the letter added that Motorola had "persuaded Telsim to accept a particularly large shipment of equipment, much of which was deficient. . . . Motorola booked the sales immediately, thereby inflating its sales figures for that quarter." (Cmplt. ¶ 168.) For the

foregoing reasons, the court declines to dismiss Lead Plaintiff's complaint as to Defendant Motorola.

### 2. Individual Defendants

#### a. Circumstantial Evidence of Knowledge or Recklessness

Although the Complaint identifies circumstances that were known to Motorola officials generally, it does not allege facts that would give rise to a strong inference that Defendants Galvin, Growney, or Koenemann themselves knew or were reckless in not knowing that the company's public statements were not accurate, or that they failed to check information they had a duty to monitor. As Defendants point out, Lead Plaintiff fails to allege that Individual Defendants were themselves aware of any of the communications between the Uzans and various Motorola employees. (Def. Mem., at 17.) In fact, the court can find only two allegations regarding Individual Defendants' knowledge or reckless behavior. The first is the contention that "Individual Defendants were . . . actually aware of and received reports about the financing provided to Telsim and the potential problems associated with Telsim's inability to pay Motorola back." (Cmplt. ¶ 241.) Such generalized allegations do not constitute concrete circumstantial evidence of knowledge or recklessness.

The second is Lead Plaintiff's assertion that "[t]he extent of the Telsim indebtedness was so significant to Motorola's operations that the Individual Defendants are presumed to have actual knowledge." (*Id.*) Several courts have concluded that allegations that corporate officials, because of their positions within the company, must have known a statement was false or misleading do not suffice under the PSLRA, regardless of the defendants' positions within the company. *See, e.g., Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir. 2002); *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1263-64 (10th Cir. 2001); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir. 1999); *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir. 1998); *Johnson v. Tellabs, Inc.,*

262 F. Supp. 2d 937, 957 (N.D. Ill. 2003); *Chu II*, 100 F. Supp. 2d at 837. Lead Plaintiff points to *Stavros*, in which the court stated that allegations that key officials knew of facts critical to a business's core operations or to an important transaction that would affect the company's performance imply that such officials knew a statement was false. 266 F. Supp. 2d at 850.

In *Spiegel*, plaintiffs alleged, *inter alia*, that defendant Spiegel, Inc. ("Spiegel") and its current or former officers and directors engaged in a fraudulent scheme to boost product sales that allowed the company to understate its debt by more than $3 billion and overstate its earnings by $240 million. 2004 WL 1535844, at *1. Individual defendants urged that plaintiffs had not identified any false or misleading statements directly attributable to them during the Class Period, but that plaintiffs had instead utilized the "group pleading doctrine." *Id.* at *20. This court found there were sufficient allegations that the individual defendants had access to information about the company's financial practices during the Class Period, and that they had specific knowledge of Spiegel's credit-related problems, to raise a strong inference that individual defendants were aware that the company had recorded $240 million of phony gains and had understated its debt by some $3 billion during the Class Period. *Id.* at *25. Although the evidence might ultimately show that the individual defendants were not in a position to detect the errors notwithstanding their status as directors and members of Spiegel's Board and Audit Committees, and despite any information they received, this court found that possibility was not a basis for dismissal. *Id.*

In this case, on the other hand, Lead Plaintiff has made no allegations that Individual Defendants had specific knowledge of the details concerning Motorola's loan to Telsim. For instance, Lead Plaintiff could have alleged that Individual Defendants' access to financial data, together with their oversight of lower-level officers and their monitoring of identified correspondence with Telsim representatives, gave Individual Defendants a clear understanding of the risks underlying the Telsim loan. The court finds that Lead Plaintiff has not pointed to any circumstantial evidence giving rise to an inference that Individual Defendants knew of any facts critical to the

Telsim loan. The court turns to consider whether Lead Plaintiff alleges facts raising an inference that Individual Defendants had both motive and opportunity to commit fraud.

### b.    Motive and Opportunity to Commit Fraud

As discussed above, under the Second Circuit test set forth in *Press*, a plaintiff may raise a strong inference of scienter by alleging either (1) facts showing that defendant had motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of deceitful intent or recklessness. 166 F.3d at 538. To establish motive, Lead Plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (internal quotation marks and citations omitted). Lead Plaintiff alleges that Defendants were motivated to engage in fraud because they knew the following asserted facts: (1) missing Wall Street's expectations would have a "devastating effect" on Motorola's stock price and on their own careers; (2) failure to provide continued financing to Telsim would result in the loss of significant reported revenue and would lead to, and necessitate disclosure of, Telsim's default; (3) losing Telsim business would prevent Motorola from making its third quarter 2000 numbers; and (4) loss of credibility if Telsim financing were revealed, in light of Motorola's failed investment in Iridium. (Id. ¶ 245.) Lead Plaintiff also alleges that Individual Defendants were motivated to engage in a scheme to defraud investors in order to enhance their the performance-based bonuses, stock options, and restricted stock awards. (*Id.* ¶¶ 247-256.) The Complaint also claims that Galvin "set very high internal targets for revenue growth" as he believed his status as CEO was tenuous. (*Id.* ¶ 55.)

Defendants contend that these allegations are insufficient to plead scienter on the ground that they apply to any corporate officer. (Def. Mem., at 21.) In support, Defendants cite *Chu II*, 100 F. Supp. 2d at 841, in which the court stated that allegations regarding corporate officers' desire

to earn production bonuses are insufficient facts from which to infer scienter, as this is a goal of any corporate executive. Defendants also point to *Weiner v. Quaker Oats Co.*, No. 98 C 3123, 2000 WL 1700136, at *13 (N.D. Ill. Nov. 13, 2000), in which this court found that allegations that defendants' desire to inflate the price of company common stock or to preserve management jobs are insufficient to satisfy scienter.

In response, Lead Plaintiff points to *Cabletron*, in which the court found that plaintiff had adequately pleaded scienter where "the executives' careers and the very survival of the company were on the line." 311 F.3d at 39; *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (inferring motive where "success of the new products, and of taking the old line company into a new world, was important to [corporate officers'] own survival and that of the company"). The court finds *Cabletron* distinguishable, however. Lead Plaintiff's Complaint contains only one vague assertion that an Individual Defendant was motivated by fear of losing his job: Galvin set very high internal targets for revenue growth at some point prior to 1998 because he knew his position was "tenuous." (*Id.* ¶ 55.) Lead Plaintiff does not specifically allege that Galvin (or Growney or Koenemann) ever directed Motorola employees to provide vendor financing to Telsim based on their fears that they would lose their positions or that Motorola's survival was at stake. Indeed, Lead Plaintiff does not allege that Individual Defendants made any decisions whatsoever with regard to the Telsim deal.

Lead Plaintiff also implicitly alleges that Galvin engaged in insider trading in that he sold 165,000 shares of common stock 11 days before Motorola's debt ratings were placed on review for possible downgrading. (Cmplt. ¶ 257.) Defendants argue this allegation is insufficient to raise an inference of motive, as Lead Plaintiff neglects to show how this sale compares with Galvin's prior trading history. In support, Defendants cite *In re System Software Associates, Inc.*, in which this court concluded that a plaintiff must show that a sale of stock "was drastically out of line with

prior trading practices and that the sale was timed to maximize personal benefit from undisclosed inside information." No. 97 C 177, 2000 WL 283099, at *13 (N.D. Ill. Mar. 8, 2000) (citing *Freeman v. Decio*, 584 F.2d 186, 197 n. 44 (7th Cir. 1978); *Rehm*, 954 F. Supp. at 1254; *see also Johnson*, 262 F. Supp. 2d at 955-56 ("the insider trading must be dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information") (internal quotation marks and citation omitted). Defendants point out, moreover, that Lead Plaintiff does not allege that Koenemann or Growney sold any Motorola stock during the Class Period. (Def. Mem., at 22.) Defendants note that several district courts in other circuits have concluded that the absence of insider trading actually negates an inference of scienter. *See D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 743 n.22 (E.D. Mich. 2003) (collecting cases). In any event, the court concludes that Lead Plaintiff's implicit allegation that Galvin engaged in insider trading by pointing to a single sale of stock, without more, cannot establish motive.

The court concludes that Lead Plaintiff has not stated with particularity facts giving rise to a strong inference that Individual Defendants acted with scienter. The court therefore dismisses Lead Plaintiff's §10(b) claims against Individual Defendants without prejudice.

**II.    Section 20(a) Claims**

To state a claim under § 20(a) of the Act, Lead Plaintiff must allege "(1) a primary securities violation; (2) [that] each of the Individual Defendants exercised general control over the operations of [Motorola]; and (3) [that] each of the Individual Defendants 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" *Johnson*, 303 F. Supp. 2d at 969 (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). Defendant argues that the § 20(a) claims against Individual Defendants should be dismissed on the ground that Lead Plaintiff fails to plead a primary cause of action under § 10(b) and Rule 10b-5. (Def. Mem., at 29-30.) Courts in this

district have held that when a plaintiff fails to plead a primary violation under § 10(b) and Rule 10b-5, § 20(a) claims against controlling persons also fail. *Stavros*, 266 F. Supp. 2d at 852 (citing *Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, at *9 (N.D. Ill. Sept. 28, 2001)). Lead Plaintiff responds that it has pleaded a violation of §10(b) and have alleged "in detail that the Individual Defendants are 'control persons' of Motorola." (Lead Pl. Resp., at 29.)

For the reasons explained earlier, the court concludes that Plaintiff has alleged a primary securities violation against Motorola. Defendants have not directly challenged Plaintiff's allegations concerning the Individual Defendants' ability to control Motorola's conduct. In any event, "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (quoting *Lindelow*, 2001 WL 830956, at *9). As Lead Plaintiff has adequately pleaded a primary securities violation against Motorola, the court declines to dismiss Lead Plaintiff's § 20(a) claims against Individual Defendants.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Docket No. 69-1) is granted in part and denied in part. Specifically, the § 10(b) claims against Individual Defendants are dismissed without prejudice. The motion to dismiss as to the § 10(b) claim against Motorola and the § 20(a) claims against Individual Defendants is denied. Plaintiffs have until September 17, 2004 to file an amended complaint consistent with this opinion, and Defendants have until October 8, 2004 to answer or otherwise plead. Rule 16 conference is set for October 29, 2004, at 9:30 a.m.

ENTER:

Dated: September 9, 2004

REBECCA R. PALLMEYER
United States District Judge