**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

|   |   |   |
|---|---|---|
| IN RE: | ) | No. 03 C 287 |
|  | ) |  |
| MOTOROLA SECURITIES | ) | Judge Rebecca R. Pallmeyer |
| LITIGATION | ) |  |

<u>**MEMORANDUM OPINION AND ORDER**</u>

   This consolidated securities fraud class action, brought by Lead Plaintiff The State of New Jersey, Department of the Treasury, Division of Investment ("New Jersey") against Motorola, Inc. ("Motorola") and three of its senior executives (collectively, "Defendants"), arises from the relationship between Motorola and Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("Telsim"), a Turkish cellular telephone service provider.  Lead Plaintiff alleges that Defendants misrepresented or failed to disclose material facts relating to a series of transactions in which Motorola sold billions of dollars worth of cellular handsets and infrastructure equipment to Telsim, but provided Telsim with 100% of the financing for the purchases and for working capital.  Lead Plaintiff alleges that these misrepresentations violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "SEA"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Defendants have filed two motions for summary judgment, one arguing that the action is barred by the statute of limitations, and the other contending that Lead Plaintiff cannot, as a matter of law, establish that Defendants' eventual disclosures of Telsim-related information caused the share price declines of Motorola common stock for which Lead Plaintiff seeks damages.  For the reasons explained below, Defendants' motion for summary judgment (statute of limitations) is denied, and their motion for summary judgment (loss causation) is granted in part and denied in part.

# **BACKGROUND**[1]

---

[1]     The facts presented here are drawn from the parties' Local Rule 56.1 statements. Defendants have filed two separate motions for summary judgment, supported by separate 56.1 Statements. Defendants' Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue (Statute of Limitations) is cited here as "Def.'s 56.1 (SOL)." Defendants' Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue (Loss Causation) is cited here as "Def.'s 56.1 (LC)." Lead Plaintiff's Response to Defendants' Rule 56.1 Statement in Support of Summary Judgment (Statute of Limitations) is cited here as "Pl.'s 56.1 Resp. (SOL)." Lead Plaintiff's Response to Defendants' Rule 56.1 Statement in Support of Summary Judgment (Loss Causation) is cited here as "Pl.'s 56.1 Resp. (LC)."

Lead Plaintiff has chosen to consolidate its further responses. Lead Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 in Opposition to Defendants' Motions for Summary Judgment, which the court construes as Lead Plaintiff's statement of additional facts pursuant to Local Rule 56.1(b)(3)(C), is cited here as "Pl.'s 56.1 Addnl." Defendants' Reply to Lead Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 in Opposition to Defendants' Motions for Summary Judgment is cited here as "Def.'s 56.1 Addnl. Resp."

Defendants object to Lead Plaintiff's 56.1 statement of additional facts on several grounds. Primarily, Defendants contend that it contains facts that are not relevant to Defendants' summary judgment motions. (Def.'s 56.1 Addnl. Resp., at 1.) To each of these allegedly irrelevant facts, Defendants have responded as follows:

> There is no dispute of material fact concerning this paragraph for purposes of the instant motions for summary judgment. Defendants do dispute certain characterizations and/or specific factual assertions contained within this paragraph and reserve their rights to dispute any and all aspects of the statements in this paragraph at trial, but any disputes Defendants have concerning this paragraph are not material for purposes of the instant motions. Even if the Court were to accept this statement as true for purposes of the motions, the statement has no relevance to the legal issues presented by the motions.

(*E.g., id.* ¶ 1.) Where Defendants provide the above response, without citation to the record in support of a specific denial, the court considers Lead Plaintiff's assertion of fact as true for purposes of these motions.

Defendants further object that Lead Plaintiff's statement of additional facts violates Local Rule 56.1 because it contains argument rather than statements of fact, omits citations to evidence in the record, and uses multiple subparagraphs to evade the Rule's limit of forty short, separately numbered statements of fact. (*Id.* at 1-2; *e.g.,* Pl.'s 56.1 Addnl. ¶ 16 (containing ten subparagraphs).) *See* N.D. Ill. R. 56.1 (b)(3)(C). The court agrees that Lead Plaintiff has not complied with Local Rule 56.1, but declines Defendants' invitation to "ignore Lead Plaintiff's Statement of Facts in its entirety." (Def.'s 56.1 Addnl., at 2.) Rather, the court will note specific instances where Lead Plaintiff's statement of additional facts fails to comply with Local Rule 56.1, and will sustain Defendants' objections where appropriate.

Finally, the factual background presented here refers to materials that both parties have redacted, in accordance with Defendants' unopposed motions to maintain confidential materials as restricted documents. The court, however, deems such confidentiality waived where reference to confidential material is necessary to the disposition of this litigation. *See* Order of 1/03/2007. Moreover, the court is not persuaded of the need to maintain confidentiality to the extent advocated by Defendants. The court is sensitive to Motorola's desire not to reveal its strategic and competitive

(continued...)

## I.    Motorola and Telsim

Motorola designs, manufactures, sells, installs, and services communications and other electronics equipment, including wireless handsets and wireless infrastructure equipment used in operating wireless networks. (Pl.'s 56.1 Addnl. ¶ 1.) A Delaware corporation, Motorola maintains its principal executive offices in Schaumburg, Illinois, and is listed on the New York Stock Exchange. (Def.'s 56.1 (SOL) ¶ 5.) Defendant Christopher B. Galvin was, during the class period, Chief Executive Officer of Motorola and Chairman of its Board of Directors. (*Id.* ¶ 6.) Defendant Carl F. Koenemann was Motorola's Executive Vice President of Finance and Chief Financial Officer. (*Id.* ¶ 7.) Defendant Robert L. Growney was Chief Operating Officer, and also served as a director and as Vice Chairman of Motorola from 1997 through 2001. (*Id.* ¶ 8.) Lead Plaintiff has alleged that it purchased publicly-traded Motorola securities between February 3, 2000 and May 14, 2001 (the "Class Period"). (*Id.* ¶ 4.)

Motorola provides its cellular infrastructure equipment and handsets to cellular operators throughout the world. (*Id.* ¶ 22.) Until 2001, one such customer was Telsim, a Turkish telecommunications company formed in 1993 to develop a wireless communications network in that country. (*Id.* ¶ 19; Def.'s 56.1 (LC) ¶ 9.) Telsim was Turkey's second-largest provider of cellular telephone service from 1997 to 2001; during this time, Turkey's largest cellular service provider,

---

[1](...continued)
position with respect to the process by which it provides financing to its customers. The court notes, however, that to the extent Motorola's dealings with Telsim reflect its vendor financing practices, there is little left to be revealed: by Motorola's own admissions, both in this litigation and in Motorola's separate lawsuit against the controllers of Telsim, it provided a massive amount of vendor financing to a customer with a poor business reputation, and continued to do so despite warning signs. Indeed, the essence of Lead Plaintiff's complaint is that Motorola concealed from investors a risky business venture that caused shareholder losses when eventually revealed. Accordingly, the court will discuss evidence redacted by the parties to the extent necessary to decide the pending motions. Finally, both parties have also redacted the entirety of reports from their expert witnesses, much of which does not incorporate confidential information but merely states the experts' conclusions. The court discusses these reports where relevant, as well.

Turkcell, obtained its wireless equipment exclusively from Ericsson, a competitor of Motorola's.[2]

(Def.'s 56.1 (LC) ¶¶ 9, 11.)  Telsim was controlled by members of the Uzan family, including Kemal

Uzan and his sons; Kemal Uzan's son Hakan Uzan was the primary contact liaison between Telsim

and Motorola.  (*Id.* ¶ 10; Pl.'s 56.1 Addnl. ¶ 2.)  The Uzans had a "very bad public reputation for

basic honesty and integrity."[3]  (Def.'s 56.1 (LC) ¶ 16 (quoting Rebuttal Expert Report of Professor

Charles A. Warner ("Werner Rebuttal"), Ex. 5 to Schwartz Decl., at 7).)  News stories appearing

---

[2]    Lead Plaintiff disputes that Ericsson's relationship with Turkcell was "exclusive," as well as Defendants' additional assertion that this exclusive relationship was "public knowledge" during the Class Period.  (Pl.'s 56.1 Resp. (LC) ¶ 11.)  Defendants cite to the report of one of their expert witnesses, who states (in a portion of his report redacted by the parties but which appears to be non-confidential) that Ericsson was Turkcell's "sole vendor."  (Expert Report of Professor G. "Anand" Anandalingam ¶ 54, Ex. 3 to Declaration of Robert Alexander Schwartz in Support of Defendants' Motions for Summary Judgment ("Schwartz Decl.").)  Defendants also cite a February 1999 news article reporting that Ericsson would be the "exclusive vendor" for Turkcell's expansion of its GSM network.  (*Ericsson in $520 Million GSM Supply Deal with Turkcell*, COMMUNICATIONS TODAY, Feb. 5, 1999, Ex. 4 to Schwartz Decl.)  Lead Plaintiff counters with a citation to Turkcell's 2000 prospectus for an initial public offering, which states that Turkcell was "not bound to purchase [its network] equipment solely from Ericsson."  (Turkcell Prospectus, July 10, 2000, Ex. T to Declaration of James A. Harrod in Support of Lead Plaintiff's Rule 56.1 Statement in Opposition to Defendants' Motions for Summary Judgment (Loss Causation and Damages) ("Harrod Decl."), at 22.)  That same prospectus, however, states that Turkcell "currently purchase[s] all" its network equipment from Ericsson.  (*Id.*)  The court thus finds that the evidence supports Defendants' assertion of an "exclusive" relationship between Ericsson and Turkcell, at least through July 2000.

Whether that relationship was "public knowledge" is not as evident.  Lead Plaintiff cites to a Bloomberg News article from April 2001 in which a columnist, discussing Motorola's reference to a "Turkish customer" in an SEC filing, assumed that Motorola's customer was Turkcell, (Mark Gilbert, *Rating Cut May Leave Motorola Gasping Like Xerox*, BLOOMBERG NEWS, Apr. 6, 2001 (8:49 a.m.), Ex. AAA to Harrod Decl., at 3); the article was subsequently corrected to identify Telsim as Motorola's customer.  (Pl.'s 56.1 Resp. (LC) ¶ 11; Mark Gilbert, *Rating Cut May Leave Motorola Gasping*, BLOOMBERG NEWS, Apr. 6, 2001 (2:45 p.m.), Ex. BBB to Harrod Decl., at 3.)  The court concludes that although Ericsson's exclusive relationship with Turkcell was not a secret, Defendants' assertion that such exclusivity was "public knowledge" is overbroad.

[3]    Lead Plaintiff purports to dispute Defendants' assertions about the Uzans' public reputation.  (Pl.'s 56.1 (LC) Resp. ¶ 16.)  The court notes, however, that Defendants' assertions repeat the opinion of Lead Plaintiff's own expert witness, who in turn based his opinion on 165 news articles referring to the Uzan family between 1985 and 2001.  (Werner Rebuttal, at 7.)  Moreover, Lead Plaintiff does not controvert Defendants' assertion about the Uzans' public reputation so much as make additional assertions that Motorola, in particular, knew of the Uzans' reputation, and that investors did not know the full extent of Motorola's dealings with the Uzans.  (Pl.'s 56.1 (LC) Resp. ¶ 16.)  These additional assertions are not inconsistent with Defendants' assertions of fact with regard to the Uzans' public reputation.

between 1985 and 2001 reported that the Uzans had a history of questionable business practices and relationships. (Werner Rebuttal, at 7.) Financial media reported that the Uzans had improperly transferred funds and committed other financial irregularities in connection with an electric company they controlled, culminating in authorities raiding the company's headquarters and seizing its books. (*Id.* at 7-8; Def.'s 56.1 (LC) ¶ 16.) The Uzans and the companies they controlled had also been accused of libel and with blackmailing a dairy company. (Werner Rebuttal, at 8; Def.'s 56.1 (LC) ¶ 16.) Other "severely adverse information about the Uzans . . . was readily available" during the Class Period. (Def.'s 56.1 (LC) ¶ 16 (quoting Werner Rebuttal, at 8).)

It is unclear when Motorola began its relationship with Telsim. The existence of that relationship became public knowledge in any event on December 3, 1996, when Motorola issued a press release announcing a $90 million contract for the sale of cellular infrastructure equipment to Telsim.[4] (*Id.* ¶ 12; Expert Report of Professor Charles A. Werner ("Werner Report"), Ex. 1 to Schwartz Decl., at 4.) Larger transactions followed. Beginning in April 1998, Motorola and Telsim entered into a series of "vendor financing" agreements in which Motorola sold cellular products to Telsim but did not seek immediate cash payment; rather, through its subsidiary Motorola Credit Corporation ("MCC"), Motorola provided financing for the purchases as well as for "working capital."[5] (Def.'s 56.1 (SOL) ¶¶ 23-25; Def.'s 56.1 (LC) ¶ 13; Pl.'s 56.1 Addnl. ¶ 2.) Specifically,

---

[4]     Lead Plaintiff purports to dispute that the relationship became "public knowledge" with the December 3 press release, asserting that investors were not informed of "material facts" of Motorola's sales to Telsim such as the amount of vendor financing or the risk of non-payment. (Pl.'s 56.1 Resp. (LC) ¶ 12.) Because Defendants assert only that the existence of the relationship, rather than its scope, became public knowledge on December 3, 1996, the court deems Defendants' assertion undisputed.

[5]     Defendants assert that vendor financing is a common business practice, widely accepted across many industries. (Def.'s 56.1 (LC) ¶ 13.) In its Local Rule 56.1 response, Lead Plaintiff agrees with this proposition, but maintains that Motorola's vendor financing agreements with Telsim were "unusual" because, *inter alia*, the loans suffered from a "lack of good collateral," and Motorola was aware of the Uzans' prior conduct. (Pl.'s 56.1 Resp. (LC) ¶ 13.) These additional assertions do not controvert Defendants' assertion that vendor financing is a common business (continued...)

in vendor financing agreements dated April 24, 1998,[6] Motorola loaned Telsim $200 million to finance the purchase of a $500 million telecommunications license from the Turkish government, and provided $360 million in vendor financing for sales to Telsim of handsets and infrastructure equipment. (Pl.'s 56.1 Addnl. ¶ 3.) At this time, Telsim had outstanding to Motorola $52.5 million in promissory notes incurred in connection with (unidentified) earlier purchases. (*Id.*) In August 1998, Motorola, subject to Telsim's guarantee of payment, provided $60 million in license financing and $9 million in equipment financing to L.L.L. KaR-Tel ("KaR-Tel"), a Kazakhstan wireless telecommunications company 70% owned by the Uzan family. (Pl.'s 56.1 Addnl. ¶ 4.)

By December 1998, Motorola had determined that it had reached its limit with regard to vendor financing for Telsim.[7] (*Id.* ¶ 5.) Accordingly, Motorola sought Telsim's cooperation in obtaining financing from third parties to enable Telsim to continue to purchase handsets and infrastructure equipment from Motorola. (*Id.*) Although the parties dispute Telsim's level of

---

[5](...continued)
practice.

[6] Lead Plaintiff asserts that "[e]ach of the Motorola-Telsim lending agreements were dated 'as of' certain dates rather than the date the agreements were actually signed." (Pl.'s 56.1 Addnl., at 1 n.4.) Lead Plaintiff does not cite to any evidence in support of this assertion, or explain its relevance; accordingly, the court disregards it. *See* N.D. Ill. R. 56.1.

[7] Defendants dispute this assertion. (Def.'s 56.1 Addnl. Resp. ¶ 5.) Lead Plaintiff, however, cites to e-mails in which senior MCC employees officials state that MCC had "reached [its] maximum exposure" and "hit [its] internal ceilings" in 1998. (E-mail from Tatje to Severns of Aug. 1, 2001, Ex. MMM to Harrod Decl.; E-mail from Atkins to Nemcek and Keating of Dec. 14, 1998, Ex. F to Harrod Decl.) In response, Defendants cite only to the deposition testimony of Walter Keating, who, when asked whether Motorola had "hit in December 1998 its internal ceilings," answered "I don't recall that." (Keating Dep., Ex. 1 to Declaration of James W. Thomas, Jr. in Support of Defendants' Reply to Lead Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 in Opposition to Defendants' Motions for Summary Judgment ("Thomas Decl."), at 199.) Defendants do not identify Keating's position with Motorola; Lead Plaintiff refers to him as a "senior MCC officer." (Pl.'s 56.1 Addnl. ¶ 5.) In the court's view, Keating's lack of recall does not rebut Lead Plaintiff's assertion.

cooperation in these efforts,[8] it is undisputed that Motorola did not secure third party financing for Telsim.  (*Id.* ¶ 8.)  Motorola then amended the April 1998 vendor financing agreements to provide additional financing for infrastructure purchases, handset purchases, and working capital: $123 million in August 1999, $155 million in September 1999, and $450 million in February 2000.  (*Id.*)  Motorola provided this financing despite the fact that Telsim had been unable to make a substantial payment due to Motorola on June 30, 1999, and had defaulted on the promissory notes that had been outstanding at the time of the April 1998 agreements; Motorola restructured that delinquent debt in terms favorable to Telsim.  (*Id.* ¶¶ 9-10.)  In September 2000, Motorola again amended the April 1998 agreements to advance another $700 million in vendor financing to Telsim, of which $250 million was for working capital.  (*Id.* ¶ 13.)  Further amendments in January 2001 again restructured Telsim's payments, providing below-market interest rates and allowing Telsim to avoid paying interest on accrued interest.  (*Id.* ¶ 14.)  All told, Motorola's Telsim-related vendor financing arrangements approximated $2 billion by the end of the first quarter of 2001.  (Def.'s 56.1 (LC) ¶ 14.)  This debt was secured by a share pledge of sixty-six percent of Telsim's capital stock,[9] (*id.*), which was not publicly traded.  (Answer ¶ 76.)

For the six quarters ending on December 31,1999 through March 31, 2001, Motorola recognized revenue on sales of equipment and services to Telsim, and interest income on Telsim's outstanding debt.  (Pl.'s 56.1 Addnl. ¶ 17.)  Lead Plaintiff asserts that this practice violated generally accepted accounting principles ("GAAP") because the collectibility of revenue and interest income

---

[8]    Specifically, the parties dispute the facts of an incident in which, according to Lead Plaintiff, Telsim falsely accused an employee of Deutsche Bank (Motorola's advisor) of stealing documents from Telsim.  (Pl.'s 56.1 Addnl. ¶ 6.)  This dispute is not relevant to the pending motions.

[9]    Lead Plaintiff purports to deny that the debt was secured by a share pledge of Telsim stock, (Pl.'s 56.1 (LC) ¶ 14), but Lead Plaintiff itself elsewhere asserts that Telsim shares were pledged as collateral for the loan.  (Pl.'s 56.1 Addnl. ¶ 16(a).)

from Telsim was not "reasonably assured."[10]  (*Id.* ¶¶ 15-17.)  Lead Plaintiff further asserts that

Motorola improperly reduced its loan loss reserves for the Telsim vendor financing and thus

"manufactured additional profit" in order "to achieve quarterly profit objectives."  (*Id.* ¶ 18.)

According to Lead Plaintiff, in the five quarters ending on December 31, 1999 through December

31, 2000, Motorola achieved net income expectations by reporting inflated operating profits on

sales to Telsim, income interest on the Telsim debt, and by reducing loan loss reserves.[11]  (*Id.* ¶

37.)  In particular, Motorola inflated its operating profits in the fourth quarter of 2000 by $300.6

million, and its earnings per share by $0.10, by improperly reporting net sales and interest income

related to Telsim.  (*Id.*)  As for the first quarter of 2001, Lead Plaintiff asserts that Defendants

anticipated "being able to manipulate" operating results by including yet more vendor-financed sales

to Telsim, and by again reducing loan loss reserves.  (*Id.* ¶ 38.)  Motorola tried to secure additional

sales to Telsim as late as January 28, 2001, by inviting Hakan and Cem Uzan to a sporting event.

(*Id.*)

---

[10]     The parties have redacted material relevant to Lead Plaintiff's assertions, but have
not satisfied the court that it should remain confidential.  Lead Plaintiff asserts that the collectibility
of Telsim debt was not reasonably assured because, *inter alia*, the Turkish government had not pre-
approved the transfer of the Telsim shares pledged as collateral; Telsim was an investment risk due
to the possibility of rapid devaluation of the Turkish lira; Motorola was aware of the Uzans'
checkered reputation and business history; and Telsim had inadequate cash flow, was delinquent
in paying its taxes, and had vendor financing debt outstanding to the Finnish telecommunications
company Nokia that was senior to Motorola's.  (Pl.'s 56.1 Addnl. ¶ 16.)  Defendants maintain that
revenue recognition was proper because Telsim was in a rapidly growing market and Motorola
could "independently verify Telsim's growth"; therefore, Motorola reasonably believed that Telsim
could repay its obligations.  (Def.'s 56.1 Addnl. Resp. ¶ 16.)  The court need not resolve this
dispute, as it is not relevant for purposes of Defendants' pending motions.

[11]     In their Local Rule 56.1 reply to Lead Plaintiff's statement of additional facts,
Defendants do not dispute Lead Plaintiff's assertions of inflated profits and manufactured earnings;
rather, Defendants respond with the boilerplate language quoted *supra* n.1, contending that those
assertions are not material to the instant motions but reserving their right to dispute them at trial.
(Def.'s 56.1 Addnl. Resp. ¶¶ 37-38.)

## II.     Motorola's Public Disclosures Relating to Telsim and Vendor Financing

### A.     Press Releases and SEC Filings Prior to Feb 23, 2001

Before and during the Class Period, Motorola issued press releases relating to its agreements with Telsim,[12] (Def.'s 56.1 (SOL) ¶ 26; Pl.'s 56.1 Addnl. ¶ 20 & n.4), announcing that Motorola expected billions of dollars in revenue from its relationship with Telsim.  (Pl.'s 56.1 Addnl. ¶ 20.)  A press release issued on May 14, 1998 announced a "$500 million contract" with Telsim for Motorola to provide network infrastructure equipment.  (May 14, 1998 Press Release, Ex. E to Harrod Decl.)  A February 3, 2000 press release trumpeted "the signing of a contract worth $1.5 billion" for Motorola to supply handsets, infrastructure equipment, and services to expand Telsim's GSM network.  (February 3, 2000 Press Release, Ex. O to Harrod Decl.)  On October 31, 2000, Motorola announced an agreement with Telsim for the supply and development of a third-generation mobile network capable of delivering multimedia services; Motorola "estimate[d] that the potential value of the contract could be in excess of $2 billion."  (October 31, 2000 Press Release, Ex. DD to Harrod Decl.)  Motorola also referred to Telsim in the October 31 release as "one of the most successful GSM operators worldwide."  (*Id.*) None of these press releases referred to vendor financing in connection with the announced contracts.  (Pl.'s 56.1 Addnl. ¶ 21.)

Motorola made periodic SEC filings such as annual and quarterly reports, and proxy statements during the Class Period.  (Def.'s 56.1 (SOL) ¶ 26.)  Prior to a Proxy Statement filed on March 30, 2001, it is undisputed that Motorola had made no public disclosure of the extent of its vendor financing to Telsim.  (Pl.'s 56.1 Addnl. ¶ 22.)  Some of Motorola's SEC filings did disclose, in general terms, that Motorola provided vendor financing to its customers.  For instance, Motorola's

---

[12]     Lead Plaintiff purports to dispute this assertion by contending that the press releases, *inter alia*, contained false statements.  (Pl.'s 56.1 Resp. (SOL) ¶ 26.)  These additional allegations and/or legal argument fail to controvert Defendants' assertion that it issued press releases; indeed, Lead Plaintiff itself cites to six such press releases in its Local Rule 56.1 statement of additional facts.  (Pl.'s 56.1 Addnl. ¶ 20 & n.4.)

Form 10-K/A for 1998 stated that its customers were "increasingly requiring financing in connection with equipment purchases," that such financing might include "all or a portion of the purchase price and working capital and can be sizeable," that Motorola had in 1998 "significantly increased the amount" of vendor financing, and that it expected the need for such financing to increase. (Form 10-K/A for 1998, Ex. 8 to Thomas Decl., at 15.) A March 2000 Proxy Statement informed investors that the amount of customer financing provided by MCC had "significantly increased" in 1999 as well. (Def.'s 56.1 (LC) ¶ 25; Schedule 14-A Proxy Statement, March 22, 2000, Ex. 9 to Schwartz Decl., at F-20.) Motorola's Form 10-Q for the third quarter of 2000 (ending September 30, 2000) predicted a "likelihood" that Motorola would further increase its amount of vendor financing. (Form 10-Q for Third Quarter 2000, Ex. 8 to Thomas Decl., at 37.) Motorola's Form 10-K for 2000 disclosed that "a portion" of its vendor financing was "supported directly by Motorola" and carried "higher risks" than third-party financing, particularly as to customers in developing countries. (Form 10-K for 2000, Ex. 8 to Thomas Decl., at 15.) The March 2000 Proxy Statement included "[i]ncreasing demand for customer financing" among its primary business risks.[13] (Def.'s 56.1 (LC) ¶ 27; Schedule 14-A Proxy Statement, March 22, 2000, Ex. 9 to Schwartz Decl., at F-28.) None of Motorola's filings prior to March 2001 identified Telsim as a recipient of vendor financing, however, even while identifying the specific amount of vendor financing provided to another customer, Nextel Communications, Inc. (Pl.'s 56.1 Addnl. ¶ 22.) The March 2000 Proxy Statement, for instance, informed investors that as of December 31, 1999, $797 million of $1.7 billion in long-

---

[13]    Lead Plaintiff denies this assertion, contending that Motorola in the March 2000 Proxy Statement "*failed* to explain 'the risks associated with vendor financing'" because it did not disclose Telsim-related information specifically. (Pl.'s 56.1 Resp. (LC) ¶ 27 (emphasis in original).) Defendants did not, however, assert that the filing "explained" the risks of vendor financing, only that Motorola "included" such risks "among its primary business risks." (Def.'s 56.1 (LC) ¶ 27.) The filing identified a risk resulting from "[i]ncreasing demand for customer financing of equipment sales, particularly infrastructure equipment, and the ability of the Company to provide financing on competitive terms with other companies." (Schedule 14-A Proxy Statement, March 22, 2000, Ex. 9 to Schwartz Decl., at F-28.) The filing thus adequately supports Defendants' assertion.

term receivables "relate[d] to one customer"; the filing did not identify that customer, though it did disclose $457 million in "equipment financing" to Nextel.  (Def.'s 56.1 (LC) ¶ 28; Schedule 14-A Proxy Statement, March 22, 2000, Ex. P to Harrod Decl., at MOT/TEL 03-0117.)

### B.    Moody's Downgrades and Devaluation of Turkish Lira

On December 8, 2000, Moody's Investors Service ("Moody's") issued a "Rating Action" on Motorola debt securities, changing the rating outlook on Motorola and its subsidiary MCC to "negative" from "stable."  (Pl.'s 56.1 Addnl. ¶ 24.)  Moody's noted that Motorola's short-term debt obligations had increased from $2.5 billion at the end of 1999 to about $6.6 billion as of November 3, 2000.  (*Id.*)  The Rating Action stated that "Moody's is also concerned with, and will be closely monitoring, Motorola's need to extend financing to many of its telecom equipment customers . . . ." (*Id.* (quoting Rating Action, Dec. 8, 2000, Ex. II to Harrod Decl.))  Of the $4.1 billion debt increase referenced in the Rating Action, 28% was attributable to the $1.15 billion increase in vendor financing to Telsim during 2000.  (Pl.'s 56.1 Addnl. ¶ 25.)  At a February 8, 2001 meeting with Moody's, Defendant Koenemann and other senior Motorola officers discussed Motorola's exposure to Telsim.  (*Id.* ¶ 26.)  On February 15, 2001, Moody's issued another Rating Action, downgrading Motorola long-term senior unsecured securities from A1 to A2.  (*Id.* ¶ 27.)  The downgrade reflected "the significant build up in debt levels at Motorola," attributable in part to "growth in the vendor financing portfolio."  (*Id.* (quoting Rating Action, Feb. 15, 2001, Ex. SS to Harrod Decl.))  Neither Rating Action mentioned Telsim.

On February 22, 2001, the Turkish government stopped supporting the valuation of the Turkish lira, causing an immediate 35% decline in the value of the lira.  (Pl.'s 56.1 Addnl. ¶ 39.) This devaluation adversely affected Telsim's ability to repay its U.S. dollar-denominated loans, and further lowered the U.S. dollar value of Motorola's collateral in Telsim stock.  (*Id.*)

## C.    The February 23 Earnings Warning

On February 23, 2001, Motorola issued an earnings warning for the first quarter of 2001 (the "February 23 Warning").  (*Id.* ¶ 40; Def.'s 56.1 (LC) ¶¶ 31-32.)  In a press release, issued prior to the opening of U.S. securities markets, Motorola attributed an expected shortfall in sales revenue and net earnings per share to "the sharp economic slowdown occurring in the United States" and "inventory corrections . . . in technology markets worldwide," which had resulted in "significant weakness in first-quarter order input across [Motorola's] business segments."  (Pl.'s 56.1 Addnl. ¶ 40; Def.'s 56.1 (LC) ¶ 32.)  According to Lead Plaintiff's expert, Motorola's stock price suffered "a statistically significant residual decline of 5.45% (or $0.92 per share) in response to the February 23, 2001 press release."[14]  (Pl.'s 56.1 Addnl. ¶ 41.)

---

[14]    Motorola shares actually fell $1.04 per share (approximately 6%) on February 23, 2001, from a close of $17.29 on February 22 to $16.25 on February 23.  Yahoo! Finance, Historical Prices, Motorola, Inc., http://finance.yahoo.com/q/hp?s=MOT.  The parties' experts, however, rely on a more elaborate methodology for purposes of calculating potential damages in this action.  Lead Plaintiff's expert, Professor Steven P. Feinstein, first calculated the amount by which Motorola's share price was "inflated" during the Class Period, due to Motorola's alleged failure to disclose facts about its relationship with Telsim.  (Pl.'s 56.1 Addnl. ¶¶ 28-29.)  Professor Feinstein then performed an "event study" to determine whether declines in Motorola's share price that occurred upon the release of previously concealed information were "statistically significant." (Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, Senior Expert, Michel-Shaked Group ("Feinstein Report") ¶ 114, Ex. 8 to Schwartz Decl.)  A movement is "statistically significant" if it "cannot be attributed to market and sector factors, or random volatility, but rather [was] likely caused by company-specific information." (*Id.* ¶ 115.)  Rather than use Motorola's actual share price declines in this process, he used the "residual return," or the difference between the actual percentage movement of the stock on a given day and Motorola's expected price movement, based on the movement of market and sector indices.  (*Id.*; Pl.'s 56.1 Addnl. ¶ 32.)  In other words, the residual decline is the portion of the share price decline "that is unexplained by the market and sector returns."  (Feinstein Report ¶ 124.)  He concluded that any Motorola residual price decline greater than 4.5% was "statistically significant."  (Pl.'s 56.1 Addnl. ¶ 33.)  Defendants' expert, Professor William H. Beaver, opines that a price decline would have to be greater than 6.3% in order to be statistically significant.  (Expert Report of William H. Beaver ("Beaver Report") ¶ 29, Ex. 7 to Schwartz Decl.)  According to Lead Plaintiff, the difference is attributable to the fact that the two experts utilized different "control periods" to determine Motorola's expected stock movement when measured against market and sector indices.  (Pl.'s 56.1 Addnl. ¶¶ 33-34.)  For purposes of the pending motions, the court need not determine which methodology is more persuasive.
    Defendants do not dispute, for purposes of the pending motions for summary judgment, that the drop in Motorola shares on February 23, 2001 was "statistically significant."  (Def.'s 56.1 Addnl. (continued...)

The February 23 press release made no mention of Telsim, nor of vendor financing. (Def.'s 56.1 (LC) ¶ 32; February 23, 2001 Press Release, Ex. VV to Harrod Decl.) Lead Plaintiff, however, asserts that the February 23 Warning was "a partial disclosure linked to Motorola's yet undisclosed exposure to Telsim." (Pl.'s 56.1 Addnl. ¶ 45.) Lead Plaintiff cites to evidence that at the time of the February 23 Warning, senior Motorola officials were "highly concerned" about Telsim's ability to make its loan payments. (*Id.* ¶¶ 42-44.) In an e-mail dated February 23, 2001—the day of the earnings warning—from Motorola Assistant Chief Financial Officer Steve Earhart to Defendant Growney, Mr. Earhart observed that the Turkish lira's devaluation affected both Telsim's ability to meet its U.S. Dollar-denominated loan obligations and the value of Motorola's collateral; the e-mail further notes that a $730 million payment was due at the end of April, but that the "current discussion" had Telsim paying only $200 million at the end of April, with the remainder due on a work-out schedule "to be agreed."[15] (*Id.* ¶ 42; E-mail from Earhart to Growney of February 23, 2001, Ex. UU to Harrod Decl.) A letter from Motorola to Telsim, also dated February 23, 2001 and entitled "Notice of Suspension Events" (the "Suspension Letter"), confirmed Telsim's representation that it would not make a $728 million payment due on April 30, 2001, and warned that, as a result, Motorola would provide no further financing. (*Id.* ¶ 44.) Attached to the letter was a list of "Current

---

[14](...continued)
Resp. ¶ 41.) Defendants do hotly dispute the extent to which the February 23 Warning was related to Telsim, or functioned as a "corrective disclosure" of information about Telsim. (*Id.* ¶¶ 31, 45, 48.)

[15]     Defendant Growney testified that he directed Mr. Earhart to perform an immediate evaluation of the impact of the Turkish lira's devaluation on Motorola's business. (Pl.'s 56.1 Addnl. ¶ 43.) It is unclear when Growney made this request, or whether Mr. Earhart's e-mail constituted the requested evaluation. Because Growney testified that he "was concerned about the impact [of the currency devaluation] upon any of our businesses," and that "it was fairly normal to provide a fairly quick assessment of the impact," (Growney Dep., Ex. BBBB to Harrod Decl., at 233), the court infers that Mr. Earhart's e-mail constituted, at least in part, his reply to Growney's request for an immediate evaluation of the currency devaluation's effect.

Lead Plaintiff asserts, without citation to the record or further explanation, that "the February 23, 2001 press release followed contemporaneously with that evaluation." (Pl.'s 56.1 Addnl. ¶ 43.) Defendants do not deny this assertion, (Def.'s 56.1 Addnl. Resp. ¶ 43), but the court is uncertain what Lead Plaintiff means by "followed contemporaneously."

Suspension Events", identifying obligations imposed by the April 1998 agreements that MCC believed Telsim had failed to meet.  (*Id.*)  According to Lead Plaintiff, this evidence establishes that the February 23 Warning was Telsim-related in that it shows that Defendants knew, on that date, that "Motorola would be unable to generate operating income from sales of equipment or services to Telsim in the first quarter of 2001."[16]  (*Id.* ¶ 45.)  In addition, according to Lead Plaintiff's expert, Defendants also knew that Motorola could not continue its practice of reducing loan loss reserves in order to achieve operating projections, due in part to Moody's scrutiny of the Telsim loans.  (*Id.* ¶ 47 (citing Expert Rebuttal Report Prepared by Professor Steven P. Feinstein, Ph.D., CFA ¶¶ 130-32, Ex. 13 to Schwartz Decl.).)

Defendants do not dispute Lead Plaintiff's evidence, nor do Defendants assert that the February 23 Warning was wholly unrelated to Telsim.  Rather, Defendants deny that "any stock price decline that may have occurred on or around February 23, 2001 was linked to Telsim-related information."  (Def.'s 56.1 Addnl. Resp. ¶ 48.)  Defendants point out that the press release announcing the earnings warning did not mention Telsim, and that "newswires reported, and analysts understood Motorola's explanation" that the shortfall was the result of weakening orders for Motorola's wireless phones and equipment, demand for lower-cost cell phones, and weakness across Motorola's other business segments.[17]  (Def.'s 56.1 (LC) ¶¶ 32-33.)  Therefore, according to Defendants, the February 23 Warning, even if it was "related to" Telsim, did not function as a "corrective disclosure" because it neither "identified Telsim [n]or called into question any prior

---

[16]    Regardless of what Defendants knew as of February 23, 2001, it is undisputed that from the fourth quarter of 2000 to the first quarter of 2001, the value of orders that Motorola received from Telsim fell from $251 million to $27 million, Motorola's revenue from sales to Telsim dropped to $40.2 million from $255.9 million, and Motorola's operating profits from sales and interest income from Telsim fell from $0.10 per share to $0.02 per share.  (Pl.'s 56.1 Addnl. ¶ 46.)

[17]    Lead Plaintiff disputes this assertion, contending that media and analysts had not been informed of the "true reason" for the earnings shortfall, namely, the impact of the Telsim debt on Motorola's financial condition.  (Pl.'s 56.1 Resp. (LC) ¶ 33.)  This allegation does not controvert Defendants' assertion of what media in fact reported and analysts understood at the time.

Motorola representation about Telsim." (Def.'s 56.1 Addnl. Resp. ¶ 48.) Because this assertion

is essentially a legal argument—that the February 23 Warning was not a "corrective disclosure" as

that term is understood in the case law—the court does not consider Defendants' challenge as

controverting any of Lead Plaintiff's factual assertions concerning the February 23 Warning.[18]

### D. The March 30 Proxy Statement Disclosing a Turkish Customer

On March 30, 2001, Motorola filed a Schedule 14A Proxy Statement (the "March 30 Proxy")

in which Motorola, after restating the general language relating to vendor financing contained in

prior SEC filings, disclosed the following:

> At December 31, 2000 and December 31, 1999 the Company had long-term finance receivables of $2.6 billion and $1.7 billion, respectively (net of allowance for losses of $233 million and $292 million, respectively), which are included in other assets on the consolidated balance sheets. As of December 31, 2000, approximately $1.7 billion of the $2.8 billion in

---

[18]     For their part, Defendants assert that Lead Plaintiff's expert, Prof. Feinstein, "admitted in his deposition that he had no idea how Motorola calculated its February earnings forecast." (Def.'s 56.1 (LC) ¶ 34.) In support of this assertion, Defendants cite to the following exchange:

Q.     Again the same question. How did this information on this piece of paper get incorporated, if at all, into Motorola's earnings projections in the first quarter of 2001?

A.     Do you mean the exact process that they follow for—

Q.     Yes.

A.     —generating?

Q.     Yes.

A.     I don't know. I think it is reasonable it was in there, but I don't know exactly how—what the process is.

Q.     Are you familiar with the process?

A.     For the company generating its earnings forecasts that they then present to the public?

Q.     Yes.

A.     No.

(Feinstein Dep., Ex. 11 to Schwartz Decl., at 138:6–139:3.) In the court's view, this exchange does not support Defendants' sweeping assertion that Prof. Feinstein "had no idea" how Motorola calculated its February forecast. The portion of the deposition that Defendants provide the court does not identify the "piece of paper" to which the question refers. The most that can be said for this exchange is that it establishes that Prof. Feinstein could not describe the precise process by which Motorola generates its earnings forecasts.

gross long-term finance receivables related to one customer in Turkey.[19]

(Def.'s 56.1 (LC) ¶ 35 (quoting March 30 Proxy, Ex. 12 to Schwartz Decl., at F-25).) The March 30 Proxy did not identify the Turkish customer. (Pl.'s 56.1 Addnl. ¶ 51.) As noted, one analyst, a columnist for Bloomberg News, initially assumed that the customer was Turkcell.[20] (*Id.*; Mark Gilbert, *Rating Cut May Leave Motorola Gasping Like Xerox*, BLOOMBERG NEWS, Apr. 6, 2001 (8:49 a.m.), Ex. AAA to Harrod Decl., at 3.) The March 30 Proxy contained no other information regarding the Turkish customer. (Pl.'s 56.1 Addnl. ¶ 52.)

Lead Plaintiff's damages expert, Professor Feinstein, characterizes as "surprising" Motorola's disclosure that $1.7 billion in long-term finance receivables was related to a single customer in Turkey. (Def.'s 56.1 (LC) ¶ 37 (quoting Expert Rebuttal Report Prepared by Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Rebuttal") ¶ 144, Ex. 13 to Schwartz Decl.) Nonetheless, it is undisputed that Motorola's stock did not decline by a statistically significant amount on March 30, 2001. (*Id.* ¶ 38.) In fact, on the following day of trading, April 2, 2001,

---

[19] Defendants assert that in this passage, Motorola "once again explained its concentrated credit risk related to vendor financing arrangements with Telsim." (Def.'s 56.1 (LC) ¶ 35.) Lead Plaintiff disputes this characterization, noting that the passage neglected to identify the Turkish customer and that this information could not have been disclosed "again" as it had not been disclosed before. (Pl.'s 56.1 Resp. (LC) ¶ 35.) The court agrees that Defendants' characterization is unsupported, and in any event is not a statement of fact.

Lead Plaintiff, for its part, disputes Defendants' presentation of the quoted passage as undisputed fact, contending that the information was "buried on page F-25" of the March 30 Proxy and "was neither full nor accurate disclosure." (*Id.* ¶¶ 35-36; Pl.'s 56.1 Addnl. ¶ 50.) Lead Plaintiff further asserts that the information about the Turkish customer was "cryptic" and "difficult to fully comprehend." (Pl.'s 56.1 Addnl. ¶ 54.) These additional assertions amount to characterization and argument, rather than statements of fact or a denial of Defendant's statements of fact; accordingly, the court disregards these assertions for purposes of determining undisputed facts. The court notes that it is undisputed that the information relating to the Turkish customer in the quoted language appears on page F-25 of the March 30 Proxy, and is repeated on page F-43 in the context of MCC's financial results. (Def.'s 56.1 (LC) ¶ 36.)

[20] Lead Plaintiff's assertion that "analysts" were confused as to whether Turkcell or Telsim was the customer is overbroad, as Lead Plaintiff cites only to the single Bloomberg News columnist. (Pl.'s 56.1 Addnl. ¶ 51.)

Motorola's stock increased by a statistically significant amount.[21]  (*Id.*)

### E.    The April 6 Bloomberg Article Identifying Telsim

On April 6, 2001, Bloomberg News released an article in which columnist Mark Gilbert discussed Motorola's March 30 Proxy.[22]  (Def.'s 56.1 (SOL) ¶ 31.)  The article contained the following analysis of Motorola's debt prospects, based on the information it disclosed on March 30:

> Motorola is up to its neck in short-term debt, and if its credit rating gets cut, the market is likely to turn off the money taps that are keeping the company afloat.  Oh, and for good measure, the company is owed a staggering $1.7 billion by a single customer in an emerging market country.  "We're beginning to think the unthinkable about Motorola," said Carol Levenson, author of the Gimme Credit bond newsletter in Chicago who spotted the land mines buried in the company's SEC filing.  "Motorola's liquidity has rapidly moved into crisis mode."

> The No. 2 cellular phone maker has been gorging in debt markets.  Its short-term debt, mostly commercial paper borrowing, more than doubled in the year to the end of 2000, surging to $6.4 billion from $2.5 billion[23] in December 1999.

(Def.'s 56.1 (LC) ¶ 39; Mark Gilbert, *Rating Cut May Leave Motorola Gasping*, Bloomberg News, Apr. 6, 2001 (2:45 p.m.) (the "April 6 Bloomberg Article"), Ex. BBB to Harrod Decl., at 1.)  The article identified Telsim as the "Turkish customer," noting that Motorola in February had announced a $1.5

---

[21]    The parties do not identify the "statistically significant amount" by which Motorola stock moved on the specified dates.  The court observes that Motorola shares fell from a close of $14.52 on March 29 to a close of $14.26 on March 30, and rose from that close to $14.70 on April 2.  Yahoo! Finance, Historical Prices, Motorola, Inc., http://finance.yahoo.com/q/hp?s=MOT.  The record does not indicate whether the March 30 Proxy was filed before the market open on March 30 or after the close.

[22]    The first version of the article, identifying Turkcell as Motorola's customer, was released at 8:49 a.m., before the open of U.S. securities markets.  (Pl.'s 56.1 Addnl. ¶ 56.)  The corrected version, identifying Telsim, appeared at 2:45 p.m.  (Mark Gilbert, *Rating Cut May Leave Motorola Gasping*, Bloomberg News, Apr. 6, 2001 (2:45 p.m.), Ex. BBB to Harrod Decl., at 3.)

[23]    Defendants assert that "it is not inferable" that the $3.9 billion increase in short-term debt referenced in the April 6 Bloomberg Article was caused by Telsim vendor financing because Motorola only loaned Telsim $700 million in 2000.  (Def.'s 56.1 (LC) ¶ 40.)  In fact, Lead Plaintiff asserts, and Defendants do not dispute, that Motorola provided $450 million in financing in February 2000, (Pl.'s 56.1 Addnl. ¶ 8), in addition to the $700 million in September 2000, (*Id.* ¶ 13), for a total of $1.15 billion in new debt for 2000.  (*Id.*¶ 25; Pl.'s 56.1 Resp. (LC) ¶ 40.)  The court thus deems it undisputed that of the $3.9 billion surge identified in the article, $1.15 billion, or 29.5%, was attributable to Telsim debt.

billing contract with Telsim, and that Motorola had been selling equipment to Telsim since 1994. (April 6 Bloomberg Article, at 3.)  The article also quoted a Motorola spokesman as stating that Motorola had "substantial collateral to at least the value of the loan" to Telsim, and that at least some of that collateral was in the form of Telsim stock.  (*Id.*)

Motorola stock declined sharply on April 6, 2001, falling 23% from $14.95 to $11.50.[24] (Def.'s 56.1 (LC) ¶ 44; Beaver Report ¶ 47.)  The price remained unchanged on the next day of trading, April 9, 2001.  (Def.'s 56.1 (LC) ¶ 44.)  Over six of the following seven trading days, however, Motorola shares rose on heavy trading, eventually surpassing the April 5 close by the end of trading on April 18, 2001.[25]  (*Id.*)

While the April 6, 2001 actual price decline is undisputed, the parties vehemently dispute the extent to which the decline was related to Telsim.  Defendants, citing to newswire items referenced in their expert's report, assert that in addition to concerns about Motorola's debt situation, analysts on April 6, 2001 were "also concerned with 'weakening demand for phones, chips, and wireless communications equipment,' which caused general concern about Motorola's earnings."  (*Id.* ¶ 43 (quoting Beaver Report ¶ 52) (quoting in turn *Dow Jones Business News*, 18:57 GMT, April 6, 2001).)  Lead Plaintiff does not dispute that analysts expressed these additional concerns, but contends that such concerns were not "new" and thus would not account for the

_____

[24]     Using their respective damages methodologies, the parties agree that the drop was "statistically significant": Defendants' expert concluded that the shares experienced a residual price decline of 17.7%, (Beaver Report ¶ 47), while Lead Plaintiff's expert put the residual decline at 18.64%.  (Pl.'s 56.1 Addnl. ¶ 57.)

[25]     Defendants do not specify the April 18 closing price.  The court notes that Motorola shares closed at $15.20 on that day, 1.7% higher than the April 4 close of $14.95.  Yahoo! Finance, Historical Prices, Motorola, Inc., http://finance.yahoo.com/q/hp?s=MOT.
In its Local Rule 56.1 Response, Lead Plaintiff admits that Motorola stock rose as Defendants assert, but contends that the assertion raises disputed issues of material fact because Defendants have not analyzed the reasons for the share price rise and because the rise may have reflected "continuing efforts to deceive investors."  (Pl.'s 56.1 Resp. (LC) ¶ 44 & n.2.)  The court disregards Lead Plaintiff's additional allegations and legal argument, and deems Defendants' factual assertion undisputed.

decline. (Pl.'s 56.1 Resp. (LC) ¶ 43.) Defendants further maintain that the decline could be attributed to other, non-Telsim-related information contained in either Motorola's March 30 Proxy or in the April 6 Bloomberg Article. (Def.'s 56.1 Addnl. Resp. ¶ 57.) Lead Plaintiff's position is that none of the other information was "new" news, and that it was the Telsim-related information in the March 30 Proxy that caused the April 6 price drop, due to "the interpretation, understanding, and broader dissemination of that information [which] took place on April 6, 2001." (Pl.'s 56.1 Addnl. ¶¶ 57, 62.) Lead Plaintiff further asserts that analysts' reports published on April 6 and April 9 "considered Motorola's loans to Telsim to be material."[26] (Id. ¶ 60.)

### F. The May 14 Form 10-Q Disclosing Telsim's Missed $728 Million Payment

In a Form 10-Q report for the quarter ending March 31, 2001 and filed after the close of trading on May 14, 2001, Motorola disclosed that Telsim had failed to make a scheduled payment to Motorola of $728 million that had become due on April 30, 2001. (Def.'s 56.1 (LC) ¶ 45; Pl.'s 56.1 Addnl. ¶ 67.) The filing also stated that "[a]s of March 31, 2001, approximately $2.0 billion of the $2.9 billion in gross long-term finance receivables related to one customer, Telsim, in Turkey." (Form 10-Q for Period Ending March 31, 2001 (the "May 14 Filing"), Ex. 15 to Schwartz Decl., at 35.) The filing disclosed that "Motorola's collateral for the vendor financing provided to Telsim is the ability, pursuant to a stock pledge agreement, to receive or sell 66% of the stock of Telsim," and that Motorola had other, unspecified "creditor remedies." (Id.) Motorola also informed investors

---

[26] Lead Plaintiff also asserts that a Dow Jones Newswire article dated April 6, 2001 "reported that it was the analysis of the Turkish debt information in the Proxy Statement conveyed by *Gimme Credit* and *Bloomberg* that concerned the market on April 6, 2001." (Pl.'s 56.1 Addnl. ¶ 59.) Lead Plaintiff purports to quote from the article: "What led investors to re-examine Motorola's SEC filing was a newsletter item and a story that appeared on a financial newswire that highlighted liquidity issues at Motorola." (Id.)

The cited article that Lead Plaintiff provided the court contains no such quoted language. Rather, the article states that Motorola shares lost 23% on April 6 "as investors reacted to the published report on Motorola's debt situation and a Credit Suisse First Boston analyst's warning on 2001 estimates." (*Motorola Denies Facing Serious Liquidity Problem*, Dow Jones News Service, April 6, 2001, Ex. CCC to Harrod Decl.)

that under the terms of the Telsim vendor financing, Telsim had 30 business days to cure the missed payment, and that Motorola was "currently in discussions with Telsim to reschedule payments, including the April 30th payment." (*Id.*)

It is undisputed that Motorola shares declined 4.7% on May 15, 2001, from a close of $15.74 on May 14 to $14.96 on May 15. (Def.'s 56.1 (SOL) ¶ 37.) According to Lead Plaintiff, this amounted to a 4.9% residual decline, (Pl.'s 56.1 Addnl. ¶ 68); Defendants' expert, however, puts the residual decline at 4.5%. (Beaver Report ¶ 56.) More significantly, while Lead Plaintiff maintains that the decline was "statistically significant," (Pl.'s 56.1 Addnl. ¶ 68), Defendants' expert, using different methodology, characterizes it as "not statistically different from zero." (Def.'s 56.1 (LC) ¶ 47.) In addition, Defendants dispute Lead Plaintiff's contention that the decline was attributable to Telsim-related disclosures, (Def.'s 56.1 Addnl. Resp. ¶ 68), noting that the May 14 Filing was a detailed, 42-page filing, and contained numerous other data related to Motorola's performance for the quarter and prospects for the future. (Def.'s 56.1 (LC) ¶ 46.)

Defendants assert that "[v]arious analysts expressed a lack of surprise or a lack of concern at Motorola's announcement that Telsim had missed a payment." (*Id.* ¶ 48.) Lead Plaintiff challenges Defendants' assertion. Defendants cite to their expert's report, which in turn quotes five analysts who reacted to the disclosure of the missed payment in the May 14 Filing. (Beaver Report ¶ 56.) One analyst stated "I'm not overly concerned about it." (*Id.* (quoting U.S. Bancorp Piper Jaffray analyst quoted in Dow Jones Business News on May 15, 2001)) Another opined that "[t]he Telsim issue, while unfortunate, does not change our view of the company." (*Id.* (quoting A.G. Edwards, May 15, 2001)) Dresdner Kleinwort Wasserstein on May 15 called the missed payment "an unsurprising bit of news," (*id.*), and Salomon Smith Barney noted that "we expect the company to successfully restructure the financing agreement." (*Id.*) Lead Plaintiff cites to no evidence in support of its challenge, other than to the same analyst reports quoted by Defendants' expert. (Pl.'s 56.1 Resp. (LC) ¶ 48.) The court thus deems Defendants' assertion undisputed, as well as

Defendants' further assertion that "[b]y May 14, the market had, for several months, understood that Turkey was in a difficult financial situation." (Def.'s 56.1 (LC) ¶ 49.)

### G. June 18, 2001 Announcement of Telsim's Failure to Cure

The May 14 Filing marks the end of the Class Period in this action. (*Id.* ¶ 50.) On June 18, as reported by the *Financial Times (London)*, Motorola announced that the 30-day period for Telsim to cure its failure to make the $728 million payment had expired without an agreement between the two companies. (*Id.* ¶ 51.) Motorola further stated that it was prepared to pursue "other options"—including all legal remedies—against Telsim. (*Id.*) Lead Plaintiff asserts, and Defendants do not dispute, that Motorola shares experienced a statistically significant residual price decline of 5.97% on June 18, 2001.[27] (Pl.'s 56.1 Addnl. ¶ 70.)

On October 9, 2001, Motorola announced that it had taken a $1.3 billion charge against third quarter earnings to increase its reserves on the Telsim debt. (*Id.* ¶ 72.)

---

[27] Defendants' expert concludes that the residual price decline was 4.8% and "not statistically different from zero." (Beaver Report ¶ 91.) Defendants do not dispute Lead Plaintiff's assertion regarding the price decline in their response to Lead Plaintiff's statement of additional facts, however, but contend, as with prior Telsim-related announcements, that the June 18 announcement was not a "corrective disclosure." (Def.'s 56.1 Addnl. Resp. ¶ 70.) As Defendants acknowledge, this is a legal question rather than a factual one. (*Id.*) Lead Plaintiff, for its part, asserts, without citation to evidence or further explanation, that analysts' reports from A.G. Edwards and UBS Warburg dated June 15 and June 18 "were not responsible for the stock price decline on June 18, 2001." (Pl.'s 56.1 Addnl. ¶ 71.) As this statement also amounts to a legal conclusion on causation, rather than a statement of fact, and is unsupported by citation to the record, the court disregards the assertion, and postpones discussion of causation until the court's analysis of the legal issues raised by Defendants' motions. The court observes, however, that Defendants' expert quotes the referenced analysts' reports in support of his assertion that two analysts had lowered their earnings estimates for Motorola. (Beaver Report ¶ 90.) The A.G. Edwards report, dated June 15, 2001, states that it was lowering its earnings estimates "in connection with the reduction of our 2001 and 2002 global handset unit forecasts." (*Id.*) The UBS Warburg report of June 18, 2001 attributed its lower forecast "primarily to greater than expected weakness across most of the company's business units." Neither report, in the portions quoted by Defendants' expert, mentions Telsim or vendor financing.

The court further notes that Motorola shares suffered an actual loss of 8.3% on June 18, 2001, from a previous close of $14.25 to a June 18 close of $13.07. Yahoo! Finance, Historical Prices, Motorola, Inc., http://finance.yahoo.com/q/hp?s=MOT.

## III.     The Uzan Action

### A.     MCC's Suit Against the Uzans

On January 28, 2002, MCC and Nokia commenced an action in the Southern District of New York (the "Uzan Action") against members of the Uzan family, one of their associates, and three companies under the Uzans' control, alleging that the defendants had fraudulently induced both Motorola and Nokia to loan billions of dollars to Telsim, with no intention of repaying the money, and had engaged in various schemes to avoid their obligations.  (Pl.'s 56.1 Addnl. ¶ 73; Uzan Action Compl. ¶¶ 3-16, Ex. SSS to Harrod Decl.)   MCC and Nokia together brought civil RICO claims against all defendants, (Uzan Action Compl. ¶¶ 237-94), and MCC additionally brought state-law fraud and conspiracy claims, (*id.* ¶¶ 295-308), as well as claims under federal statutes relating to computer fraud and electronic communications.   (*Id.* ¶¶ 309-25.)   Both plaintiffs sought a constructive trust over Telsim stock.  (*Id.* ¶¶ 334-37.)

The Uzan defendants "expressly refus[ed] to attend or participate in the trial" that commenced on February 19, 2003.  *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 492 (S.D.N.Y. 2003).  While noting that the plaintiffs were arguably entitled to a default judgment, Judge Rakoff proceeded with the trial, hearing only the plaintiffs' testimony, but taking into account the proof developed at an earlier six-day evidentiary hearing and a two-day contempt hearing that the defendants had contested.  *Id.* at 493.  Concluding that the Uzans had "perpetrated a huge fraud," Judge Rakoff summarized the scheme as follows:

> Under the guise of obtaining financing for a Turkish telecommunications company, the Uzans have siphoned more than a billion dollars of plaintiffs' money into their own pockets and into the coffers of other entities they control.  Having fraudulently induced the loans, they have sought to advance and conceal their scheme through an almost endless series of lies, threats, and chicanery, including, among much else, filing false criminal charges against high level American and Finnish executives, grossly diluting and weakening the collateral for the loans, and repeatedly disobeying the orders of this Court.[28]

---

[28]     Lead Plaintiff moves to strike Defendants' presentation of Judge Rakoff's findings
(continued...)

*Id.* at 490.  The court awarded MCC compensatory damages of more than $2.1 billion and an equal amount in punitive damages, and further imposed a constructive trust in both MCC's and Nokia's favor on Telsim shares held by an Uzan-controlled corporation.[29]  *Id.* at 579-81.

## B.    Lead Plaintiff's Assertions That It Based its Complaint on the Uzan Action

In its Local Rule 56.1 statement of additional facts, Lead Plaintiff asserts that it was able to plead a securities fraud claim in this action only by virtue of information contained in the allegations pleaded by MCC in the Uzan Action, or available in the record of the Uzan Action.  (Pl.'s 56.1 Addnl. ¶¶ 75-76.)  Specifically, Lead Plaintiff asserts that the Uzan Action provided it with knowledge "necessary" to plead its claim, such as the amounts of the loans that were outstanding to Telsim on various dates during the Class Period, the absence of enforceable collateral, Telsim's violations of loan covenants, Telsim's lack of cooperation in obtaining alternative financing for purchases of Motorola's products and services, Defendants' *scienter* with respect to their alleged misrepresentations and omissions concerning Telsim, and the collectibility of the Telsim debt.  (*Id.* ¶ 76.)  Lead Plaintiff further asserts that its allegations regarding "misbehavior by the Uzans," "Telsim's pattern of default on loan payments and refusal to provide access to its financial records," and "the well known economic conditions and devastating earthquakes that occurred in Turkey,"

---

[28](...continued)
in Defendants' Local Rule 56.1 statement, contending that those findings are "irrelevant" to Defendants' motions for summary judgment.  (Pl.'s 56.1 Resp. (LC) ¶ 15.)  The court agrees, but given that Lead Plaintiff cites extensively to MCC's allegations against the Uzans, the court sees no harm in presenting Judge Rakoff's resolutions of those claims.

[29]      Nokia's only remaining claim sought a constructive trust rather than damages. *Motorola Credit Corp.*, 274 F. Supp. 2d at 574.  Subsequent to trial but before Judge Rakoff's damages calculation, the court had dismissed the RICO claims as premature, at the direction of the Second Circuit.  *Id.* at 491; *see Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003). Upon appeal from Judge Rakoff's ruling, the Second Circuit vacated the award of punitive damages and the constructive trust in favor of MCC, finding that the district court had not made sufficient factual findings to support those awards.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61, 64 (2d Cir. 2004).

are all "derived from facts taken from the record in the Uzan Action." (*Id.* ¶¶ 77-79.) To support these assertions, Lead Plaintiff cites to twenty paragraphs in the Consolidated Amended Complaint ("CAC") in this action, and invites the court to "compare" these paragraphs with citations to allegations in the Uzan Action pleadings and affidavits. (*Id.*) Having done so, the court concludes that Lead Plaintiff has overstated the case.

It is true that some of the allegations in the CAC, referenced by Lead Plaintiff in its Local Rule 56.1 statement of additional facts, relate facts that also formed the basis for allegations pleaded by MCC in the Uzan complaint. For instance, both complaints allege specific instances of misconduct by the Uzans, including that Hazan Uzan thwarted MCC's efforts to refinance the Telsim loans through Deutsche Bank, told Motorola executives that Telsim had improperly used money provided by Motorola to cover payments required during a run on an Uzan-controlled bank, and boasted about renegotiating a contract with the Turkish Football League that he had no intention of performing. (*Id.* ¶ 77; CAC ¶¶ 94-97, 183-85; Uzan Action Compl. ¶¶ 59, 68-69.) An allegation in the CAC that "the Uzans had defrauded other business partners," (CAC ¶ 189j), is similar to MCC's allegation in the Uzan Action that "the Uzans have committed similar acts of fraud and deceit against other major domestic and international corporations." (Uzan Action Compl. ¶ 15.) Allegations in the CAC that Telsim failed to provide financial information upon request or as required by the lending agreements mirror allegations in the Uzan Action. (CAC ¶¶ 98-99, 128f, 150i, 159g, 176h, 180c, 189g; Uzan Action Compl. ¶¶ 153-54.)

In other respects, however, Lead Plaintiff's allegations are not obviously "derived" from the Uzan Action. For instance, Lead Plaintiff asserts that its allegation that Motorola was aware that the Uzans were using Motorola's money to "fuel their personal lifestyles," (CAC ¶ 184), including buying a New York City apartment, was derived from an allegation in the Uzan Action. (Pl.'s 56.1 Addnl. ¶ 77.) The cited allegation in the Uzan Action contains no such information, but instead refers to Hazan Uzan's boasting about the Turkish Football League contract. (Uzan Action Compl.¶

24

69.) Similarly, Lead Plaintiff cites an affidavit from the Uzan Action as the source of its allegation in the CAC that Motorola advanced additional vendor financing to Telsim in September 1999 only because Motorola knew that Telsim would default on its prior debt unless Motorola did so. (CAC ¶ 92.) The cited affidavit contains no similar assertion; rather, the affidavit, from the Uzans' expert in that proceeding, states that based on the information available to Motorola, no reasonable lender would have expected Telsim to repay its loans. (Declaration of Vincent J. Love, Ex. VVV to Harrod Decl. ¶¶ 6, 8-10.)

Similarities between the allegations in the CAC and MCC's allegations in the Uzan Action do not, by themselves, establish that the former were "derived from" the latter. And Lead Plaintiff's assertions that it derived, from the Uzan Action, its allegations regarding "misbehavior by the Uzans," "Telsim's pattern of default on loan payments and refusal to provide access to its financial records," and "the well known economic conditions and devastating earthquakes that occurred in Turkey," (Pl.'s 56.1 Addnl. ¶¶ 77-79), is overbroad; at most, *some* of its allegations relating to these subjects appear to correspond with allegations in the Uzan Action. In any event, information concerning these subjects was publicly available regardless of the Uzan Action. Based on 165 news articles referring to the Uzan family between 1985 and 2001, Lead Plaintiff's own expert concluded that the Uzans had a "very bad public reputation for basic honesty and integrity." (Werner Rebuttal, at 7.) It is undisputed that Motorola's SEC filings and public announcements revealed, well before the Uzan Action, that Telsim had missed a $728 million payment and failed to cure. (Def.'s 56.1 (LC) ¶¶ 45, 51.) The August 1999 earthquake in Turkey, which Lead Plaintiff asserts alerted Motorola to Telsim's inability to make its payments, (CAC ¶ 85), killed thousands and was widely reported at the time. *See* Edmund L. Andrews, *Earthquake in Turkey: The Overview; Thousands Killed as Big Quake Hits Cities in Western Turkey*, N.Y. TIMES, Aug. 18, 1999, at A1. Thus, the court cannot accept Lead Plaintiff's assertion that its allegations concerning the Uzans' behavior, Telsim's loan defaults, and the 1999 earthquake were derived exclusively from

information that came to light in the Uzan Action.  Nor does the court accept Lead Plaintiff's implied assertion that it was unaware of information regarding the above subjects prior to the Uzan Action.

The court does note two exceptions: Lead Plaintiff has identified two specific allegations in the CAC as based on specific information that "would not have been publicly available without the Uzan Action."  (Pl.'s 56.1 Addnl. ¶ 80.)  Specifically, Lead Plaintiff cites to its allegations that Defendants "had knowledge that its collateral in the form of Telsim stock was weak, not marketable, and subject to potential manipulations by the Uzans", (CAC ¶¶ 12, 71, 76-77), and compares these allegations to an affidavit in the Uzan Action, filed by Motorola Vice President Ed Hughes.  In that affidavit, Mr. Hughes states his belief that Hazan Uzan had instituted a complex foreclosure process for the Telsim shares held as collateral for the purpose of impeding Motorola's ability to recover its collateral in the event of default.  (Declaration of Ed Hughes in Support of Plaintiffs' Motions for an Attachment and a Preliminary Injunction ¶ 20, Ex. RRR to Harrod Decl.)  Lead Plaintiff also cites to its allegation that Telsim guaranteed the $86 million in vendor financing that Motorola provided to KaR-Tel, (CAC ¶¶ 80-82), and corresponding allegations in the Uzan Action complaint.  (Uzan Action Compl. ¶¶ 72-73.)  Because Defendants do not dispute Lead Plaintiff's assertion that the information contained in these two allegations was not publicly available, (Def.'s 56.1 Addnl. Resp. ¶ 80), and because the record contains no evidence that such information had been made available prior to the Uzan Action, the court accepts Lead Plaintiff's assertion that these two particular allegations were based on information that first came to light via the Uzan Action.

Finally, the court disregards Lead Plaintiff's assertions that knowledge obtained from the Uzan Action was "necessary" to file a securities fraud complaint, and that Lead Plaintiff was unable to do so prior to the Uzan Action.  (Pl.'s 56.1 Addnl. ¶¶ 75-76.)  The issue of what information and facts were available to Lead Plaintiff, and when, is a question of fact; the degree to which that information was sufficient to plead a securities law claim is, however, a question of law.

IV.     **Market efficiency**

It is undisputed that during the Class Period, Motorola's stock traded in an efficient market, in which securities prices reflect all known risks. (Def.'s 56.1 (LC) ¶¶ 18, 20.) The parties do, however, disagree on how an "efficient market" operates. According to Defendants, an efficient market is one in which all public information related to a given stock is immediately incorporated into that stock's share price, such that share prices typically adjust within one day of a disclosure of information. (*Id.* ¶¶ 18-19.) Lead Plaintiff disputes that publicly available information is always immediately reflected in share prices; rather, the speed at which prices adjust to disclosures "is a question of fact that is dependent on the nature of the information and the manner in which the information is disclosed." (Pl.'s 56.1 Resp. (LC) ¶¶ 18-19.) Both parties cite to their experts' reports in support of their respective positions.

The parties also disagree about the type of information that causes share price changes. Defendants assert that "only 'new' information, the unexpected portion of information, causes price changes. Repetition of 'old' information will not affect stock price." (Def.'s 56.1 (LC) ¶ 21; Beaver Report ¶ 10.) Lead Plaintiff responds that "old" information can become "stale," such that later repetition of that "old" news becomes "new" again.[30] (Pl.'s 56.1 Resp. (LC) ¶ 21.)

It is undisputed that Motorola common stock has a large average daily trading volume, that a significant number of analysts follow Motorola, and that Motorola is subject to widespread press coverage. (Def.'s 56.1 (LC) ¶ 23.) Defendants assert that because of these factors, Motorola shares tend to react quickly to new information. (*Id.*) Lead Plaintiff disagrees, asserting that Motorola's share price only reacts quickly when information was "prominently revealed and easy to interpret." (Pl.'s 56.1 Resp. (LC) ¶ 23.)

## V. This Lawsuit

---

[30] The portion of Lead Plaintiff's expert's report that Lead Plaintiff cites to in support of its assertion does not state this proposition directly, but rather references the fact that Motorola share prices rose after Motorola on August 1, 2000 reiterated earnings guidance for the upcoming quarter that it had previously issued. (Feinstein Report ¶¶ 142-46, Ex. 8 to Schwartz Decl.)

## A. Procedural History

The first complaint in this litigation was filed on December 24, 2002. (Def.'s 56.1 (SOL) ¶ 9.) *See Barry Family LP v. Koenemann*, No. 02 CV 10209 (S.D.N.Y. filed Dec. 24, 2002) (the "*Barry* complaint"). Thereafter, an additional seventeen complaints were filed in this court and others between January 2, 2003 and March 27, 2003, all alleging that Motorola and various Motorola officers violated securities laws during the Class Period. (Def.'s 56.1 (SOL) ¶¶ 10-11.) Pending cases were consolidated in this court, which on July 17, 2003 appointed New Jersey as Lead Plaintiff. (*Id.* ¶ 12.) *See* Order of 10/2/2003; *In re Motorola Sec. Litig.*, No. 03 C 287, 2003 WL 21673928, at *1 (N.D. Ill. July 16, 2003). Lead Plaintiff filed the CAC on October 10, 2003, naming as Defendants Motorola, Mr. Galvin, Mr. Koenemann, and Mr. Growney, and alleging that Defendants violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme, and course of conduct" in which they knowingly and/or recklessly took actions, made deceptive statements, and omitted to state material facts in order to induce Lead Plaintiff and other Class members to purchase Motorola securities at artificially inflated prices during the Class Period. (CAC ¶ 261.) Lead Plaintiff also brought claims against the individual Defendants under § 20(a) as "controlling persons" of Motorola. (*Id.* ¶ 272.)

On August 25, 2004, this court granted Defendants' motion to dismiss the § 10(b) claims against the individual defendants, but denied Defendants' motion as to the § 10(b) claims against Motorola and the § 20(a) claims against the individual Defendants.[31] *See In re Motorola*, No. 02 C 287, slip op. at 60 (N.D. Ill. Aug. 25, 2004), *superseded by In re Motorola*, No. 02 C 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004). On March 21, 2005, the court certified the consolidated action as a class action, defining the class as all persons who purchased publicly traded Motorola

---

[31] Lead Plaintiff elected not to amend the CAC and re-plead its § 10(b) allegations against the individual Defendants. (Lead Plaintiff's Statement of Election Not to File an Amended Complaint ¶ 2.)

common stock or registered debt securities during the Class Period. Order of 3/21/2005 ¶ 8. The court set January 31, 2006 as the last date for the parties to amend their pleadings. Order of 10/18/2005. Although Lead Plaintiff did not amend the CAC before this deadline, the parties entered into a stipulation in which the CAC, upon the filing of the Final Pretrial Order, would be deemed amended to reflect the evidence contained in the Final Pretrial Order concerning what Lead Plaintiff expected to prove at trial; the parties further stipulated that the CAC was deemed amended to include additional allegations of false and misleading statements by Defendants. Order of 2/1/2006 (entering Stipulation With Regard to Discovery Prior to Trial). Lead Plaintiff provided Defendants with its expert witness reports on March 28, 2006. (Def.'s 56.1 (SOL) ¶ 18.)

**B.    Specific Allegations and Characterizations Contained in Prior Complaints and Made by Lead Plaintiff**

Defendants have raised a statute of limitations defense in this action. As explained more fully below, Defendants have moved for summary judgment on that defense, on the ground that because certain facts concerning Motorola's relationship with Telsim were available to Lead Plaintiff as of May 2001, Lead Plaintiff was on "inquiry notice" that triggered the running of the statute of limitations from that time. (Def.'s 56.1 Addnl. Resp. ¶¶ 75-80.) In their Local Rule 56.1 statement supporting their motion, Defendants assert that plaintiffs in complaints filed prior to the consolidation of this action, as well as Lead Plaintiff and its experts, made statements and allegations that characterize Motorola's disclosures between March and May 2001, and the market's reaction to those disclosures.[32]  (Def.'s 56.1 (SOL) ¶¶ 31-32, 36, 39, 41-43.)

_____

[32]    Lead Plaintiff purports to dispute Defendants' assertions, but the court concludes that the evidence supports the fact that the allegations and statements, to which Defendants refer, were indeed made. Lead Plaintiff first objects to Defendants' reference to assertions made by plaintiffs in prior complaints in this action, contending that "the CAC is the only operative complaint in this Action, and the allegations contained therein are the only allegations in this Action." (Pl.'s 56.1 Resp. (SOL) ¶¶ 31-32, 34, 36.) This may be true, but it is undisputed that the plaintiffs in the previous actions made the allegations cited by Defendants, which is the only fact that Defendants assert; Defendants do not impute those allegations to Lead Plaintiff.

(continued...)

The *Barry* complaint alleged that Motorola's March 30 Proxy, disclosing the $1.7 billion owed by the customer in Turkey, and the April 6 Bloomberg Article discussing it, "stunned investors and had a sharply negative effect on Motorola's stock price." (*Barry* Compl. ¶ 34, Ex. 19 to Schwartz Decl.) The complaint further asserted that this constituted "the first disclosure that Motorola had provided massive vendor financing in connection with the Telsim deal." (*Id.* ¶ 31.) Lead Plaintiff, in its motion for consolidation and for appointment as lead counsel, similarly characterized the March 30 Proxy as "disclos[ing] for the first time" the $1.7 billion in vendor financing relating to Telsim, and stated that this information had previously been "hidden" by Defendants. (Def.'s 56.1 (SOL) ¶ 39; Memorandum of Law in Support of the State of New Jersey's Motion for Consolidation, to be Appointed Lead Plaintiff and for Approval of its Selection of Lead Counsel, at 5.) The CAC similarly alleges that "[i]nvestors could not have reasonably discovered any of the true facts concerning the Telsim debt prior to March 30, 2001." (CAC ¶ 204.) Lead Plaintiff has further stated, in other filings with this court, that "[i]vestors had to wait until March 31, 2001 . . . to learn that 100% of the increase in vendor financing during 2000 was attributable to Telsim," and that Defendants "did not begin to disclose publicly the magnitude and risk of the financing to Telsim until March 2001." (Def.'s 56.1 (SOL) ¶ 39; The State of New Jersey's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint, at 6, 26.) In his report, Lead Plaintiff's damages expert Professor Feinstein described Motorola's March 30 Proxy as containing "incriminating information."[33] (Def.'s 56.1 (SOL) ¶ 41 (quoting Feinstein Report

---

[32](...continued)
Lead Plaintiff further objects to Defendants' assertions that Lead Plaintiff made certain statements in the CAC and in its briefs; Lead Plaintiff responds to those assertions by declaring "Lead Plaintiff did not state that." (*Id.* ¶¶ 39, 41.) Lead Plaintiff similarly objects to Defendants' assertions of statements contained in Lead Plaintiff's expert's report. (*Id.* 41.) In support of these objections, Lead Plaintiff quotes the material cited by Defendants; this material, however, *contains the precise language quoted* by Defendants. Lead Plaintiff's objection is overruled.

[33]    Professor Feinstein referred to "incriminating information" in the following context:
(continued...)

¶ 55).)  He described the April 6 Bloomberg article as having "[b]lindsided" the market.  (Feinstein Report, at 13.)

One plaintiff in a pre-consolidation complaint described Motorola's May 14 Filing, disclosing Telsim's missed $728 million payment, as having "shocked the market."  (*Scribner* Compl., Ex. 18 to Schwartz Decl.)  The CAC similarly labels that disclosure "surprising," (CAC ¶ 207), a characterization shared by Professor Feinstein, who described the May 14 Filing as containing "[m]ore surprises" when Motorola disclosed "the Magnitude of Telsim's Debt and Anounce[d] a Missed Payment."  (Feinstein Report, at 18.)

### C.    The Consolidated Amended Complaint

The CAC alleges that Defendants violated the securities laws by issuing, during the Class Period, materially false and misleading statements relating to Telsim, and by overstating Motorola's financial results during the Class Period in violation of GAAP.  (CAC ¶¶ 2, 118-22, 160-02, 177-80, 218-38.)  Defendants allegedly failed to disclose, in connection with public statements and financial reports, material facts about Motorola's relationship to Telsim and its loans to Telsim.  Specifically, Lead Plaintiff asserts that in reporting financial results for the third and fourth quarters of 2000, Defendants failed to disclose the existence of $2 billion in vendor financing provided to Telsim, (*id.* ¶¶ 176, 189); failed to disclose the concentration of and risks associated with that vendor financing, (*id.* ¶¶ 128d, 150h, 159d, 176f, 189e); failed to disclose that the entire amount of its contracts with Telsim was contingent upon Motorola providing 100% financing for the equipment purchased and

_____

[33](...continued)
Motorola's sales and profit growth had depended on providing vendor financing to Telsim, essentially paying for the customer's purchases, but the practice was unsustainable as Motorola's own access to credit was in jeopardy.  The facts that *the incriminating information* was buried in the Company's proxy statement filed one week earlier, that it was brought to light in the course of the subsequent week, and that the Telsim loans contributed to the liquidity crises are evident in the following excerpt from the Bloomberg article [quotation omitted].
(Feinstein Report ¶ 55 (emphasis added).)

for working capital, (*id.* ¶¶ 150d, 159e, 176g, 180a, 189f); failed to disclose, in reporting financial results for 1999, that Telsim had not repaid Motorola any of the financing advanced since April 1998 and that it was highly improbable that Telsim would be able to pay Motorola back for the amounts already borrowed, (*id.* ¶ 128g); and failed to disclose, in reporting results for the first quarter of 2000, that Motorola was at risk for approximately $1.3 billion in prior financing to Telsim for which collection was "gravely in doubt." (*Id.* ¶ 150b.) The CAC additionally alleges that Motorola's operating results for the second quarter of 2000 gave the false impression that Nextel, not Telsim, represented the largest concentration of vendor financing. (*Id.* ¶ 159a.) Lead Plaintiff further asserts that Motorola's press releases of February 3, 2000 and August 1, 2000, announcing expected revenue of $1.5 billion from a contract with Telsim, were false and misleading because no such agreement was in place, (*id.* ¶¶ 122a, 162g), and that Motorola's October 31, 2000 press release misrepresented Telsim as one of the world's most successful GSM operators. (*Id.* ¶ 180e.)

The CAC alleges that Defendants acted either knowingly or recklessly, with "actual knowledge of the falsity of the public statements or the materiality of the omissions" alleged in the CAC. (*Id.* ¶ 239, 262-65.) Lead Plaintiff asserts that the price of Motorola securities "declined materially upon public disclosure of the true facts which had been misrepresented or concealed," and that this decline was "caused by the public dissemination of true facts, which were previously concealed or hidden." (*Id.* ¶¶ 268-69.)

### D.     Defendants' Motions for Summary Judgment

Defendants on July 17, 2006 filed two separate motions for summary judgment. The first contends that this action is time-barred because the applicable one-year statute of limitations began to run no later than May 2001, when investors had "inquiry notice" of a potential fraud claim, and the first complaint was not filed until December 2002. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Statute of Limitations) ("Def.'s Mem. (SOL)"), at 1, 4.) The second argues that Lead Plaintiff cannot as a matter of law prove "loss causation," particularly

in light of the Supreme Court's recent decision in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), because none of the four events identified by Lead Plaintiff's damages expert constitutes the requisite "corrective disclosure."  (Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Loss Causation) ("Def.'s Mem. (LC)"), at 1-2.)  The court addresses each motion in turn.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322--23 (1986).  A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party.  *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party.  *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson*, 477 U.S. at 255).

### II.    Statute of Limitations

Prior to passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), a plaintiff bringing claims under § 10(b) of the SEA and Rule 10b-5 was required to commence litigation within one year following the discovery of the facts constituting the violation.  *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).  Sarbanes-Oxley, effective as of July 30, 2002, extended the statute of limitations to two years.  *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (2002) (codified in part at 28 U.S.C. § 1658(b)).  The new statute of limitations is not retroactive; therefore, Sarbanes-Oxley does not revive claims that had

33

expired, under the one-year statute of limitations, before July 30, 2002. *See Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 542 (7th Cir. 2005). Here, the parties agree that Lead Plaintiff's claims are not time-barred unless the statute of limitations had been triggered by July 30, 2001. (Def.'s Mem. (SOL), at 6; Lead Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (Statute of Limitations and Loss Causation) ("Pl.'s Resp."), at 3.) Defendants contend that the statute of limitations began running no later than May 14, 2001, by which time Motorola investors were on "inquiry notice" of a potential securities fraud claim. (Def.'s Mem. (SOL), at 6.) Defendants bear the burden of proving this affirmative defense on summary judgment. *Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997).

The statute of limitations for claims brought under § 10(b) and Rule 10b-5 begins to run when a potential plaintiff is put on "inquiry notice" of a violation, rather than when an investor actually discovers the fraud. *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997). The test is an objective one. *Law*, 113 F.3d at 786. Inquiry notice occurs when the plaintiff becomes "aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Marks v. CDW Computer Ctrs.*, 122 F.3d 363, 367 (7th Cir. 1997) (quoting *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993)). In other words, a plaintiff is put on inquiry notice when the plaintiff has "learned or should have learned the facts that he must know to know that he has a claim." *Law*, 113 F.3d at 785. Inquiry notice does not, however, require that the plaintiff "ha[ve] in hand *all* the facts he needs in order to bring suit immediately." *Fujisawa*, 115 F.3d at 1334-35 (emphasis in original). Rather, the statute of limitations is triggered when "the plaintiff learns or should have learned through the exercise of ordinary diligence . . . enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year." *Id.* at 1334 (citing *Law*, 113 F.3d at 785). Such facts must be "sufficiently probative of fraud" to be "advanced beyond the stage of mere suspicion," but "can fall short of actual proof of fraud." *Id.* at 1335.

The Seventh Circuit has instructed that a crucial element of inquiry notice is the potential plaintiff's access to the facts that will be needed to plead a securities fraud claim. *See id.* (noting that a determination of how probative of fraud the circumstances must be in order to trigger the statute of limitations "will depend on how easy it is to obtain the necessary proof by a diligent investigation aimed at confirming or dispelling the suspicion"). Thus, "more than 'merely suspicious circumstances' must exist; instead, the plaintiff must learn of a circumstance that places him 'in possession of, or with ready access to, the essential facts that he needs in order to be able to sue.'" *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 670 (7th Cir. 1998) (quoting *Fujisawa*, 115 F.3d at 1337). For an investor to be charged with inquiry notice, therefore, "not only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence" and without the aid of legal process. *Marks*, 122 F.3d at 367; *see also Law*, 113 F.3d at 786 (inquiry notice requires "[s]uspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded"). Moreover, a potential plaintiff must be in a position to ascertain, based on publicly available information, that a defendant acted with *scienter*. *See Law*, 113 F.3d at 784-86; *Antell v. Andersen LLP*, No. 97 C 3456, 1998 WL 245878, at *4 (N.D. Ill. May 4, 1998) (citing *Law*, 113 F.3d at 786).

In *Law*, investors brought a securities fraud class action against Medco, a drug company, arising from Medco's statement in April 1992 that its FDA application for a new cardiac drug was "on track." 113 F.3d at 783. Two months later, the FDA recalled batches of a similar drug, manufactured at the same plant by the same company, LyphoMed, that Medco had licensed to manufacture its new cardiac drug. *Id.* In May of 1993, a lawsuit filed by Medco against LyphoMed's parent company, Fujisawa, revealed that problems at the LyphoMed plant had forced Medco to withdraw its FDA application for the new drug a week *before* it had announced in April 1992 that its application was on track. *Id.* The plaintiffs argued that they were not on inquiry notice until this

information came to light in Medco's suit against Fujisawa; Medco argued that inquiry notice arose no later than August 1992, when a series of articles reported that Fujisawa was itself suing the principal owner of the company that had sold it LyphoMed, and that LyphoMed was experiencing quality-control and regulatory problems. *Id.* at 784-85.

The Seventh Circuit observed that the August 1992 articles, in connection with a stock price plunge that had bottomed in June 1992, may have created "grounds for suspicion." *Id.* But those factors provided no indication to the public that Medco had been aware of the problems at the LyphoMed plant when it had made the positive statement about its FDA application four months earlier. *Id.* The court concluded that the statute of limitations for a securities fraud claim does not begin to run until an investor knows or should know "that the defendant has made a representation that was *knowingly* false." *Id.* at 786 (emphasis in original). Moreover, the potential plaintiff must be able to discover facts amounting to fraud "without the use of legal process." *Id.* Because Medco did not explain how a diligent investor could have learned, before Medco's suit against Fujisawa, and without being able to subpoena Medco's correspondence, that the April 1992 statement was knowingly false, the Seventh Circuit held that the district court had improperly granted summary judgment for Medco on statute of limitations grounds.[34] *Id.* at 786-87; *see also Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp. 2d 1114, 1125-26 (E.D. Wis. 2001) (in securities fraud suit against holding company's auditor, plaintiffs were not on inquiry notice upon the company's issuance of a press release announcing accounting irregularities because the release did not mention the auditor and "contained no facts suggesting that . . . the auditor acted with scienter").

In *Marks*, the Seventh Circuit emphasized that "implicit" in the objective test for inquiry notice

---

[34]     The court affirmed summary judgment on loss causation grounds because the plaintiffs had failed to produce evidence countering defendants' expert's analysis of share prices, showing that Medco's share price decline was indistinguishable from the price movements of its competitors' stock. *Law*, 113 F.3d at 786-87.

is a requirement that a potential plaintiff be able to learn the facts underlying the claim. 122 F.3d at 367. There, the plaintiff, an employee-shareholder of CDW Computer Centers—which at that time was a closely-held corporation—agreed to a buyout of his 20% stake by the defendant majority shareholder, after plaintiff's employment was terminated. *Id.* at 365-66. The plaintiff alleged that the defendant fraudulently misrepresented the true value of the shares by concealing the circumstances of an attempted purchase of CDW by a third party several years earlier, as well as the profit-sharing arrangement between CDW and a separate corporation wholly owned by the defendant. *Id.* at 366. The plaintiff argued that he was not on inquiry notice until that information came to light, three years after the buyout of his shares, in CDW's registration statement for its initial public offering. *Id.* The Seventh Circuit agreed, reversing the district court's grant of the defendant's motion to dismiss the plaintiff's § 10(b) claim as time-barred. *Id.* at 370. The court ruled that "inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit." *Id.* at 368. Inquiry notice did not exist before the registration statement, the court held, because the plaintiff could not have found the concealed information by reviewing CDW's books or any other material available to him, and thus could not have filed a complaint without violating Rule 9(b) or risking Rule 11 sanctions. *Id.* at 369.

In contrast, the plaintiff in *Kauthar* was both aware of circumstances suggesting fraud and in a position to investigate it. There, the plaintiff brought § 10(b) claims against the officers of a bankrupt company, formed to provide satellite communications services, in which the plaintiff had made an initial investment of $38 million. *Kauthar*, 149 F.3d at 661. The defendants had represented that of the first $25 million, $8.75 million would be used exclusively for the construction of satellites and the lease of orbital positions; the plaintiff learned a year and a half before filing suit, however, that defendants instead paid $3.8 million to a separate company that they controlled, as a "finder's fee." *Id.* at 670. Dismissing the plaintiff's claims as time-barred, the district court held

that the plaintiff's awareness of this misuse of its investment was sufficient to put it on inquiry notice for a fraud claim. *Id.* Affirming, the Seventh Circuit noted that the plaintiff, as part of its agreement to invest in the company, had the power to appoint one-half of the board of directors; thus, the plaintiff "had ready access to the financial information of the company" and could easily have verified the circumstances of the "finder's fee." *Id.* at 671. Because the plaintiff had the ability to confirm or dispel the suspicion aroused upon learning of this possibly fraudulent diversion of its investment, the plaintiff was on inquiry notice for more than a year before filing suit. *Id.* In a footnote, the court, citing *Marks*, noted that the plaintiff's awareness of the suspect finder's fee might have, by itself, been "enough for inquiry notice," but that the plaintiff's "ready access" to financial information "satisfies the concern addressed" in *Marks*. *Id.* n.15.

Defendants in this case contend that Lead Plaintiff was on inquiry notice no later than May 14, 2001. (Def.'s Mem. (SOL), at 7.) Defendants characterize this action as "essentially an omissions case" in which Lead Plaintiff's claims are based on Defendants' alleged failure to disclose several key facts in its public statements related to Telsim: that Motorola had advanced $2 billion in vendor financing to Telsim; that the Telsim sales were contingent on Motorola providing 100% financing for the purchases; that the Telsim financing represented a large portion of Motorola's assets; and that there was a very real risk that Telsim would never repay the loans. (*Id.* at 1, 7.) According to Defendants, these facts were all known to the investing public by May 2001, beginning with the March 30 Proxy that disclosed $1.7 billion in vendor financing to a Turkish customer and culminating with the May 14 Filing in which Motorola announced that Telsim had failed to make a $728 million payment on its (now) $2 billion debt. (*Id.* at 5.) Defendants maintain that these disclosures were sufficient to charge investors with inquiry notice and trigger the statute of limitations. In support of this contention, Defendants devote much of their brief to quoting previous complaints filed in this action, Lead Plaintiff's own statements, and Lead Plaintiff's expert's report, which, as noted, refer to the March through May disclosures as "shocking", "stunning", and

"surprising," and characterize these disclosures as revealing, "for the first time", "incriminating information" relating to Telsim that Motorola had "hidden" or "concealed." (*Id.* at 1-4, 8-10.)

Lead Plaintiff contends that despite Motorola's disclosures, investors in May 2001 lacked any evidence that Defendants acted with *scienter.* (Pl.'s Resp., at 7.) Specifically, investors did not know that the Telsim stock pledged as collateral was undervalued and unmarketable, that there was no other security for the Telsim debt, that Defendants had been aware of "the Uzans' bad acts" while making the loans, and that Motorola had on February 23, 2001 sent the Suspension Letter advising Telsim that due to violations of the loan agreements, Motorola would provide no more vendor financing.[35] (*Id.*) Because Motorola alone had access to these and other facts indicating that Defendants acted fraudulently, rather than having simply made a poor business decision, Plaintiff argues that there were no facts in the public domain sufficient to put investors on inquiry notice in May 2001.[36] (*Id.* at 6, 9.) Such information was not publicly available, Lead Plaintiff

---

[35]     Lead Plaintiff also cites to Motorola's internal investigation of the Telsim situation, commenced in July 2001 and concluded in February 2002, that was harshly critical of Motorola's dealings with Telsim. (Pl.'s Resp., at 8-9.) Because Defendants argue that investors had inquiry notice as of May 2001, this evidence is irrelevant.

[36]     Lead Plaintiff also argues that inquiry notice did not arise in May 2001 because Motorola "tempered" the bad news with positive statements, including Motorola's comment in the April 6 Bloomberg Article that Motorola had "substantial collateral to at least the value of the loan," (April 6 Bloomberg Article, at 3), and its statement in the May 14 Filing that it was in discussions with Telsim to reschedule the missed $728 million payment. (May 14 Filing, at 35.) Lead Plaintiff cites a district court case from the District of Delaware for the proposition that "where a company reveals adverse information, inquiry notice is not triggered when the company contradicts or tempers that negative information with positive statements." (Pl.'s Resp., at 5.) *See In re DaimlerChrysler AG Sec. Litig.,* 269 F. Supp. 2d 508, 513-14 (D. Del. 2003) (finding no inquiry notice in suit alleging fraudulent representations that the merger of Chrysler and Daimler-Benz was a "merger of equals" rather than a takeover, where media reports expressing skepticism about the equality of the merger were met with vigorous denials and continued similar representations by management). There appears to be no Seventh Circuit authority in support of this proposition, however. In fact, in *Kauthar,* discussed above, the Seventh Circuit observed that the fact that one of the defendants told the plaintiff that he had not received any part of the "finder's fee" was insufficient to relieve the plaintiff of inquiry notice. 149 F.3d at 671. Moreover, the court in *In re DaimlerChrysler* articulated a test for inquiry notice—a burden-shifting test incorporating both objective and subjective elements—that differs from the test used in the Seventh Circuit. *See* 269
(continued...)

maintains, until Motorola filed the Uzan Action in January 2002. (*Id.* at 10.)

As an initial matter, the court finds unpersuasive Defendants' reliance on statements made in previous complaints, and by Lead Plaintiff and its damages expert, that, *inter alia*, characterize Motorola's disclosures in March through May 2001 as having "stunned investors" with "shocking" and "surprising" news. It is true, as Defendants assert, that the CAC largely repeats these allegations and further describes this period as the time in which "The Truth Begins to be Revealed", (CAC, at 68), and "Defendants' fraud began to unravel." (*Id.* ¶ 17.) Lead Plaintiff's expert also described Motorola's March 30 Proxy as containing "incriminating information", (Feinstein Report ¶ 55), and the April 6 Bloomberg Article as having "[b]lindsided" the market. (*Id.* at 13.) As Lead Plaintiff points out, however, these allegations and characterizations reveal nothing about what facts investors knew or should have known in May 2001; rather, the statements reflect what the persons making the statements knew at the time the statements were made. The allegations cited by Defendants first appeared in the *Barry* complaint, filed in December 2002. By that time, much additional information about the Telsim transaction had come to light in the Uzan Action. The allegations cited by Defendants were thus made from the vantage point of plaintiffs who, as of December 2002, possessed more knowledge than was available in May 2001. Similarly, Lead Plaintiff's expert's reference to "incriminating information" was made with the benefit not only of the Uzan Action, but of extensive discovery in this action. In short, any characterizations of Motorola's March through May 2001 disclosures, and of the market's reaction to those disclosures, made months and even years later with the benefit of hindsight and a wealth of additional information, are not at all probative of what investors knew or should have known in May 2001.

Similarly unconvincing is Lead Plaintiff's insistence that the bulk of the CAC, as well as the

---

[36](...continued)
F. Supp. 2d at 513. The court thus finds that case sufficiently distinguishable on both the facts and the law to serve as persuasive authority, and declines to adopt the rule proposed by Lead Plaintiff.

previous complaints filed in this action, was "derived from" the Uzan Action. (Pl.'s 56.1 Addnl. ¶¶ 75-79.) As noted, some of the allegations in the CAC relate facts that also formed the basis of some of MCC's allegations against Telsim in the Uzan Action. At most, this creates an inference that *some* allegations in the CAC *may* have been based on the Uzan Action; this in turn gives rise to an inference that these facts came to light only by virtue of the Uzan Action and were unavailable to investors in May 2001. The latter inference is much weaker because, as noted, many allegations cited by Lead Plaintiff as "derived" from the Uzan Action, including those concerning the Uzans' reputation, Telsim's default on its debt, and the 1999 earthquake in Turkey, reflect information publicly available apart from the Uzan Action. Nonetheless, for purposes of this motion, the court views all reasonable inferences in the light most favorable to Lead Plaintiff. Moreover, as noted, it is undisputed that Lead Plaintiff's assertion that Defendants "had knowledge that its collateral in the form of Telsim stock was weak, not marketable, and subject to potential manipulations by the Uzans[,]" was "based on" information that was not publicly available prior to the Uzan Action. (Pl.'s 56.1 Addnl. ¶ 80.) In the court's view, a reasonable jury could find that some of allegations in the CAC are based on information that was unavailable to Motorola investors in May 2001.

This conclusion is not, however, dispositive of whether investors were on inquiry notice in May 2001. In fact, Lead Plaintiff's heavy reliance on the relationship between the CAC and the Uzan Action is somewhat of a red herring. As Defendants have charged Lead Plaintiff with having inquiry notice in May 2001, the relevant time frame for the court's inquiry is May 2001, and the focus of that inquiry is on what information was available to investors in May 2001. The fact that Lead Plaintiff and other plaintiffs in this action may have learned *additional* information in January 2002 from the Uzan Action, which information allowed them to make *additional* allegations beginning in December 2002, is largely beside the point. The relevant issue is whether a potential plaintiff *in May 2001* knew or should have known of facts giving rise to suspicion of fraud, and would have been able to complete its investigation and file suit within a year. *See Fujisawa*, 115 F.3d at 1335.

Lead Plaintiff was on inquiry notice if it could have filed *a* securities fraud claim within a year, not *the* particular securities fraud claim that it and other plaintiffs eventually filed. *See Kauthar*, 149 F.3d at 671 (plaintiff's allegation of defendants' diversion of its investment to pay the "finder's fee" was by itself sufficient for inquiry notice, even though the complaint alleged "a plethora" of other fraudulent misrepresentations and omissions as well).

Lead Plaintiff contends that it could not have filed a claim within a year following May 2001 because none of Motorola's disclosures up to that point indicated that Defendants had acted with *scienter*, and because it had no access, prior to the Uzan Action, to facts sufficient to plead *scienter*. The court agrees. The Seventh Circuit authority discussed above makes it clear that inquiry notice has two components: first, facts that would generate in a reasonable investor a suspicion of fraud; and second, the investor's access to information that could confirm the suspicion and enable the potential plaintiff to file suit within a year. *See Fujisawa*, 115 F.3d at 1335. These decisions emphasize the importance of an investor's ability to "obtain the information needed to file suit," *see Marks*, 122 F.3d at 368, including facts "sufficiently particular" to avoid violating Rule 9(b) or Rule 11 if and when the investor files suit. *Id.* at 369; *see also Fujisawa*, 115 F.3d at 1335. *Law* emphasized that a potential plaintiff cannot be charged with inquiry notice without access to facts showing that a defendant acted with the *scienter* required for a fraud claim. 113 F.3d at 784-85. Particularly relevant here is the court's observation in *Law* that a defendant, moving for summary judgment with the affirmative defense that the statute of limitations has run due to inquiry notice, bears the burden of showing what a reasonably diligent investor could have done to obtain the necessary information. *Id.* at 786. Defendants in this case have failed to meet that burden. Defendants nowhere address the issue of Lead Plaintiff's access to information, and indeed do not even mention that required component of inquiry notice despite the Seventh Circuit's repeated emphasis of the point. According to Defendants, "[t]he central question is whether there was <u>cause for suspicion</u> by May 14, 2001." (Def.'s Mem. (SOL), at 11 (emphasis in original).) But that is only

half of what is required for inquiry notice; investors must also have been in a position to confirm or dispel that suspicion within a year.[37]  *See Fujisawa*,115 F.3d at 1335.

Lead Plaintiff is correct that investors had no indication in May 2001 that Defendants had acted fraudulently in connection with the Telsim vendor financing, as opposed to merely having made poor business decisions.  Prior to Motorola's disclosures from March through May 2001, its public pronouncements regarding Telsim were limited to positive news of Telsim's equipment purchases: a $1.5 billion dollar contract announced in February 2000, (February 3, 2000 Press Release, Ex. O to Harrod Decl.), and a contract with a "potential value . . . in excess of $2 billion" in October 2000.  (October 31, 2000 Press Release, Ex. DD to Harrod Decl.)  Motorola's SEC filings prior to March 2001 disclosed generally that Motorola's customers increasingly were demanding vendor financing, that Motorola had significantly increased the amount of vendor financing and

---

[37]     Defendants accuse Lead Plaintiff of arguing, contrary to the law in the Seventh Circuit, that "the statute of limitations does not start to run until a plaintiff has 'the facts necessary to plead [securities fraud].'"  (Def.'s Mem. (SOL), at 7 (quoting Pl.'s Resp., at 4).)  Defendants are correct that this is not the law; the court in *Fujisawa* rejected the notion that the clock does not start running until the plaintiff has all the facts necessary to plead a claim.  115 F.3d at 1334.  But the court does not understand Lead Plaintiff to make such an argument; indeed, the portion of Lead Plaintiff's brief quoted by Defendants actually states that "the statute begins to run only when . . . the plaintiff has *access to* the facts necessary to plead its case."  (Pl.'s Resp., at 4 (emphasis added).)  This is indeed a correct statement of the law in the Seventh Circuit, as discussed above.
        The court notes, however, that Lead Plaintiff, in a parenthetical after a citation to *Fujisawa*, describes that case as holding that the "statute begins to run only when plaintiff is 'able to file suit on the spot without running afoul of Rule 9(b), which requires that fraud be pleaded with particularity, and without courting Rule 11 sanctions."  (*Id.* at 5-6 (quoting *Fujisawa*, 115 F.3d at 1335).)  Lead Plaintiff quotes this fragment of a sentence from *Fujisawa* out of context and thus indeed misstates the law by mischaracterizing that case as standing for something it does not.  The full sentence from Judge Posner's opinion reads as follows:

> *How* suspicious the circumstance need be to set the statute of limitations running—how close, in other words, it needs to be to the proof that one would have to have in hand in order to be able to file suit on the spot without running afoul of Rule 9(b), which requires that fraud be pleaded with particularity, and without courting Rule 11 sanctions—will depend on how easy it is to obtain the necessary proof by a diligent investigation aimed at confirming or dispelling the suspicion.

*Fujisawa*, 115 F.3d at 1335.  As both *Fujisawa* and other Seventh Circuit decisions explain, a plaintiff can be charged with inquiry notice before having all the facts needed to file suit, so long as the plaintiff has the ability to obtain those facts and file suit within a year.  *Id.*; *see Marks*, 122 F.3d at 368.

expected to continue to do so, and that vendor financing was a "primary business risk." (Def.'s 56.1 (LC) ¶¶ 25-27.)  After the March through May 2001 disclosures, an investor would have known that the Telsim sales were all accomplished through vendor financing, that the amount of vendor financing was indeed huge ($2 billion as disclosed by the May 14 Filing), and that Telsim had failed to make a $728 million payment due by April 30, 2001.  Given the missed payment, the Uzans' bad reputation, and the February 2001 devaluation of the Turkish lira, investors would thus have been aware by May 2001 that there was a very good chance that Motorola would never see a dime of the $2 billion Telsim debt.  But there would have been no public indication that Defendants *knew*, when announcing the contracts with Telsim back in February and October 2000, when recognizing revenue on the sales in its financial reports, or even when first disclosing in the March 30 Proxy that Telsim owed Motorola $1.7 billion, that Motorola would likely never be repaid.  Thus, similar to Medco's announcement in *Law* that its FDA application was on track, there was no indication to the investing public in May 2001 that Defendants *knowingly* made a false representation regarding Telsim.  An investor would have known that the Telsim sales were based on vendor financing that was turning out to have been a very risky business decision; an investor would not have suspected that Motorola knew it would not be repaid, even as it announced billion-dollar contracts and booked the revenue.

Lead Plaintiff now alleges, of course, that Defendants knew, long before publicly disclosing the extent of the Telsim vendor financing and while making positive statements about and booking revenue from the Telsim sales, that it was unlikely that Telsim would repay the debt.  Defendants allegedly knew that the collateral was weak, and that Telsim had already defaulted on some of the debt and violated the lending agreements to the point at which Motorola had cut off any further vendor financing to Telsim.  Defendants allegedly knew of specific instances of the Uzans' "bad acts" in addition to the Uzans' poor public reputation.  These facts all go to *scienter*.  None, however, were available to investors by May 14, 2001; rather, this information came to light in the

Uzan Action.

As noted above, however, the question is not whether the facts eventually alleged in complaints filed beginning in December 2002 were available to investors in May 2001, but whether the facts available to an investor in May 2001 were sufficiently suspicious, and whether an investor had access to information from which the investor could glean facts sufficient to file a securities fraud claim within the following year.  To this end, Defendants argue that investors, without reference to the Uzan Action, had access to facts in May 2001 both that indicated that Defendants had acted with *scienter* and that were sufficient to file a claim even then.  Specifically, a reasonable investor would have known that Defendants knew that their public statements regarding Telsim were incomplete and misleading when made; that Defendants had misleadingly "buried" the first Telsim disclosure in the March 30 Proxy; that Defendants had recklessly ignored the Uzans' reputation and the risks of the Turkish market in making the loans; and that Defendants had (unidentified) "financial incentives to mislead the market in the form of stock performance and executive compensation."  (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Statute of Limitations) ("Def.'s Reply (SOL)"), at 8 n.3.)  Absent from this argument, however, is any explanation of how an investor, exercising reasonable diligence, could have confirmed or dispelled the suspicion of fraud that these factors might have aroused.  As noted, Defendants bear the burden on summary judgment of proving that a reasonable investor, with due diligence, could have discovered the facts needed to plead a fraud claim more than a year before filing suit.  *Law*, 113 F.3d at 786.  To meet the standard required by Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), a Motorola investor would have had to have been able to plead particularized facts showing Defendants' *scienter*.  *See* FED. R. CIV. P. 9(b) (all fraud claims must be "stated with particularity"); 15 U.S.C. § 78u-4(b)(2) (securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594-95 (7th Cir.

2006) (PSLRA requires a securities fraud plaintiff to "marshal sufficient facts to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud'") (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)).

While the court need not decide the issue here, the above facts identified by Defendants as indicating *scienter* in May 2001 may have supported a general suspicion of wrongdoing, but are likely insufficient to meet the pleading requirements. Defendants must therefore explain how a reasonable Motorola investor, acting on a generalized suspicion of Defendants' motives and judgment, could have been in a position, in May 2001, to conduct an investigation that would have revealed particularized facts supporting a claim that Defendants' actions with regard to Telsim were intended to deceive. Defendants fail to do so. The facts, indicating *scienter*, that Lead Plaintiff and others eventually (and adequately) alleged with the benefit of the Uzan Action, supporting the claim that Defendants had known almost from the beginning that Telsim was unlikely to repay the loans, may not be highly probative of what facts, indicating *scienter*, were available in May 2001. But those were the *type* of facts that would have been required to charge investors with inquiry notice at that time, and such facts, indicating that Motorola and its senior officers acted with fraudulent intent, were likely within the knowledge and exclusive control of Defendants and would not have been available to an investor without the aid of legal process.

The cases cited by Defendants do not require a contrary conclusion. *Kauthar*, while holding that the plaintiff was on inquiry notice as a result of learning of the "finder's fee," involved both a clear indication of fraud ($3.8 million diverted to companies controlled by defendants) and ease of access to information that could confirm that fraud (the plaintiff's ability to seat half of the board of directors). 149 F.3d at 670-71. Neither was present in this case in May 2001. In *Fujisawa*, the very action that revealed to the plaintiff investors in *Law* that Medco had been aware of problems at the LyphoMed plant before it announced that its FDA application was on track, Fujisawa sued the previous owner of LyphoMed for concealing the fact that LyphoMed had filed fraudulent drug

applications with the FDA.  *Fujisawa*, 115 F.3d at 1334.  The court held that Fujisawa had been on

inquiry notice well before a year prior to filing suit, given that Fujisawa had been aware that the FDA

had cited LyphoMed for violations of FDA regulations, seized products at a LyphoMed plant, and

begun an investigation into the fraudulent drug applications.  *Id.* at 1335-36.  Moreover, Fujisawa

"easily could have obtained enough information to sue" because it had been LyphoMed's largest

shareholder, with seats on its board, even before buying the company in its entirely.  *Id.* at 1336.

Motorola investors in this case had neither the same degree of access nor the same clear

indications of fraudulent activity.

Defendants also cite to *Tregenza* and to *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67

F.3d 605 (7th Cir. 1995), both of which suggest more of a willingness to find inquiry notice than the

Seventh Circuit later expressed in *Law* and *Marks*.  In *Tregenza*, the court held that where the

defendant broker had touted a stock as "greatly undervalued," accompanied by specific price

targets and a prediction of a downside risk of less than ten percent, a subsequent dramatic and

precipitous fall in the share price was sufficient to put the investors on inquiry notice.  12 F.3d at

720.  The court reasoned that a reasonable investor "would have become suspicious and

investigated when [the broker's] emphatic and precise prediction was so swiftly and dramatically

falsified."  *Id.*  Similarly, the court in *Whirlpool* held that where the plaintiff had received "very

precise" financial projections in return for its loan to a holding company for the purpose of

purchasing a hospital-staffing concern, the concern's subsequent miserable performance was

sufficient to put the plaintiff on inquiry notice because "a reasonable investor would have believed

that fraud was a possible explanation."  67 F.3d at 610.  Both decisions predated the Seventh

Circuit decision in *Law*, however, which noted that *Whirlpool* and other cases appeared to support

a formulation of inquiry notice that found "mere suspicion" sufficient.  *Law*, 113 F.3d at 785.

Announcing "[w]e think it is time to resolve the issue[,]" the court in *Law* emphasized, as noted

above, that inquiry notice does not arise until suspicion is combined with a potential plaintiff's "ease

of discovering, without the use of legal process, whether the suspicion is well grounded." *Id.* at 786.

Moreover, the court in *Whirlpool* had similarly noted that once discrepancies between the

projections and the actual results in that case had alerted the plaintiff to the possibility of fraud, the

information that the defendant allegedly fraudulently failed to disclose, including adverse industry

and regulatory trends, "was in the public domain." 67 F.3d at 610. Finally, both *Tregenza* and

*Whirlpool* found inquiry notice when actual results failed to meet precise and specific financial

projections. Given the absence of that circumstance here, along with the emphasis that the

Seventh Circuit has placed on an investor having access to the facts needed to plead a fraud

claim—a requirement Defendants neglect to even mention in their briefs—the court finds

Defendants' reliance on *Tregenza* and *Whirlpool* unpersuasive.[38]

For the above reasons, the court concludes that Motorola investors were not on inquiry

notice as of May 2001. As Lead Plaintiff's claims are thus not barred by the statute of limitations,

Defendants' motion for summary judgment on that ground is denied.

## III.    Loss Causation

Section 10(b) of the SEA "forbids (1) the 'use or employ[ment] . . . of any deceptive device,'

(2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities

and Exchange Commission 'rules and regulations.'" *Dura Pharm.*, 544 U.S. at 341 (quoting 15

---

[38]      The court is also unmoved by Defendants' citation to *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 1999 WL 543209, at *4 (N.D. Ill. July 23, 1999), where this court, in a suit against the outside auditor of a software company, disagreed with the defendant's argument opposing class certification on grounds that the putative plaintiff was subject to the unique defense that his claim was time-barred. The defendant's argument was based entirely on the deposition testimony of the plaintiff's witness, who indicated knowledge of wrongdoing more than a year before the suit was filed; the court concluded, however, that the witness simply misstated the relevant dates and corrected himself later in the deposition. *Id.* at *3-4. In a footnote, the court remarked that a press release issued by the software company, announcing that the defendant auditor had advised the company that its financial results had been "materially misstated" and would have to be corrected, was likely sufficient to put potential plaintiffs on inquiry notice at that time. *Id.* at *4 n.6. Because that issue was not material to the question before the court in *Retsky* and thus warranted no analysis, and because no similar announcement of earnings misstatements existed in this case as of May 2001, Defendants' citation to the *Retsky* footnote is unpersuasive.

U.S.C. § 78j(b)).  SEC Rule 10b-5 prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5).  The required elements of a claim for damages under § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance on the misrepresentation (i.e., "'transaction causation'"), (5) economic loss, and (6) "'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Id.* (citations omitted).  Defendants contend that Lead Plaintiff cannot, as matter of law, show loss causation.  (Def.'s Mem., at 1-2.)

Loss causation requires a plaintiff in a § 10(b) action to allege and prove that the defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss.  *Dura Pharm.*, 544 U.S. at 345.  It is analogous to the requirement, in common-law actions for fraud or deceit, that a plaintiff show both actual loss and causation.  *Id.* at 344; *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) ("'Loss causation' is an exotic name . . . for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains.").  This requirement comports with the objectives of federal securities laws, which are designed "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm.*, 544 U.S. at 345.

To satisfy loss causation, a plaintiff must show a causal connection between a decline in the price of a security, and the revelation of the truth that the defendant's misrepresentation or omission concealed.  *See id.* at 347; *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (To establish loss causation, plaintiff must show "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."); *In re Comverse Technology, Inc.*, No. 06-CV-1825 (NGG)(RER), 2006 WL 2792757, at *2 (E.D.N.Y. Sept. 27, 2006) (citing *Dura Pharm.*, 544 U.S. at 346) (securities fraud plaintiff

"must . . . prove that the company's stock price later declined because the misconduct was disclosed to the public"). In other words, the plaintiff must have suffered a loss when the defendant's "material misrepresentation 'became generally known.'" *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, ___F.3d ___, No. 05-4322, 2007 WL 102985, at *16 (7th Cir. Jan. 17, 2007) (quoting *Dura Pharm.*, 544 U.S. at 344). A plaintiff cannot satisfy loss causation merely by showing that the price of a security was artificially inflated at the time of purchase by the defendant's misrepresentations or omissions. *Dura Pharm.*, 544 U.S. at 338.

At the pleading stage, the complaint must "provide a defendant with some indication of . . . the causal connection that the plaintiff has in mind." *Dura Pharm.*, 544 U.S. at at 347. Courts generally find this requirement satisfied by allegations that the plaintiff bought securities at a price artificially inflated by a defendant's misrepresentations, and the price dropped once the truth was revealed. *See, e.g., In re Daou Systems, Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (plaintiffs adequately pleaded loss causation by alleging that defendants had concealed premature revenue recognition, thus inflating earnings, and that share price "fell precipitously after defendants began to reveal figures showing the company's true financial condition"); *see Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 982 (N.D. Ill. 2006) (citing *Dura Pharm.*, 544 U.S. at 347) (to plead loss causation, plaintiff "must allege that the company's share price fell significantly after the truth about the alleged misrepresentations or omissions became known"). To prevail on summary judgment, the defendant must "establish that, as a matter of undisputed fact, the depreciation in the value of the [security] could not have resulted from the alleged false statement or omission of the defendant." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649–50 (7th Cir. 1997).

Some courts have referred to an event, where the truth about previously misrepresented information is revealed and is followed by a decline in share price, as a "corrective disclosure." *See, e.g.,Lentell*, 396 F.3d at 175 & n.4; *In re Comverse*, 2006 WL 2792757, at *3; *Blatt v. Corn Prods. Int'l, Inc.*, No. 05 C 3033, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006). The parties

adopt that terminology here. Lead Plaintiff has identified four events, labeled "partial corrective disclosures," (Pl.'s 56.1 Addnl. ¶ 36), where, according to Lead Plaintiff, Telsim-related information entered the market and caused significant declines in Motorola's share price: (1) the February 23 Warning, announcing that Motorola would not meet earnings projections; (2) the disclosure of the $1.7 billion Telsim debt, as first disclosed in the March 30 Proxy and reported in the April 6 Bloomberg Article; (3) Motorola's May 14 Filing, disclosing Telsim's missed $728 million payment; and (4) Motorola's June 18, 2001 announcement that Motorola would pursue legal options against Telsim.[39] (Pl.'s Resp., at 14-15.) Defendants argue that none of these four events constitutes a true "corrective disclosure," in light of the Supreme Court's recent (2005) decision in *Dura* and *post-Dura* case law, because none both involved the correction of misleading representations or omissions relating to Telsim, and precipitated a drop in share price. (Def.'s Mem., at 6.) Therefore, Defendants maintain, Lead Plaintiff cannot, as a matter of law, prove loss causation.[40] (*Id.*)

---

[39] Lead Plaintiff also lists Motorola's October 11, 2000 press release, announcing third quarter 2000 operating results, as a "curative disclosure" because Motorola allegedly reported less income overstatement from Telsim revenue in the third quarter of 2000 than in the second quarter. (Pl.'s Resp., at 14 n.5.) Lead Plaintiff presents no further argument in support of this position, and does not attempt to link the October 11, 2000 press release to any share price decline. As Lead Plaintiff cites to no authority to support the theory that loss causation can be satisfied in such circumstances, the court considers loss causation only in the context of the February 2001 through June 2001 disclosures.

[40] Defendants also devote a great deal of attention to what they deem an inconsistency between Lead Plaintiff's positions on loss causation and the statute of limitations. According to Defendants, if the March through May 2001 disclosures were truly events in which truth about the allegedly fraudulent Telsim scheme entered the market and caused declines in Motorola's share price, thus satisfying loss causation, then the disclosures must have been sufficient to place investors on inquiry notice on May 2001 and trigger the statute of limitations. (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Loss Causation) ("Def.'s Reply (LC)"), at 1.) According to Defendants, Lead Plaintiff thus "cannot have it both ways." (*Id.*)

The court does not share Defendants' concerns regarding the consistency of Lead Plaintiff's positions in opposition to Defendants' two motions. As discussed, the court finds summary judgment inappropriate on statute of limitations grounds because investors were not aware of facts indicating *scienter* in May 2001 and had no ready access to such facts. There is nothing inconsistent about the market reacting sharply to disclosures of truth regarding the Telsim situation, while remaining unaware that Defendants had acted with allegedly fraudulent intent in concealing

(continued...)

In *Dura,* the Supreme Court held that a securities fraud plaintiff cannot satisfy the loss causation requirement merely by alleging (and subsequently establishing) that the price of a security was inflated by the defendant's misrepresentations as of the date of purchase. 544 U.S. at 338. The plaintiff investors alleged that Dura, a drug company, made false statements about expected FDA approval of an asthmatic spray device. *Id.* at 339. The Ninth Circuit determined that the plaintiffs had adequately pleaded loss causation by alleging "nothing significantly more" than that the plaintiffs "paid artificially inflated prices for Dura securities' . . . and suffered 'damages' thereby." *Id.* at 339-40 (citation omitted). The Supreme Court reversed. Noting the "common-law roots" of securities fraud actions in actions for fraud and misrepresentation, *id.* at 344, as well as the PSLRA, which "expressly imposes on plaintiffs 'the burden of proving' that the defendants' misrepresentations 'caused the loss for which the plaintiff seeks to recover[,]'" *id.* at 345-46 (quoting 15 U.S.C. § 78u-4(b)(4)), the Court concluded that a plaintiff must "adequately allege and prove the traditional elements of causation and loss." *Id.* at 346. An inflated purchase price, standing alone, cannot constitute economic loss, as the plaintiff holds an asset of equal value at the moment of purchase. *Id.* at 342. Nor is an inflated purchase price in itself sufficient to establish causation: given the "tangle of factors" affecting share prices apart from the misrepresentation, such as changing economic conditions and additional company-specific or industry-specific news, "the logical link between the inflated share purchase price and any later economic loss is not invariably strong." *Id.* at 342-43.

A securities fraud complaint, therefore, must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. The complaint in *Dura* failed this test because it indicated no loss apart from an inflated price, nor any causal link between Dura's misrepresentations regarding the spray device and any later loss. *Id.* Since *Dura*, courts

---

[40](...continued)
that information previously.

in this district and elsewhere, including this court, have found loss causation satisfied, at least at the pleading stage, by allegations that the plaintiff bought securities at a price artificially inflated by a defendant's misrepresentations, and that the price dropped once the truth was revealed.[41]

Significantly, however, *Dura* did not address what is required beyond the pleading stage. Indeed, the Court emphasized the narrowness of its holding: "In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss. We need not, and do not, consider other proximate cause or loss-related questions." *Dura Pharm.*, 544 U.S. at 346. The Court thus held that a plaintiff must prove loss causation, and cannot do so merely by showing that the share price was artificially inflated at the time of purchase; but the Court did not address *how* a plaintiff could prove loss causation. *See In re Comverse*, 2006 WL 2792757, at *3 (observing that the Supreme Court in *Dura* "expressly refused to formulate precise standards for proving loss causation"); *see also* Merrit B. Fox, *After Dura: Causation in Fraud-on-the-Market Actions*, 31 J. Corp. L. 829, 847 (2006) (concluding that *Dura's* holding was "extremely narrow" and

---

[41]     *See, e.g., See also Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 750 (N.D. Ill. 2006) (plaintiffs adequately pleaded loss causation by alleging that the value of debt securities issued by Sears' wholly-owned credit-card subsidiary was artificially inflated due to misrepresentations regarding the quality and profitability of the credit-card operations, and that the securities' price dropped steeply upon Sears' disclosures of poor financial results from credit card operations, sub-prime borrowers, and a charge to cover bad debt); *Asher v. Baxter Int'l, Inc.*, No. 02 C 5608, 2006 WL 299068, at *7 (N.D. Ill. Feb. 7, 2006) (loss causation properly pleaded where plaintiffs alleged that Baxter fraudulently issued optimistic and unattainable financial predictions in order to conceal pervasive operational problems, thus artificially inflating share price, and that share price fell sharply when Baxter announced a shortfall in earnings reflecting the company's true condition); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005) ("conjunction" of allegations that the defendant's stock was inflated due to misrepresentations concerning HIV drug's effectiveness and likelihood of FDA approval, and that the stock "collapsed" upon disappointing study results and defendant's decision to terminate the drug's funding, were sufficient to plead loss causation under *Dura*); *see also In re Loewen Group Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("Plaintiffs have pleaded loss causation adequately by alleging that they purchased TLGI stock at an inflated price and lost money when the price fell.").

left many questions unanswered, including what kind of proof would be sufficient at trial to show that an inflated purchase price proximately caused an economic loss).

According to Defendants, however, *Dura* imposed two strict requirements on a securities fraud plaintiff seeking to prove loss causation.  First, Defendants argue, *Dura's* proximate cause requirement can only be satisfied by a "corrective disclosure" that both identifies a particular prior misrepresentation and reveals its falsity.  (Def.'s Mem. (LC), at 8.)  The February 23 Warning fails to satisfy this requirement, Defendants maintain, because Motorola's press release on February 23, 2001, announcing an earnings shortfall, contained no reference to Telsim.  (*Id.*)  Second, Defendants contend that under *Dura*, the plaintiff bears the burden of proving that its economic loss, i.e., a decline in share price, resulted directly from disclosure of the allegedly fraudulent scheme, and not from the "tangle of other factors" affecting share price movements.  (*Id.* at 9-10 (quoting *Dura Pharm.*, 544 U.S. at 343).)  Defendants argue that Lead Plaintiff has failed to meet this burden with regard to the April 6 Bloomberg Article and Motorola's May 14 Filing.  (*Id.* at 9-13.)

The court addresses Defendants' arguments in the context of the four events that the parties have deemed "corrective disclosures."  Because Defendants have urged that *Dura* imposes requirements Lead Plaintiff cannot meet, the court addresses the significance of that decision at some length with respect to the February 23 Warning and the April 6 Bloomberg Article.

## A.    The February 23 Warning

Defendants contend that the February 23 Warning, in which Motorola announced an expected shortfall in sales revenue and net earnings per share, cannot support loss causation. Because the press release, attributing the earnings warning to economic conditions, inventory corrections, and weak order input, neither "identified Telsim [n]or called into question any prior Motorola representation about Telsim," Defendants argue that the February 23 Warning was not a sufficient "corrective disclosure" and cannot be tied to the subsequent decline in Motorola share price on February 23, 2001.  (Def.'s Mem., at 8.)  Lead Plaintiff maintains that despite the fact that

54

the earnings warning did not refer to Telsim by name, "the press release was in fact motivated by then recent events concerning Telsim." (Pl.'s Resp., at 16.)  Pointing to internal Motorola e-mails concerning the impact of the February 22, 2001 devaluation of the Turkish lira on the Telsim debt, the February 23, 2001 Suspension Letter informing Telsim that Motorola would provide no further vendor financing, and the "liquidity crisis" resulting from the accumulated $2 billion Telsim debt, Lead Plaintiff claims that the true reason for the expected earnings shortfall was Motorola's anticipated inability to book Telsim-related income.  (*Id.* at 15-16; Pl.'s 56.1 Addnl. ¶ 45.)  This, Lead Plaintiff contends, is sufficient to link Defendants' misrepresentations and omissions concerning Telsim to the February 23, 2001 share price decline.  (Pl.'s Resp., at 15-16, 20; Pl.'s 56.1 Addnl. ¶ 45.)

Defendants' argument relies on a strict interpretation of "corrective disclosure."  Defendants maintain that a corrective disclosure must "at a minimum . . . identify which prior representation is called into question," *In re Odyssey Health Care Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 888 n.4 (N.D. Tex. 2005), and must further "reveal to the market the falsity of that representation," *Lentell*, 396 F.3d at 175 n.4.  (Def.'s Mem. (LC), at 8.)  A mere earnings warning is insufficient to meet this standard, according to Defendants, because it does not disclose a fraudulent scheme and thus cannot correct the price inflation it caused.  (Def.'s Mem. (LC), at 1-2.)  Lead Plaintiff contends that this interpretation is unduly restrictive and is not required by *Dura* or by any other authority.  (Pl.'s Resp., at 16.)  The court ultimately agrees with Defendants that the February 23 Warning fails to provide a sufficient causal link between the allegedly concealed or misrepresented Telsim information and the February 23, 2001 decline in Motorola share price.  First, however, the court addresses whether Defendants' strict interpretation of "corrective disclosure" is warranted.

Although Defendants cite to *Dura* as supporting their strict interpretation of a "corrective disclosure" requirement for loss causation, this court does not read that decision to impose the requirements Defendants urge.  Significantly, the Court in *Dura* did not use the term "corrective

disclosure."  The opinion does suggest that loss causation involves a decline in share price after some kind of revelation of the truth about a prior misrepresentation: in holding that an inflated purchase price is insufficient in itself to properly allege both loss and causation, the Court noted "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth became known[,]" *Dura Pharm.*, 544 U.S. at 347; and in pointing to the common law roots of securities fraud claims, the Court quoted the Restatement of Torts, which states that a defendant becomes liable for an investor's loss "'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s],'" *id.* at 344 (quoting RESTATEMENT (SECOND) OF TORTS § 548A cmt. b (1976)).

The Court did not, however, indicate what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or how specifically it must refer to that information.  *See In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (internal citations omitted) (observing that *Dura* "only suggested that the plaintiffs needed to have alleged in some fashion that 'the truth became known' before 'the share price fell.'  However, *Dura* did not address what type of events or disclosures may reveal the truth.  Nor did *Dura* explain how specific such disclosures must be.");  *In re Winstar Communications*, No. 01 CV 3014(GBD), 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (stating that in *Dura*, "[t]he Court did not address the means by which the information is imparted to the public.  Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality.").  Rather than speaking in terms of a single event in which all is revealed, the *Dura* court referred to a hypothetical loss that might occur "after the truth makes its way into the market," and the lack of any such loss if the investor sells "before the relevant truth begins to leak out[.]"  *Dura Pharm.*, 544 U.S. at 342.  This language suggests that a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity.  *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 2319118, at *23

(S.D.N.Y. Sept. 21, 2005) (noting that to satisfy *Dura*, plaintiff cannot rely on price inflation alone but must "establish that his losses were attributable to *some form of revelation* to the market of the wrongfully concealed information") (emphasis added).     Indeed, several courts and commentators have concluded that *Dura* does not impose a "corrective disclosure" requirement for showing loss causation.  *See In re Loewen Group*, 395 F. Supp. 2d at 218 (concluding, post-*Dura*, that "'loss causation does not . . . require a corrective disclosure followed by a decline in price." (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005)); *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D.D.C. 2006) (*Dura* does not require "proof of a complete, corrective disclosure"; and collecting cases observing the lack of such a requirement); *see also* Fox, *supra*, at 847 (*Dura* did not indicate whether "it is necessary for the plaintiff to plead and prove a price drop immediately following the public announcement of the truth[,]" or whether proof can "consist of some other kind of indication that the purchase price had been inflated by the misstatement and that the market had later realized the true situation dissipating this inflation[.]"); Madge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 118 (2006) ("The Court [in *Dura*] did not say (or even imply) that 'truth, then price drop' was to become the only test of loss causation . . . ."); Patrick J. Coughlin et al., *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review The Supreme Court's Opinion and Its Import for Securities Fraud Litigation*, 37 Loy. U. Chi. L.J. 1, 15-16, 21-22 & n.104 (2005) (noting that the Court in *Dura* declined requests by Dura and the Solicitor General for a rule that would have required a plaintiff to show that a stock drop was directly tied to a corrective disclosure, and concluding that the decision "nowhere requires there be a corrective disclosure tied to a stock drop").

Defendants bring to the court's attention the Seventh Circuit's recent decision in *Tricontinental Industries*, which addressed loss causation in the pleading context in light of *Dura*. The plaintiff in *Tricontinental Industries* sold its wire and cable distribution assets to Anicom in

October 1998 in exchange for cash and Anicom stock. 2007 WL 102985, at *1. The plaintiff alleged that Anicom, beginning in 1996, had been improperly reporting revenue from fictitious sales orders, a practice the defendant, Anicom's auditor PricewaterhouseCoopers ("PwC"), allegedly became aware of in July 1997. *Id.* PwC's audits of Anicom's financial results for 1997, 1998, and 1999 made no mention of accounting irregularities. *Id.* at *2. In July 2000, Anicom disclosed that it had been overstating revenue since 1998, and that its 1998 and 1999 financial results could no longer be relied upon. *Id.* Anicom subsequently declared bankruptcy, deflating the value of the plaintiff's shares. *Id.* At no point did Anicom ever announce or disclose that its 1997 results were inaccurate or unreliable. *Id.*

The district court dismissed the complaint for failure to plead loss causation because the drop in share value followed the disclosure of misrepresentations in Anicom's 1998 and 1999 financial statements, but did not disclose any fraud with regard to the 1997 results. *Id.* at *15. On appeal, the plaintiff contended that *Dura* did not require a specific disclosure of the 1997 fraud: "Nowhere in *Dura* does the Supreme Court require that the precise fraud that resulted in the underlying transaction be the subject of a later corrective disclosure in order to satisfy loss causation . . . ." *Id.* at *16 (quoting Appellant's Reply Br., at 20). The Seventh Circuit, affirming the dismissal, declined to apply this interpretation of *Dura* to the complaint before the court. *Id.* at *16. The court noted that *Dura* requires a securities fraud complaint to "'specify each misleading statement,'" *id.* (quoting *Dura Pharm.*, 544 U.S. at 345), and provide "'a causal connection between the material misrepresentation and the loss,'" *id.* (quoting *Dura Pharm.*, 544 U.S. at 342). Because the plaintiff acquired its shares prior to publication of Anicom's 1998 results, it had to allege, in order to recover against PwC, that it acquired Anicom shares in reliance on PwC's 1997 audit; thus, to establish the requisite causal link to its later loss, the plaintiff had to identify a disclosure that the 1997 audit, and not the audits for 1998 and 1999, contained material misrepresentations or omissions. *Id.* at *16. Because Anicom disclosed problems only with its 1998 and 1999 financial

results, the complaint failed to sufficiently show a causal connection between the alleged (1997) fraud and the plaintiff's loss. *Id.*

The court is not persuaded that *Tricontinental Industries* stands for the rule that Defendants advocate here: that a plaintiff can establish loss causation only by showing a corrective disclosure that both identifies a specific prior false representation and "calls [it] into question." (Def.'s Mem. (LC), at 8.) Like the Court in *Dura*, the Seventh Circuit did not use the term "corrective disclosure." And as in *Dura*, the court did not specify how a misrepresentation must be revealed to the market in order to satisfy loss causation; rather, the court stated that a securities fraud plaintiff must show that it suffered a loss when the truth "became generally known." *Tricontinental Industries*, 2007 WL 102985, at *16. The court did not squarely hold that the only way the truth can become "generally known" is through a "corrective disclosure" that, on its face, points directly to a specific prior statement and reveals its falsity. The complaint in *Tricontinental Industries* failed because the plaintiff did not "identif[y] any statements by Anicom or PwC that made 'generally known' any problems or irregularities in the 1997 audited financial statement[,]" and because Anicom's eventual disclosure of accounting irregularities was confined to its 1998 and 1999 results. *Id.* In short, the plaintiff failed to plead loss causation because it failed to allege that the truth about the misrepresentation upon which it relied *ever* made its way into the marketplace.

That is not, of course, the situation here; it is undisputed that the entire truth about Motorola's vendor financing arrangements with Telsim became "generally known" at some point in or before May 2001. The present question is whether, as Lead Plaintiff urges, Motorola's February 23, 2001 earnings warning, which did not on its face refer to Telsim or contain any Telsim-related information, could have nonetheless served as a vehicle by which Telsim-related information began to enter the market because Motorola's deteriorating business relationship with Telsim was allegedly the catalyst for Motorola's expected earnings shortfall. The court finds these circumstances distinguishable from those in *Tricontinental Industries*, where the complaint failed

to allege *any* means by which the truth about the relevant fraud *ever* entered the market, and thus does not read that case to necessarily foreclose Lead Plaintiff's argument as a matter of law.

The courts finds persuasive a recent decision from the District of New Jersey that squarely rejected Defendants' position. The plaintiffs in *In re Bradley Pharmaceuticals* alleged that the defendants, in an effort to boost earnings, engineered a $1 million "sham" sale of the company's cold remedy, Deconamine, with no expectation that the customer would keep the product. 421 F. Supp. 2d at 824. The company in October 2004 issued a press release and filed a Form 10-Q, both of which recognized the sale as revenue. *Id.* On February 28, 2005, the company announced an SEC inquiry of, *inter alia*, the company's revenue recognition practices, and further disclosed that it was withholding release of full-year 2004 financial results; the stock immediately plummeted. *Id.* at 825. On April 27, 2005, the company announced that the Deconamine sale was indeed improper and that it would restate the relevant financial results; this time, the stock barely moved. *Id.* The defendants argued that the February 28 announcement of the SEC inquiry was not a "corrective disclosure" because it said nothing about Deconamine; rather, the true "corrective disclosure" did not occur until the full disclosure on April 27, at which time the share price (conveniently for the defendants) did not decline by an appreciable amount. *Id.* at 828.

The court rejected the defendants' "rigid and dogmatic interpretation of *Dura*." *Id.* Noting that *Dura* said nothing about the manner in which "truth" must be revealed to satisfy loss causation, and "[g]uided by a pragmatic understanding of *Dura*," the court held that the plaintiffs had adequately pleaded loss causation despite the fact that the February 28 announcement did not mention the Deconamine sale. *Id.* at 828-29. Loss causation was satisfied where the "revelation of the 'truth' . . . did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events. . . . The February 28, 2005 announcement partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what the April 27 Press Release later confirmed." *Id.* Thus, the market corrected the inflated price of

the company's stock when the "truth began to leak out on February 28," so that by the time of the April 27 full disclosure, "the market had already incorporated" the information that the previously announced financial results, incorporating the Deconamine sale, were unreliable. *Id.* at 829.

The court's approach in *In re Bradley Pharmaceuticals* is consistent with the Seventh Circuit's decision in *Tricontinental Industries*, which required that the truth about a defendant's misrepresentation become "generally known" and which held that the plaintiff had failed to allege that the truth about the relevant fraud ever made it way into the marketplace. *Tricontinental Industries*, 2007 WL 102985, at *16. In *In re Bradley Pharmaceuticals*, the truth became "generally known" though a series of partial disclosures that resulted in the market's absorption of that truth. The court thus treated the loss causation requirement as more functional than facial: a disclosure is sufficiently "corrective" if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions. *See In re Bradley Pharm.*, 421 F. Supp. 2d at 829.

This court finds the district court's flexible approach to loss causation in *In re Bradley Pharmaceuticals* more persuasive than Defendants' rigid proposed rule, requiring that a corrective disclosure invariably must, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges. Defendants' proposed rule does have the advantage of simplicity. As a practical matter, however, the truth that a misrepresentation or omission conceals can make its way into the market, resulting in dissipation of a fraudulently inflated share price, long before a company issues a formal "corrective" announcement, and by a variety of other ways. As one commentator points out:

> Prior to an unambiguous public announcement, the operation of one or more phenomena may lead to a complete market realization of the truth. One way is a series of earlier, smaller disclosures by the issuer or others that gradually leads market participants whose actions set price to conclude that the misstatement was false. Another is that the price is pushed back to the level it would have been but for the misstatement as a result of trading by insiders or others based on non-public information or rumors concerning the true state of affairs. Another would be a growing quiet awareness on the part of certain highly sophisticated market participants—arbitrageurs and sell side analysts—that previously publicly-available facts, which for a time had gone unnoticed or seemed unimportant, were in fact inconsistent

with the misstatements. Yet another is that the higher earnings or sales in the future that one would have predicted based on the misstatement do not materialize or the poor financial condition of the issuer, which the misstatement masked, subsequently becomes obvious.

Fox, *supra*, at 851. Precluding a plaintiff from establishing loss causation merely because of the absence of the kind of explicit corrective disclosure that Defendants would require, where the market in fact learned and absorbed the relevant truth anyway, seems unduly harsh.

Moreover, Defendants' proposed rule would provide an expedient mechanism for wrongdoers to avoid securities fraud liability. A company that has, for example, booked revenue from non-existent contracts could simply issue some damaging announcement that appears on its face unrelated to any fraudulent scheme, e.g., a significant earnings warning citing order weakness, wait for its share price to plummet, and then disclose the wrongdoing once the damage has been done. The plaintiff would be unable to tie its loss, i.e., the share price decline, to the fraud, rather than to the apparently unrelated announcement. As one court put it, the loss causation requirement should not allow securities fraud defendants to "immunize themselves with a protracted series of partial disclosures." *Freeland*, 233 F.R.D. at 47.

Defendants' remaining cited cases do not persuade the court to adopt the strict "corrective disclosure" rule Defendants seek. In *In re Odyssey*, a § 10(b) action against officers of a company that operated hospices, a court in the Northern District of Texas held that plaintiff investors had not adequately pleaded loss causation. 424 F. Supp. 2d at 887-88. The complaint alleged that the share price fell after the company announced, on the same day, an earnings warning, the resignation of the company's CEO, and a federal investigation of the company for Medicare fraud. *Id.* at 883. The court treated each disclosure separately, finding that the earnings warning fell under the PSLRA's "safe harbor" provision, *id.* at 887, and dismissing allegations regarding the federal investigation for failure to plead *scienter* or plead why previous statements were misleading, *id.* at 891, 895. The announcement of the CEO's resignation failed for lack of loss causation. Noting that the announcement attributed the resignation to "operational challenges," the court interpreted this

as a "corrective disclosure" that purported to correct prior representations that the company was operating smoothly. *Id.* at 887-88. The court concluded that under *Dura*, a corrective disclosure "at minimum must identify which prior representation is called into question," and held that a representation corresponding to a disclosure of "operational challenges", i.e., the lack of operational challenges, was simply not specific enough to satisfy *Dura.*

This court does not read *Dura* to imply that a plaintiff cannot satisfy loss causation without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline. To the extent that *In re Odyssey* would impose such a requirement, the court respectfully disagrees. The court further notes that another court in the Northern District of Texas declined to follow *In re Odyssey's* approach to loss causation. *See Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 728 & n.3 (N.D. Tex. 2006) (expressly declining to follow *In re Odyssey* and observing that "*Dura* did not, even by way of *dicta*," impose a "fact-for-fact" pleading requirement in which every truthful disclosure must match up with a prior fraudulent misrepresentation).

Defendants also cite two post-*Dura* cases from this district, neither of which support Defendants' position. In *Blatt*, Judge Zagel of this district used the term "corrective disclosure" but in fact rejected an argument similar to Defendants'. There, the defendant producer of corn by-products issued two press releases, the first announcing that it expected improved financial results in 2005, and the second providing more specific predictions that higher corn sweetener prices would offset higher energy prices, resulting in improved operating margins and return on capital in 2005. *Blatt*, 2006 WL 1697013, at *2. Six weeks later the company announced an earnings shortfall for the first quarter of 2005, claiming higher raw corn costs, energy and freight costs, and manufacturing expenses; the company's stock immediately declined. *Id.* The defendants argued that the plaintiffs failed to plead loss causation because the press releases did not refer to the particular problems identified in the earnings warning, and spoke in terms of the entire year rather than one quarter. *Id.* at *6. The court, denying the motion to dismiss, "reject[ed] the premise on

which this reasoning is based." *Id.* Noting that to allege loss causation, the plaintiffs merely had to "state facts from which one could reasonably conclude that the stock price decline was caused by the 'corrective disclosure' rather than some other cause, such as an explosion destroying the company plant[,]", the court held that the press releases had made "representations by omission" that the earnings warning "effectively correct[ed]." *Id.* Neither a fact-for-fact correlation between the earlier statements and the "corrective disclosure," nor a specific admission of the earlier statements' falsity, was required. Similarly, *Takara* sustained a complaint against a loss causation attack, holding that the plaintiffs had adequately alleged loss causation by stating that the company's share price dropped more than 4%, as compared to a composite index of market and sector stock performance, through the "timeframe" of announcements of improperly-booked profit, the resignation of the outside auditor, and the removal of the CFO. 429 F. Supp. 2d at 982. Judge Castillo's opinion did not use the term "corrective disclosure," and did not discuss whether the damaging announcements were required to call into question any previous representations.

Finally, in *Lentell*, the plaintiffs, investors in two internet companies, alleged that Merrill Lynch and its star analyst Henry Blodget maintained false and misleading "buy" or "accumulate" ratings on the companies, while the defendants' true motivation lay in attracting underwriting and other investment banking business. 396 F.3d at 166-67. The plaintiffs alleged that the ratings caused them to purchase shares at artificially inflated prices; the Second Circuit held, however, that the complaint was insufficient because it did not further allege that the companies' share prices declined in response to a disclosure that corrected "the falsity of Merrill's 'buy' and 'accumulate' ratings." *Id.* at 175. The court rejected the plaintiffs' argument that loss causation was established by the fact that the companies' shares declined when Merrill eventually downgraded to "accumulate" and "neutral": "These allegations do not amount to a corrective disclosure . . . because they do not reveal to the market the falsity of the prior recommendations." *Id.* at 175 n. 4. Thus, although the event the plaintiffs deemed a "corrective disclosure" indeed corresponded

to a prior representation, it did not *correct* anything about that prior representation. Noting that the prior ratings were accompanied by research reports, warning that the companies were high-risk investments, the court reasoned that the earlier ratings did not conceal any risk that the eventual downgrades could possibly reveal; thus, the downgrades revealed nothing of the alleged fraud and therefore could not function as corrective disclosures. *Id.* at 176-77.

This court finds *Lentell* distinguishable from the circumstances here. Defendants themselves acknowledge that "this is primarily an omissions case," (Def.'s Mem. (SOL), at 1), in which Defendants allegedly failed to disclose the "truth" about the risks of the Telsim financing to investors, rather than one involving, as in *Lentell*, a specific affirmative representation that allegedly caused investors' losses when "corrected." Indeed, *Lentell* itself recognized that the case was "sharply distinguishable from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions." *Id.* at 177. That is precisely what Lead Plaintiff has alleged here. In *Lentell*, the purported "corrective disclosure" could not reveal a concealed risk because that risk had already been adequately disclosed; here, in contrast, the action here rests on the theory that Defendants intentionally concealed the risk of the Telsim transactions. *See In re Bristol-Myers Squibb Sec. Litig.*, No. Civ.A. 00-1990(SRC), 2005 WL 2007004, at *20 (D.N.J. 2005) (rejecting defendants' argument that *Lentell* stood for "the proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud"; and noting that the downgrades in *Lentell* could not possibly have corrected the alleged fraud because the entirety of the earlier representation and the purported corrective disclosure consisted "of only four words" and thus "could not have revealed to the market the more complicated fraud underlying the prior recommendations").

The court thus concludes that a securities fraud plaintiff is not necessarily precluded from establishing loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent

scheme the plaintiff alleges.  In this case, the fact that Motorola's February 23 Warning did not mention Telsim, or refer on its face to Telsim or vendor financing, is not necessarily fatal.  The court acknowledges that the standard cannot be so lax that every announcement of negative news becomes a potential "corrective disclosure."  As Defendants correctly point out, courts have held that an earnings warning, *standing alone*, is not a "corrective disclosure" because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud.  *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect. . . . It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.") (emphasis in original); *In re Tellium Sec. Litig.*, No. Civ.A. 02CV5878FLW, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005) (observing that disclosure that revenues would be less than expected is "not the type of announcement[] [that] adequately demonstrate[s] a market correction of the artificial inflation caused by defendants' misrepresentations" and holding loss causation unsatisfied where "Plaintiffs have failed to allege that the concealed scheme was *ever* disclosed to the market") (emphasis in original).  Nevertheless, if a plaintiff shows, as Lead Plaintiff claims to have done here, that significant aspects of the still-concealed fraud in fact provided the catalyst for an anticipated failure to meet earnings forecasts, then the share price decline following an earnings warning might indeed dissipate the fraudulent price inflation; in such circumstances, there is no good reason why the earnings warning should not serve as a disclosure in which "the relevant truth begins to leak out."  *See Dura Pharm.*, 544 U.S. at 342.

With this analysis in mind, the court addresses the first of the four "corrective disclosures" identified by Lead Plaintiff in this case: Motorola's earnings warning of February 23, 2001.  It is undisputed that the financial media and industry analysts at the time attributed the expected earnings shortfall, announced in Motorola's press release on February 23, 2001, to weakening orders for Motorola's wireless phones and equipment, demand for lower-cost cell phones, and

weakness across Motorola's other business segments. (Def.'s 56.1 (LC) ¶¶ 32-33.) Lead Plaintiff maintains that there is "compelling evidence" that Motorola in fact issued the earnings warning because of "Telsim-related events." (Pl.'s Resp., at 16.) Lead Plaintiff points primarily to three pieces of evidence: first, the e-mail exchange on February 23 between Defendant Growney and Motorola CFO Earhart, in which Mr. Earhart wrote that the Turkish government's devaluation of the lira the previous day hurt both the value of Motorola's collateral in the form of Telsim stock and Telsim's ability to generate dollar-equivalent cash flow and thus meet its loan payments, and further informed Defendant Growney that the "current discussion" had Telsim paying only $200 million, rather than $730 million, at the end of April, (Pl.'s 56.1 Addnl. ¶ 42); second, the Suspension Letter, also dated February 23, in which Motorola informed Telsim that it would cease providing vendor financing under the April 1998 agreements, (*id.* ¶ 44); and third, due in part to the recent "scrutiny" of the Telsim loans by Moody's, Motorola knew on February 23 that it would not be able to reduce loan loss reserves to meet earnings projections. (*Id.* ¶ 47.)

In the court's view, this evidence does not link the still-concealed Telsim information to the earnings warning and thus to the decline in Motorola share prices on February 23, 2001. The evidence Lead Plaintiff cites shows that Defendants were aware of significant problems with Telsim on February 23. It would not be unreasonable to draw an inference that those problems could affect Motorola's ability to meet its earnings targets for the first quarter of 2001: if Motorola cut off the financing spigot, Telsim might stop purchasing Motorola's equipment and Motorola would be unable to book sales revenue; if Telsim was likely to default on its debt, Motorola might have to allocate existing net income to a substantial increase in its loan loss reserves. But absent from the record is any evidence that these concerns *actually* motivated the February 23 Warning. At most, the evidence indicates that Motorola issued the earnings warning *at the same time* that Defendants were aware of problems with Telsim that might impact its earnings; there is no evidence suggesting that the earnings warning was issued *because of* those concerns. The latter is required; mere

temporal proximity does not establish causation. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (to prove damages, "[*p*]*ost hoc ergo propter hoc* will not do"). Despite extensive discovery in this action, Lead Plaintiff has offered no e-mail correspondence, document, or testimony indicating that Motorola or its senior executives issued the earnings warning on February 23, 2001 in anticipation of an earnings shortfall that was due in particular to an expected loss of Telsim-related income, rather than to Motorola's stated reasons: economic conditions, business weakness, and inventory corrections. Without such evidence, the causal link between the concealed Telsim information and the share price decline on February 23 is simply too tenuous to satisfy loss causation.

Although Lead Plaintiff relies on *In re Bradley Pharmaceuticals*, and this court agrees with that court's approach to loss causation, the facts of that case are sufficiently distinguishable from those here. There, as noted, the court found a sufficient "corrective disclosure" even though the corrective press release did not refer to the concealed sham sale of Deconamine. *In re Bradley Pharm.*, 421 F. Supp. 2d at 828-29. The press release did, however, disclose an SEC inquiry relating to "revenue recognition"—the precise subject matter of the alleged fraud. *Id.* at 828. The causal link between the fraud and the share price decline after the announcement was thus sufficiently established: share price had been inflated by improper revenue recognition, and the disclosure of an SEC inquiry into improper revenue recognition dissipated that inflation, even if the particulars were as yet unrevealed. *Id.* at 829. Here, in contrast, the February 23 Warning attributed the earnings shortfall to factors wholly unrelated to Telsim; because Lead Plaintiff has not shown that the earnings warning was in fact in anticipation of Telsim-related troubles, there is nothing to indicate that the share price decline on February 23, 2001 dissipated any price inflation that had resulted, in particular, from Defendants' alleged concealment of the Telsim risks. Nor is there any indication that Defendants attempted to minimize securities fraud liability by issuing the earnings warning in an effort to depress share price prior to the release of Telsim-related

information, so that the major damage would have already been done by the time complete disclosure occurred.

The court concludes that Lead Plaintiff has not produced sufficient evidence from which a reasonable jury could find that the decline in Motorola shares on February 23, 2001 was caused by Defendants' misrepresentations or omissions regarding Telsim. Lead Plaintiff thus cannot, as a matter of law, establish loss causation with regard to the February 23 Warning, and the court accordingly grants summary judgment for Defendants to the extent that Lead Plaintiff alleges economic loss from the share price decline on that date.

### B. The March 30 Proxy and the April 6 Bloomberg Article

Lead Plaintiff next contends that the April 6 Bloomberg Article, reporting, *inter alia*, that Motorola was owed $1.7 billion by Telsim, was another "partial corrective disclosure" that caused the decline in Motorola share price on April 6, 2001. (Pl.'s Resp., at 14-15, 22.) Lead Plaintiff acknowledges that Motorola had previously disclosed, in the March 30 Proxy, that $1.7 billion in long-term receivables "related to one customer in Turkey," (March 30 Proxy, at F-25), but characterizes the April 6 Bloomberg Article as having "unearthed" this "buried" information. (Pl.'s Resp., at 22.) Defendant argues that the April 6 Bloomberg Article, as a matter of law, cannot be a corrective disclosure for two reasons: first, Lead Plaintiff has not met its burden of showing that the decline in share price on April 6, 2001 was caused by Telsim-related information, rather than by other pieces of information also contained in the article; and second, that the only piece of Telsim-related information, i.e., the existence of the $1.7 billion Telsim debt, had already been disclosed on March 30 and could not, in an efficient market, have caused a price decline seven days later. (Def.'s Mem. (LC), at 9-13.)

In support of their first argument, Defendants note that the April 6 Bloomberg Article contained several pieces of negative news about Motorola, none of which explicitly referred to Telsim. The article described Motorola as having been "gorging in debt markets," and therefore "up

to its neck in short-term debt" which had "more than doubled" in the past year, "surging to $6.4 billion from $2.5 billion." (April 6 Bloomberg Article, at 1.) The columnist speculated that Motorola's credit rating might be cut, and concluded that the company's liquidity was in "crisis mode." (*Id.*) Defendants also contend that the columnist's "inflammatory" opinion itself was "new news" and thus capable of affecting Motorola's share price, and that analysts at this time had also been concerned with weakening demand for wireless equipment in general. (*Id.* at 10-11.) According to Defendants, Lead Plaintiff's damages expert has failed to "untangle" these factors from the information regarding the Telsim debt when calculating economic loss resulting from the share price decline on April 6; this, argues Defendants, "is fatal under *Dura.*" (*Id.* at 11.)

This argument relies on a flawed view of what this court understands to be the law of loss causation. Defendants contend that a securities fraud plaintiff bears the burden, even as the non-moving party on summary judgment, of proving that its loss was caused by the claimed fraud, and not by the "tangle of other factors" affecting share price. (*Id.* at 10 (quoting *Dura Pharm.*, 544 U.S. at 343); Def.'s Reply (LC), at 5.) Defendants also maintain that a plaintiff further retains the burden of apportioning and quantifying its loss between damages caused by the alleged fraudulent conduct and other factors that might have contributed to that loss. (Def.'s Reply (LC), at 5.) As noted above, Defendants claim that these requirements are mandated by the Supreme Court in *Dura*; in this court's view, however, *Dura* did not impose such burdens on securities fraud plaintiffs.

Defendants are correct that under both *Dura* and the PLSRA, the plaintiff must prove that the defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss. *Dura Pharm.*, 544 U.S. at 345; *see* 15 U.S.C. § 78u-4(b)(4). As noted, however, *Dura* did not explain how a securities fraud plaintiff must make the required showing. Defendants rely on the following passage from the Court's opinion in support of their position that the plaintiff must show that its loss was not caused by factors other than the alleged misrepresentation or omission:

[T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. . . . If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.

*Dura Pharm.*, 544 U.S. at 342–43 (emphasis in original).

This court does not share Defendants' view that this passage establishes the rule that a "plaintiff has the burden of proving that the alleged misrepresentation, and not the 'tangle of [other] factors affecting price,' caused the claimed loss." (Def.'s Mem., at 9 (quoting *Dura Pharm.*, 544 U.S. at 343).) The Court's discussion of "other factors" provided a rationale to support its observation that an inflated purchase price, standing alone, does not necessarily indicate that a later loss was caused by a misrepresentation, particularly when a decline in share price, following a disclosure of "truth," occurs some time after the purchase. The passage does not address the "other factors" in the context of the time of the disclosure. In other words, the Court pointed to potential weakness in the causal link between a share price decline and an inflated purchase price, and not to weakness in the causal link between that share price decline and a disclosure of "truth." The Court's recognition of the possibility that other factors, apart from the misrepresentation that inflated the purchase price, might have contributed to a later share price decline, supports *Dura's* holding that a plaintiff must tie the misrepresentation to the decline with something more than just an inflated purchase price. The Court did *not*, however, hold that this "something more" requires a plaintiff to rule out all other factors that may have contributed to the loss following a disclosure of previously concealed information, and as this court reads *Dura*, the Court did not so imply.

More importantly, Defendants' argument ignores the burden that they bear as the moving party on summary judgment. As noted, *Dura* did not address what loss causation requires of a

securities fraud plaintiff beyond the pleading stage. Indeed, the court can locate no cases, post-*Dura*, that discuss what kind of showing a plaintiff must make to survive summary judgment on the issue of loss causation. *Cf. In re Loewen Group*, 395 F. Supp. 2d at 218 (noting that plaintiff adequately pleaded loss causation "by alleging that they purchased TLGI stock at an inflated price and lost money when the price fell," and holding, without explanation, that plaintiffs "have offered enough evidence on that point to survive summary judgment.") The Seventh Circuit addressed this very issue, however, in *Caremark*. There, Caremark negotiated to sell its blood infusion business to Coram, the defendant, in exchange for notes and cash; however, Coram failed to disclose that it was simultaneously negotiating a merger with another company. *Caremark*, 113 F.3d at 647. After the deal with Caremark closed, the merger was announced, and the value of Coram's notes, now in Caremark's hands, dropped dramatically. *Id.* The Seventh Circuit held that Caremark had "alleged a plausible theory" of proximate cause by asserting that Coram's failure to disclose the merger negotiations caused it to undervalue the risk it was taking by accepting the notes as payment. *Id.* at 649. The court explained that Caremark's loss causation allegation was sufficient despite the fact that the complaint mentioned "other causes that could have contributed to the fall in the value of the notes. . . . [I]t is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct." *Id.* The court then addressed what showing Coram would have to make to prevail at summary judgment:

> Our holding does not preclude Coram from submitting, at the summary judgment stage, that Caremark cannot prove the loss causation that it has alleged in this complaint. At summary judgment, this burden usually is met by establishing that the decline in the value of the security is attributable in total to some other factor. . . . To defeat Caremark's claim at summary judgment, therefore, Coram would have to establish that, as a matter of undisputed fact, the depreciation in the value of the notes could not have resulted from the alleged false statement or omission of the defendant.

*Id.* at 649-50. Although *Caremark* was decided before *Dura*, nothing in *Dura* indicates that *Caremark* is no longer good law. As noted, *Dura's* holding was quite narrow: a plaintiff must plead

and prove both actual loss and loss causation, and cannot rely on price inflation alone. That was the law in the Seventh Circuit long before *Dura*. *See Caremark*, 113 F.3d at 648-49; *Bastian*, 892 F.2d at 683. Indeed, the Supreme Court cited *Bastian* when observing that other circuits, including the Seventh, had rejected the Ninth Circuit's "inflated purchase price" approach to pleading loss causation. *Dura Pharm.*, 544 U.S. at 344; *see also Ong*, 459 F. Supp. 2d at 749 ("*Dura* has not abrogated *Caremark* or changed the law in the Seventh Circuit. Both *Caremark* and the Seventh Circuit's decision in *Bastian* emphasized that a plaintiff in a securities fraud action must allege and prove loss causation, and nothing in *Dura* alters the Seventh Circuit's approach."); *Lawrence Jaffe Pension v. Household Int'l, Inc.*, No. 02 C 5893, 2006 WL 1120522, at *3 (N.D. Ill. Apr. 24, 2006) ("*Dura* did not change the controlling law in this circuit.") Nor did the Seventh Circuit abandon *Caremark* in its post-*Dura* decision in *Tricontinental Industries*; the court in fact cited to and quoted from *Caremark* when defining loss causation. 2007 WL 102985 at *15.

Following *Caremark*, the burden in this case rests with Defendants, on summary judgment, to show that a decline in Motorola's share price, identified by Lead Plaintiff as occurring following the disclosure of Telsim-related information, did *not* result from that disclosure. Lead Plaintiff's burden is to present sufficient evidence from which a reasonable jury could conclude that those price declines indeed resulted from such a disclosure. Should Lead Plaintiff meet this burden, *Caremark* instructs that "the trier of fact can determine the damages attributable to the fraudulent conduct." 113 F.3d at 649. Thus, the burden does not, in the Seventh Circuit, rest with Lead Plaintiff, at either the pleading or summary judgment stages, to apportion and quantify which part of its loss is attributable to disclosures of Telsim-related information, and which part might attributable to other factors. The Ninth Circuit, in a decision amended after *Dura* and which cites extensively to *Dura*, has endorsed this approach as well. *See In re Daou*, 411 F.3d at 1025 ("A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation. . . . '[A]s long as the misrepresentation is one

substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'") (quoting *Robbins v. Koger Prop., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).

The cases cited by Defendants—none from this circuit—do not persuade the court to disregard the Seventh Circuit's explicit guidance in *Caremark*. In *In re First Union Corp. Securities Litigation*, a magistrate judge interpreted *Dura* as requiring a plaintiff to "allege why a decline in price was actually caused by the fraud they claim, rather than by other factors, by specifically linking the price drop to 'the truth mak[ing] its way into the market place.'" No. Civ. 3:99CV237-H, 2006 WL 163616, at *5 (W.D.N.C. Jan. 20, 2006) (quoting *Dura Pharm.*, 544 U.S. at 342). The complaint inadequately pleaded loss causation not because it failed to rule out other factors, however, but because the alleged share price declines followed two mere earnings warnings that disclosed nothing of the alleged fraud; indeed, the complaint specifically alleged that the "truth" was not in any way disclosed until a later announcement. *Id.* at *6. Similarly, the district court in *In re Tellium* dismissed the complaint because the alleged disclosure announced only that the defendant company would be unable to meet its revenue guidance; thus, the plaintiffs "failed to allege that the concealed scheme was *ever* disclosed to the market." 2005 WL 2090254, at *3 (emphasis in original). In *Lentell*, discussed above, the Second Circuit (before *Dura*) stated that to adequately plead loss causation, a "plaintiff must allege [either] (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; *or* (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." 396 F.3d at 177 (emphasis added). The court limited that requirement, however, to situations "where . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk." *Id.* Loss causation failed in *Lentell* because no risk had been concealed that the alleged disclosure (the ratings downgrades) could have revealed. *Id.* at 176-77. As explained above, that situation

74

does not exist here; moreover, the Seventh Circuit has never expressed any similar requirements.[42]

Finally, Defendants cite *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 248 (S.D.N.Y. 2006), which dismissed a complaint in part for failing to "suggest any theory by which a loss attributable to such a market suspicion could be quantified." This directly conflicts with *Caremark*, which explained that a claim is not "rendered infirm" where more than one cause affects share price; rather, the "trier of fact can determine the damages attributable to the fraudulent conduct." 113 F.3d at 649.

The court thus finds that Lead Plaintiff does not, in response to Defendants' motion for summary judgment, bear the burden of showing that the decline in Motorola share price on April 6, 2001 was not caused by factors other than the news of the $1.7 billion Telsim debt, such as the other pieces of information in the April 6 Bloomberg Article, which could have impacted the stock that day; nor must Lead Plaintiff at this stage "quantify" the part of the decline that resulted from only the Telsim-related news. Lead Plaintiff can survive summary judgment by presenting enough evidence from which a reasonable jury could conclude that the Telsim news, at least in part, caused the decline. Had the April 6 Bloomberg Article marked the first time that the existence of the huge Telsim debt was disclosed to the market, Lead Plaintiff would easily have carried this burden. Here, however, Defendants' second argument comes into play, for it is undisputed that the extent of the Telsim-related information in the April 6 Bloomberg Article had been publicly available for a week, since March 30, 2001 when Motorola filed the March 30 Proxy.

_____

[42] The court further observes that the Second Circuit's approach to loss causation has not been adopted by the Seventh Circuit. Loss causation in the Second Circuit "require[s] both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173. *Lentell* further describes loss causation as satisfied where "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Id.* The Seventh Circuit does not speak of loss causation in terms of foreseeability or "zone of risk." Indeed, *Caremark* indicated a preference for a simpler approach: "This requirement of 'loss causation,' which we have described as nothing more than the 'standard common law fraud rule,' ought not be construed as a metaphysical term." 113 F.3d at 645 (quoting *Bastian*, 892 F.2d at 683). The court emphasized that "the requirement is straightforward: The plaintiff must allege that it was in fact injured by the misstatement or omission of which it complains." *Id.*

Defendants argue that Motorola's disclosure, in the March 30 Proxy, that $1.7 billion in long-term debt "related to one customer in Turkey" could not, as a matter of law, have caused a share price decline on April 6. (Def.'s Mem. (LC), at 11.) In an efficient market, Defendants contend, new information is "immediately" incorporated into share prices; therefore, the information about the Turkish customer's debt would have been incorporated into Motorola's share price on either March 30 or the next trading day (April 2). (*Id.* at 12.) By April 6, Defendants argue, it was "old news" and incapable of affecting share price. (*Id.*) Lead Plaintiff has a different conception of an efficient market, in which the effect of new information on share price is not invariably "instantaneous" but "may appear somewhat later," (Pl.'s Resp., at 24), depending on "the manner in which the information is disclosed." (Pl.'s 56.1 Resp. (LC) ¶ 18.) That is the case here, according to Lead Plaintiff, because Defendants "intentionally buried" the Telsim information in the March 30 Proxy; thus, the news had no effect on the market until it was "ferreted out" by analysts and reported in the April 6 Bloomberg Article. (Pl.'s Resp., at 25.) Summary judgment is improper, Lead Plaintiff argues, because "[g]iven the opacity of Motorola's March 30, 2001 announcement, and the immediate reaction of the market to [the April 6 Bloomberg Article's] unearthing that information about Telsim, a jury could find . . . that the news contained in the March 30 announcement caused the April 6 stock drop." The court agrees.

The efficient market theory supports the "fraud-on-the-market" doctrine, which relieves a securities fraud plaintiff of the burden of showing reliance on the defendants' alleged misstatements or omissions when purchasing or selling securities. *See Basic Inc. v. Levinson*, 485 U.S. 224, 244-47 (1988). In an efficient capital market, all publicly available information is reflected in the market price of a security. *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 731-32 (7th Cir. 2004). Thus, an investor who buys or sells shares at the price set by an efficient market is entitled, for purposes of establishing a § 10(b) claim, to a rebuttable presumption that she traded in reliance on any public material misrepresentations. *Basic*, 485 U.S. at 247. The presumption can satisfy the required

"transaction causation" element of the claim.  *See Dura Pharm.*, 544 U.S. at 341.  The parties in this case, however, dispute the nature of an efficient market in the context of loss causation, rather than transaction causation.

The Supreme Court in *Basic* expressly declined to discuss how quickly new information is incorporated into share prices in an efficient market: "we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." 485 U.S. at 248 n.28.  The Seventh Circuit has noted that the fraud-on-the-market doctrine, which, as noted, relies on the efficient market theory, "presumes that news is *promptly* incorporated into stock price." *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (emphasis added) (presumption of reliance rebutted where company issued allegedly fraudulent earnings prediction in April, announced actual earnings results in May, but plaintiff did not purchase shares until July; efficient market would have incorporated the actual results, as well as the prediction, long before purchase).   The Seventh Circuit has never held that such incorporation occurs "immediately," however.   In *Asher*, cited by Defendants, the court did not discuss the speed at which share prices reflect new information, but rather held that a plaintiff seeking the benefit of the fraud-on-the-market theory to show reliance must accept that in an efficient market, all, not just some, publicly available information is reflected in share prices.  377 F.3d at 732.

Defendants cite three decisions that indeed refer to an efficient market as one that "immediately" reflects new information.  In *In re Burlington Coat Factory Securities Litigation*, then-Judge Alito stated that "efficient markets are those in which information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." 114 F.3d 1410, 1425 (3d Cir. 1997) (citation omitted).  This statement appears in the context of materiality, however, to support the court's holding that a statement that did not affect share price was not "material" because the lack of share price movement showed that the information was not important to a reasonable investor.  *Id.*  A court in this district quoted the above language from *In re Burlington* in

the same context, but held that the plaintiffs had alleged share price movements sufficient to establish materiality. *Takara*, 429 F. Supp. 2d at 976. Neither decision involved the issue of whether an efficient market invariably incorporates new information immediately, or whether such incorporation may occur, in some circumstances, after investors have some time to digest the news. Finally, and more explicitly, the district court in *Cammer v. Bloom*, engaging in an extensive discussion of the characteristics of an efficient market, noted several factors that would indicate that a particular security traded in an efficient market. 711 F. Supp. 1264, 1286 (D.N.J. 1989). The fifth factor was "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* The court characterized this factor as "the essence of an efficient market and the foundation for the fraud on the market theory." *Id.*

Lead Plaintiff counters with cases that decline to hold that available information is always immediately incorporated into share prices. In *Cross v. 21st Century Holding Co.*, No. 00 CIV.4333 AGS, 2002 WL 31158901, at *6-7 (S.D.N.Y. Sept. 27, 2002), the court held that the presumption of reliance afforded by the fraud-on-the-market theory was not rebutted by the fact that share prices did not decline for several days after the defendant company announced that it was restating earnings. While share prices indeed were unchanged in the four trading days immediately after the announcement, prices declined steadily after that. *Id.* at *6. Noting that the Supreme Court in *Basic* had expressly declined to adopt a theory of how quickly information is incorporated into share prices, the court rejected defendants' argument that information important to investors is immediately reflected in the stock price, and declined to adopt a rule that the "fraud-on-the-market theory must fail where a relatively brief period of price stability follows a public disclosure, especially where the few days of price stability is followed by a relatively steady decline in share price." *Id.* at *7. In *Regal Communications Corp. Securities Litigation*, No. 94-179, 1996 WL 411654, at *1, plaintiffs asserted that outside auditor Ernst & Young conducted a "sham audit" of Regal's 1992 financials that failed to reveal non-existent receivables, resulting in a false and misleading June

78

1993 prospectus for a debenture offering. Ernst & Young sought summary judgment against investors who purchased securities after the lawsuit was filed in January 1994, arguing that the presumption of reliance was rebutted because investors became aware of the fraud at Regal through the lawsuit and thus could no longer have relied on the June 1993 prospectus. *Id.* at *3. Denying the motion, the court held that a jury could reasonably find that the lawsuit had not necessarily dissipated the price inflation that had resulted from the fraudulent prospectus. *Id.* A 28% decline in Regal's share price, immediately following an announcement confirming that the 1992 financials and Ernst & Young's audit indeed could no longer be relied upon, "raises a factual issue of whether the market was fully apprised of the fraud any earlier." *Id.* There was thus "a factual question as to *when* the market reflected knowledge of the alleged fraud." *Id.* at *4 (emphasis in original).[43]

In any event, this court need not define the precise parameters of how an efficient market operates, or adopt any rule that defines the speed at which new information is reflected in share price. Despite the parties' sharp disagreement over whether incorporation occurs "immediately"

---

[43] Both parties also cite to the landmark case of *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90 (10th Cir. 1971). There, TGS, a mining company, issued a press release on April 12 that denied rumors of a lucrative mineral strike at a site in Ontario and downplayed the significance of its exploration there; at the time, however, company officers were well aware that the find was likely worth hundreds of millions of dollars. *Id.* at 99. On April 16, TGS held a press conference revealing in detail the magnitude of the find, a summary of which appeared on Dow Jones newswires. *Id.* at 95. Plaintiffs, TGS investors, claimed to have sold their shares in reliance on the misleading, negative April 12 press release but before learning of the more positive April 16 disclosures, even though two plaintiffs sold shares as late as April 22 and April 23. *Id.* at 103. This was too late for these two plaintiffs to claim reliance on the April 12 press release, the court held, because, given the "saturation coverage" and "abundance of publicity" surrounding the April 16 release, a reasonable investor would have been informed of the April 16 release by April 22 or April 23. *Id.* This holding does not strongly support either position in this case. The court did not state that the April 16 information was "immediately" reflected in the share price of TGS, such that any reliance on the April 12 release was thereafter untenable; rather, the court held that the market had sufficiently absorbed the information six or seven days (four or five trading days) later. *Id.* Nor did the court hold, as Lead Plaintiff claims, that the market did *not* absorb the information *until* the time at which the plaintiffs sold. Indeed, the court stated only that reliance on an earlier misstatement could not be presumed "[a]t some point in time" after disclosure of curative information. *Id.*

or "somewhat later," the more relevant issue, in the court's view, is whether the Telsim-related information in the March 30 Proxy was truly "publicly available." *See Asher*, 377 F.3d at 732. If it was, then Defendants arguably have the better view that such information would have been "immediately," *see In re Burlington*, 114 F.3d at 1425, or at least "promptly," *see Root*, 965 F.2d at 1419, reflected in Motorola's share price on either March 30 or April 2, rather than as late as April 6. On this issue, as noted, Lead Plaintiff urges that the information was "buried" in the March 30 Proxy. To be sure, the information was not prominently displayed. The sole reference to Telsim appeared in a single sentence that appeared twice: "As of December 31, 2000, approximately $1.7 billion of the $2.8 billion in gross long-term finance receivables related to one customer in Turkey." (March 30 Proxy, at F-25, F-43.) To identify that customer as Telsim, an investor would have to have known that Turkey had only two cell phone companies, Telsim and Turkcell; to determine that the customer was not Turkcell, an investor would have to have been aware that Turkcell obtained its wireless equipment exclusively from Ericsson, not Motorola, perhaps by looking to Turkcell's 2000 prospectus, which stated that it currently purchased its equipment from Ericsson, or news articles announcing sales by Ericsson to Turkcell. (Def.'s 56.1 (LC) ¶¶ 9, 11.) Or, an investor could infer from Motorola's press releases, announcing billion-dollar contracts with Telsim, and the language in several of Motorola's SEC filings that referred to its customers increasingly demanding vendor financing, that Telsim was the debtor. (*Id.* ¶¶ 25-28; Def.'s 56.1 (SOL) ¶ 26.)

A diligent investor, therefore, upon a careful study of the March 30 Proxy, Motorola's other SEC filings, and press releases, and armed with knowledge of the exclusive relationship between Ericsson and Turkcell, would have identified Telsim as the Turkish customer. More research would have revealed the negative media coverage of the Uzans, who, it is undisputed, had a "very bad public reputation for basic honesty and integrity." (Def.'s 56.1 (LC) ¶ 16.) Such an undertaking, at least in hindsight, should not have taken a full week, and could have been conducted based on information that was available to the public. An investor, processing this information, would been

apprised of much of the risk of the Telsim debt, and could have acted accordingly, before April 6.

The court is not persuaded, however that no reasonable investor could have done otherwise. Indeed, as Lead Plaintiff notes, the author of the first version of the April 6 Bloomberg Article, released before the market open on April 6, identified Turkcell, not Telsim, as the "Turkish customer" from the March 30 Proxy. Thus, the inferential process noted above, which appears so logical in hindsight, was perhaps not as obvious to investors at the time. But Defendants' position contains a more fundamental flaw. Defendants, as noted, contend that the news of the $1.7 billion Telsim debt, as referenced in the April 6 Bloomberg Article, could not have affected Motorola's share price on that date because it had been disclosed a week earlier in the March 30 Proxy; rather, it was the other Motorola-specific information in the April 6 Bloomberg Article that moved markets, in particular the news that short-term debt had surged from $2.5 billion to $6.4 billion. Defendants ignore, however, the fact that the news of the increase in short-term debt *also* was included in the March 30 Proxy. (March 30 Proxy, Ex. YY to Harrod Decl., at F-24 ("At December 31, 2000, the Company's short-term debt . . . was $6.4 billion, compared to $2.5 billion and $2.9 billion at December 31, 1999 and 1998, respectively."); *id.* at F-39 (balance sheet containing the precise figures).) If that information was "new news" that contributed to the share price decline on April 6, as Defendants maintain, then it must be that the news of the $1.7 billion Telsim debt, disclosed at the same time and in the same manner, could also have contributed. In other words, if the Telsim news was incorporated into Motorola's share price on March 30 or April 2, as Defendants insist, then the news of the surge in short-debt was incorporated then as well. Defendants, who urge that share prices "immediately" reflect "all" available information, cannot argue that the one piece of news was reflected immediately, and the other a week later, where both pieces of news were disclosed at the same time and in the same manner. *See Asher*, 377 F.3d at 732 (efficient market incorporates all public information, not just some). Either the April 6 price decline was caused by both the news of the $6.4 billion in short-term debt *and* the news of the $1.7

billion Telsim debt, or it was caused by neither.

The latter possibility is unlikely. Defendants do contend that the April 6 Bloomberg Article contained other, "new" news: that Motorola was "up to its neck in short-term debt"; that it had been "gorging in debt markets"; and that "if its credit rating gets cut, the market is likely to turn off the money taps that are keeping the company afloat." (Def.'s Mem. (LC), at 10.) This colorful language does not disclose any new information to the market, however, but merely reflects the author's interpretation of the increase in short-term debt that had been disclosed, along with the Telsim news, in the March 30 Proxy. It may be possible, as Defendants contend, that one analyst's opinion, in itself, might be so influential as to be capable of moving markets. There is no indication that this Bloomberg columnist, who initially misidentified Motorola's customer, possessed such influence, however. Moreover, the burden for purposes of this motion is on Defendant to demonstrate that the price decline did *not* result from Telsim-related factors. *See Caremark*, 113 F.3d at 650. Thus, the fact that another factor *may* have contributed is insufficient. Whatever the effect of the columnist's views, the most reasonable inference is that the price decline on April 6 was caused by facts—the $6.4 billion in short-term debt, and the $1.7 billion Telsim debt—which had been disclosed on March 30, but had not yet been incorporated into Motorola's share price because of the manner in which they had been revealed.[44]

The court thus concludes that Lead Plaintiff has produced sufficient evidence from which a reasonable jury could find that Defendants' disclosure of the $1.7 billion Telsim debt, as first referenced in the March 30 Proxy and highlighted in the April 6 Bloomberg Article, contributed to the decline in Motorola share price on April 6, 2001. This was the extent of Lead Plaintiff's burden, as the non-moving party on summary judgment, in showing loss causation.

---

[44] The court further observes that Defendants' argument that the increase in short-term debt was "unrelated to Telsim," (Def.'s Mem. (LC), at 11), is incorrect. In fact, $1.15 billion of the $3.9 billion increase, or 29.5%, was attributable to new Telsim debt in 2000. *See supra* n.23.

### C.    The May 14 Filing

The next "partial corrective disclosure" identified by Lead Plaintiff is Motorola's May 14, 2001 Form 10-Q, in which Motorola disclosed that Telsim had failed to make a scheduled payment to Motorola of $728 million that had become due on April 30, 2001.  (Pl.'s Resp., at 15.)  Defendants argue that the May 14 Filing was not a "corrective disclosure" because Lead Plaintiff has failed to "isolate" the effect of this information from that of other Motorola-specific information contained in the "detailed, 42-page filing."  (Def.'s 56.1 (LC), at 13.)  Defendants further contend that the information regarding the missed payment could not have caused any subsequent price decline because this news was merely the "materialization of a known risk."  (*Id.*)  Finally, Defendants, citing their damages expert's report, maintain that the decline in Motorola share price on May 15, 2001 was "not statistically different from zero."  (*Id.*)

Defendants' first argument need not detain the court.  As explained above, Lead Plaintiff does not bear the burden, for purposes of this motion, of "isolating" the causal effect of Telsim news from all other factors that may have contributed to a particular price decline.  *See Caremark*, 113 F.3d at 649-50.  Nor can Defendants prevail on summary judgment by arguing that the May 15, 2001 price decline was insignificant and that investors thus suffered no economic loss.  Lead Plaintiff's damages expert, isolating Motorola's actual share price decline on that date from industry and sector price movements, has concluded that the decline indeed was "statistically significant." (Pl.'s 56.1 Addnl. ¶ 68.) Defendants do not attack Lead Plaintiff's expert's methodology in reaching his conclusion; indeed, Defendants cite only their own expert, and do not even refer to Professor Feinstein's conclusions with regard to the May 15 price decline.  This disagreement between experts thus creates a dispute of fact inappropriate for resolution on summary judgment.  *See Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293, 298 (7th Cir. 1999) (noting that a non-moving party's expert report may not preclude summary judgment "where it offers nothing but naked conclusions," but will create a genuine issue of fact where the expert provides a factual basis for

her conclusions). Defendants' argument that Lead Plaintiff cannot show loss causation from the May 14 Filing thus hinges on whether the news of the missed Telsim payment was merely "the materialization of a known risk."

Defendants propose the rule that "[a] plaintiff cannot prove the loss causation element of a claim for securities fraud if his loss was caused by the materialization of a known risk." (Def.'s Mem. (LC), at 13.) Because the market understood, on May 14, 2001, that Turkey was experiencing significant financial troubles, and further "would have understood any risk unique to dealing with the Uzans," the market "knew all information necessary to digest the risk that Telsim would not pay." (*Id.* at 14.) Defendants further attempt to buttress this conclusion by pointing to the fact that "the market barely reacted" after the disclosure of the missed payment, and analysts expressed a lack of surprise or concern over the announcement. (*Id.*) The court is not persuaded.

First, there appears to be little authority supporting Defendants' proposed rule. The Second Circuit case that Defendants cite as its source, *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996), does not address causation at all. In *Olkey*, the court held that cautionary statements in a prospectus precluded the plaintiffs' claim that the prospectus misrepresented both the investment strategy and the risks involved in the investment. *Id.* at 8-9. Because the prospectuses offered "extensive and detailed cautionary language" that "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed," the prospectuses thus "contained no material misstatements or omissions of fact." *Id.* at 5, 9. Thus, *Olkey* and similar cases stand for the proposition that certain statements are not material, i.e., actionable for § 10(b) purposes, if the defendants have explicitly disclosed the risk that the plaintiff contends was concealed. *Id.* at 5; *see In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *6-9 (N.D. Ill. June 29, 2001) (cautionary language and "numerous frank disclosures" of business and investment risks in SEC filings of an e-commerce company precluded defendants' "puffing" statements to the media from rising to the level of actionable false and misleading statements). That is not at all the case here,

where the issue is loss causation rather than the materiality of Defendants' alleged misstatements or omissions; *Olkey* and *In re Allscripts* thus address a wholly different context. Moreover, in contrast to those cases, Defendants here do not contend that they explicitly disclosed the risks that Lead Plaintiff alleges were concealed; rather, Defendants argue that the market as a whole somehow gained awareness of those risks from other sources.

Defendants cite to no Seventh Circuit authority in support of the notion that loss causation is precluded as a matter of law by the "materialization of a known risk," and this court can locate none from this or any other circuit or district court. Defendants' position appears to be a variation of the "truth-on-the-market" defense, in which a defendant contends that investors were actually informed of the risks they alleged were concealed because "the full truth had reached the market" despite any shortcomings in a defendant's disclosures. *Asher*, 377 F.3d at 734 (holding truth-on-the-market defense unavailable at the pleading stage); *see also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) ("Prompt incorporation of news into stock price is the foundation for the fraud-on-the-market doctrine and therefore supports a truth-on-the-market doctrine as well."). Once again, the typical context is materiality rather than loss causation. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (truth-on-the-market doctrine provides that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market"). Indeed, Defendants asserted this very defense in moving to dismiss this action, arguing that the cautionary statements in Motorola's SEC filings, regarding vendor financing, rendered immaterial certain alleged misstatements or omissions concerning the Telsim debt; the court rejected Defendants' argument. *See In re Motorola*, 2004 WL 2032769, at *26. In the present context, Defendants do not contend that the market in fact knew the entire "truth" of the Telsim situation as of May 14, 2001; rather, Defendants contend that the market, by some means, knew of and had digested the *risks* inherent in the Telsim loans, so that Telsim-related negative news could not have impacted Motorola's stock price. The

court is not persuaded that a variation of the "truth-on-the-market" doctrine operates to preclude loss causation where the market is allegedly aware of risks, rather than facts that have yet to materialize, and where such awareness did not result from explicit disclosures from a defendant. *See Ganino*, 228 F.3d at 167 (defendant can use the truth-on-the-market doctrine to show that its misrepresentations did not affect share price because "the truth of the matter was already known"; however, the "truthful corrective information . . . must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements.") (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

Even if Defendants' "materialization of a known risk" theory or some similar variation of the "truth-on-the-market" defense were applicable in the loss causation context, however, summary judgment would be inappropriate here. Defendants argue that because the market was aware of the Telsim risks, the fact that Telsim missed a $728 million payment was not news at all and thus could not have affected the market. But even if the market, by May 14, 2001, knew that the $1.7 billion Telsim loan was particularly risky in light of the economic conditions in Turkey and the poor reputation of the Uzans, the market did *not* know of the specific risk that Telsim would fail to make a $728 million payment. Indeed, it was not public knowledge at all that this payment, in this amount, was even due by April 30. For the market to have totally "digested" the Telsim risks, such that disclosure of the fact that Telsim had apparently defaulted on nearly half its debt would have no effect, the market would have had to, before learning of the missed payment, essentially given up all hope that the $1.7 billion debt would ever be repaid.

On this record, such a notion is simply not established as a matter of undisputed fact. It is true, as Defendants contend, that some analysts were nonplused by the news. One analyst quoted by Defendants' expert, for example, called the news "unsurprising," and another was "not overly concerned." (Beaver Report ¶ 56.) The court is not persuaded that these analysts' opinions

86

conclusively establish that the market, by May 14, 2001, had entirely digested the risk of Telsim's missing a massive payment due on April 30—the existence of which was not even known—or of Motorola's entirely writing off the Telsim debt.  Indeed, one of the analysts quoted by Defendants held out hope that the loans could be salvaged: "we expect the company to successfully restructure the financing agreement."  (Beaver Report ¶ 56.)  At the very least, therefore, the question of what risks the market had digested as of May 14, 2001 is a question of fact that a jury is entitled to resolve.  *See Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1992 WL 380929, at *8 (N.D. Ill. Dec. 10, 1992) (summary judgment inappropriate where defendants asserted truth-on-the-market defense for loss causation, arguing that market professionals knew the true facts of risks allegedly concealed by defendants, because there was a "factual dispute about how widespread the knowledge was.")

As noted, there is a genuine dispute of fact as to whether the actual share price decline of 4.7% on May 15, 2001 was statistically significant once isolated from market and sector factors. That issue—whether Lead Plaintiff suffered an actual economic loss as a result of this share price decline—will be resolved at trial.  With regard to loss causation, Lead Plaintiff has, at this stage of the proceedings, produced enough evidence from which a reasonable jury could conclude that the news of the missed Telsim payment contributed to the May 15 share price decline.

### D.    The June 18 disclosure

Lead Plaintiff's final "partial corrective disclosure" is Motorola's June 18, 2001 announcement, as reported in the *Financial Times (London)*, that Telsim had failed to cure the missed payment and that Motorola was prepared to pursue legal options against Telsim.  (Pl.'s Resp., at 15.)  Defendants do not dispute, for purposes of this motion, that Motorola shares experienced a statistically significant residual price decline of 5.97% on June 18, 2001.  (Def.'s 56.1 Addnl. Resp. ¶ 70.)  Defendants contend that the June 18 announcement was not a "corrective disclosure," however, because it again reflected the mere materialization of a "known risk."  (Def.'s

Mem. (LC), at 15.)  Defendants further argue that they are entitled to a judgment as a matter of law as to any disclosure on June 18 because the CAC did not allege June 18 as a "corrective disclosure date," and because June 18 falls outside the Class Period.  (*Id.*)

For the reasons explained above, the court is not persuaded that Defendants' "materialization of a known risk" theory is indeed the law in the loss causation context.  Even if it were, it would not operate in Defendants' favor here.  Defendants argue that once the market had been informed on May 14, 2001, that Telsim had missed the $728 million payment, "it was clearly a known risk by that point that Telsim would continue not to make the payment for an additional 30 days."  (*Id.*)  This argument ignores the fact that the May 14 Filing had assured investors that Motorola was "currently in discussions with Telsim to reschedule payments, including the April 30th payment."  (May 14 Filing, at 35.)  Indeed, as noted, one of the analysts, quoted by Defendants' expert as showing little concern in reaction to the May 14 news of the missed payment, expected Motorola and Telsim to "successfully restructure the financing agreement."  (Beaver Report ¶ 56.)  The June 18, 2001 announcement, informing investors that discussions had failed, that no restructuring was forthcoming, and that litigation was likely to ensue, was clearly "new news" that had not, on the basis of Defendants' own evidence, been anticipated and digested by the market prior to that date.

Although Defendants maintain that "it is truly extraordinary . . . to contend that a corrective disclosure occurred outside of the class period," (Def.'s 56.1 ¶ 15), Defendants cite to no authority suggesting that such an allegation is inappropriate, let alone precluded as a matter of law.  Indeed, the district court in *In re Dura Pharmaceuticals, Inc. Securities Litigation*, on remand from the Supreme Court's decision, explicitly rejected Defendants' argument.  452 F. Supp. 2d 1005, 1022-23 (S.D. Cal. 2006).  There, the amended complaint alleged four "corrective disclosures"occurring as late as December 1998, even though the class period had ended for plaintiffs who purchased shares as of February 1998.  *Id.* at 1021-22.  The court found "some appeal to requiring a corrective

88

disclosure to occur at the end of the class period," as otherwise, non-class-member investors who purchased securities after the end of the class period would suffer the same alleged loss from a later corrective disclosure, but would be unable to recover with the class. *Id.* at 1023. But the court found nothing in the Supreme Court's decision in *Dura* to indicate that corrective disclosures must be within a class period, and held that the amended complaint had adequately alleged loss causation despite the fact that the alleged disclosures had occurred months after the class period. *Id.*

Here, too, Defendants articulate no rationale, and the court can see none, for requiring that any "corrective disclosure" be within the Class Period. *Dura* does not so mandate, and the court is aware of no authority that imposes such a rule. The class in this case consists of those investors who purchased Motorola securities through May 14, 2001; it does not define that class as those who suffered losses prior to that date as well. Although a class member who sold Motorola securities before June 18 will of course have suffered no loss attributable to any share price decline on that date, that should not preclude recovery for class members who held shares and indeed suffered the alleged loss.

Finally, Defendants contend that any reliance on the June 18 announcement for loss causation purposes is improper under *Dura* because June 18 does not appear in the CAC. (Def.'s Mem. (LC), at 15.) *Dura* did require a securities fraud complaint to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." 544 U.S. at 347. Here, however, by stipulation of the parties, the pleadings will be deemed amended to reflect the evidence contained in the Final Pretrial Order concerning what Lead Plaintiff expects to prove at trial. Order of 2/1/2006 (entering Stipulation With Regard to Discovery Prior to Trial). Defendants will not be prejudiced by Lead Plaintiff's use of the June 18 announcement to show loss causation.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (statute of limitations)

(264) is denied, and Defendants' motion for summary judgment (loss causation) (260) is granted in part and denied in part.  With respect to the loss causation motion, Lead Plaintiff may not, at trial, use Motorola's earnings warning of February 23, 2001 to show loss causation; but Defendants' motion is otherwise denied.

ENTER:

Dated: February 8, 2007

REBECCA R. PALLMEYER
United States District Judge